**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.: 16-CR-55 (RBW)** |
| | : | |
| **v.** | : | |
| | : | |
| **ROBERT KELSEY** | : | **SENTENCING**: December 19, 2016 |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case.  For the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of incarceration of 600 months, to be followed by a lifetime of supervised release, with the conditions recommended by the United States Office of Probation, including sex offender assessment and treatment, computer and internet monitoring, and no unsupervised contact with individuals under the age of eighteen.  The defendant is also statutorily required to register as a sex offender for life.  In support of this recommendation the government relies on the following points and authorities, as well as such other points and authorities as may be cited at the sentencing hearing.

I.    **BACKGROUND**

A.    **Procedural Posture**

The defendant was arrested on May 4, 2015, in the District of Columbia.  He was detained without bond pending a combined preliminary and detention hearing that was continued

1

several times during the course of plea negotiations, and ultimately waived.  A Grand Jury sitting in the District of Columbia returned an indictment on March 31, 2016, charging the defendant with one count of Transportation of Minor with Intent to Engage in Criminal Sexual Activity (Count I), in violation of 18 U.S.C. § 2423(a); one count of Aggravated Sexual Abuse of a Child, in violation of 18 U.S.C. § 2241(c) (Count II); and two counts of First Degree Sexual Abuse of a Child with Aggravating Circumstances, in violation of 22 D.C. Code §§ 3008, 3020(a)(1) (Counts III and IV).  The matter was set for trial on August 21, 2016, on which date a jury was empaneled, and trial commenced before United States District Judge Reggie B. Walton.  The jury returned a unanimous verdict on August 29, 2016, finding the defendant guilty of Counts 1 through 3 of the Indictment.[1]  The Court ultimately set sentencing for December 19, 2016.

### B.   Statement of Offense

The defendant, Robert Kelsey, met the victim, S.H., on the social-media networking site "Instagram" in July of 2014.   The defendant, a then 27-year-old man, trolled the internet to find an unsuspecting child and sent her a request to connect with her via Instagram.  The defendant had never met S.H., who was then only eleven years old.  S.H. began communicating with the defendant online, and, although S.H. initially expressed discomfort with providing the defendant her "KiK"[2] username because she did not know him, the defendant ultimately persuaded the victim to do so.  After sending S.H. a KiK message and opening a dialogue, the defendant spent several weeks exchanging messages with the victim.  Defendant fabricated his identity during

---

[1] Count Four of the Indictment was dismissed on the defendant's motion at trial.
[2] KiK is a mobile phone application that allows users to exchange text messages through the application.

these communications, leading S.H. to believe he was a nineteen-year-old teenager named "Kevin."

S.H., an 11-year-old, believed defendant was who he said he was. After chatting with the defendant over KiK for several days, S.H.'s trust deepened and she provided him her phone number. The two began communicating over text message and, on one occasion, a cellular phone application called "Ovoo."[3] Over the course of these electronic communications S.H. informed the defendant that she was eleven years old, that she was an elementary school student, and that she lived in Maryland. The defendant expressed to the victim that he was interested in having sex with her. She told him that she had never had sex before.

Defendant used his communications with S.H. to manipulate her into believing his manufactured identity and groom her to engage in sexual acts with him. His efforts included convincing S.H. during the course of an Ovoo call – one in which the defendant did not display himself on the video feature – to disrobe for him and touch her own genitalia on video so the defendant could watch. Ultimately, the defendant convinced S.H. to tell him where she attended summer school and made arrangements to pick her up there so that he could engage in sex acts with her. When S.H. told the defendant her summer camp was at Kingsford Elementary School, the defendant researched its location and made arrangements to drive there from his home in D.C. on July 25, 2014.

---

[3] Ovoo is a cellular phone application similar to "Facetime" in which users can engage in video-conference calling with one another.

That day, S.H.'s mother dropped her off at her summer camp like she had each of S.H.'s older siblings for years before, and like she had S.H. every day that summer. S.H.'s parents expected that while S.H. was at camp, she would spend the day as usual – playing kickball, spending time with the other campers her own age, and participating in other camp activities. However, at lunch time on that day, the defendant arrived at the camp with different plans.

When the defendant arrived at Kingsford Elementary School, he found himself outside of the doors that were locked to protect the children inside. Undeterred, the defendant spoke to S.H. by phone, asking how he could get inside the camp. S.H. told him which door was open. When the defendant came into the gymnasium where the children were eating lunch he was stopped by a camp counselor. Nonplused by the scene around him – kids ranging from eight to twelve-years-old eating their lunches in a school gymnasium – the defendant continued to lie about who he was in order to get access to S.H. He told the counselor who stopped him that he was S.H.'s cousin and that he was there to pick her up. Succeeding in his deception, S.H. was allowed to leave with the defendant, and followed him out to the parking lot and got into his car.

Without conversation or delay, the defendant immediately began kissing and touching S.H. all over her body. He continued to do so as he drove her away from the safety of her summer camp to his home in the District of Columbia, stopping along the way as he drove, continuing to kiss and fondle her, reaching inside her underwear and rubbing his fingers on her vagina. Not far from the school, S.H. was no longer able to identify precisely where she was, but watched out the car window as the defendant drove her past the "Welcome to D.C." sign along

their route.   The defendant drove S.H. into his neighborhood, which was unfamiliar to S.H., parked the car, and led her to his house.

The defendant took S.H. into his home; no one else was inside.  After leading her upstairs to his room and leaving her alone briefly, the defendant came into the bedroom, closed the door behind him, and removed S.H.'s leggings and underwear.  With S.H. lying on her back on a mattress on the floor, the defendant proceeded to penetrate S.H.'s vagina with his penis from multiple positions, instructing her how he wanted her to position herself, regardless of S.H.'s discomfort during the assault.  After he ejaculated, the defendant and S.H. put their clothes back on and the defendant drove S.H. back to her summer camp, saying nothing to her on the return drive.  While in the car on the way back to camp, S.H. received a message from one of her fellow campers informing her that her father was at the camp looking for her.

When the defendant arrived back at the summer camp with S.H., he dropped her off a safe distance away so as not to be seen, and sped away. When S.H. walked back toward the entrance to the camp, she came upon her father, Aaron Mason, who was beside himself with worry and anger that his youngest daughter was not at the camp where her mother had left her just that morning.  Mr. Mason, frantic with concern and angry at the camp for allowing S.H. to leave with a strange man, immediately demanded to know where his daughter had been.  S.H., in tears herself, told her father she had left the camp with a man she knew as "Kevin" and that he had sex with her at his house in D.C.

Mr. Mason immediately reported what had happened to police who were on scene. S.H.'s parents took her to the police station to make a report, and then to the Prince George's

County Hospital so that a sexual assault nurse examination ("SANE" exam) could be completed. S.H. was treated at the hospital and attempted to assist detectives in locating her assailant. During the course of her SANE exam, swabs were taken for evidence, and, ultimately, semen was recovered on S.H.'s vaginal/cervical and anal/perianal swabs. DNA analysis confirmed that that semen belonged to the defendant.

In the interim, when police contacted the defendant after the assault at the telephone number that S.H. provided from her telephone, the defendant boldly maintained that it was his fabricated alter-ego, "Kevin," whom the police should contact. The defendant continued to assert for days, including during two in-person meetings with police that he had picked S.H. for "Kevin," driven her to D.C. and had no idea what had happened as a result. Even when the DNA results were returned, the defendant did not budge from his fabricated story.

## II.     SENTENCING CALCULATION

### A.     Statutory Penalties

The offense of Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, in violation of 18 U.S.C. § 2423(a), carries a mandatory minimum sentence of 10 years imprisonment and a maximum sentence of life imprisonment; a fine of up to $250,000; and a term of supervised release of not less than 5 years up to life. See PSR at p. 1, ¶ 96. Pursuant to 18 U.S.C. § 3663A, restitution is mandatory. PSR ¶ 117.

The offense of Aggravated Sexual Abuse of a Child, in violation of 18 U.S.C. § 2241(c), carries a mandatory minimum sentence of 30 years imprisonment and a maximum sentence of life imprisonment; a fine of up to $250,000; and a term of supervised release of not less than 5

years up to life.  See PSR at p. 1 and ¶ 96.  Pursuant to 18 U.S.C. § 3663A, restitution is mandatory.  PSR ¶ 117.

The offense of First Degree Child Sexual Abuse with Aggravating Circumstances, in violation of 22 D.C. Code § 3008, 3020(a)(1), carries a maximum sentence of lifetime imprisonment without the possibility of release; a fine of up to $125,000, and a mandatory term of supervised release of not less than 5 years.  See PSR at p. 1 and ¶ 99.  Pursuant to 16 D.C. Code § 711, the court may order restitution.

Pursuant to 18 U.S.C. § 3013(a)(2)(A), there is a mandatory $100 special assessment fee for each felony conviction payable to the Clerk of the United States District Court for the District of Columbia.  See PSR at ¶ 112.

The defendant is also subject to the Justice for Victims of Trafficking Act of 2015, which requires the Court to assess $5000 per count in addition to the assessment imposed under 18 U.S.C. § 3013, on any non-indigent person convicted under, among other provisions, 18 U.S.C. §§ 109A, 110 or 117.  See PSR at ¶ 113.

### B.    Guidelines Range

Counts 1 and 2 group together pursuant to United States Sentencing Guideline ("U.S.S.G.") § 3D1.2(b).  See PSR at ¶ 25.   Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the Group is the offense level that produces the highest total offense level, which here is U.S.S.G. § 2G1.3.  See Id.  The presentence report writer calculated the defendant's Guidelines Sentencing Range as follows:  a base offense level of 28, pursuant to U.S.S.G. § 2G1.3.  See PSR at ¶ 26.  The PSR writer applied four specific offense characteristics: (1) the

defendant knowingly misrepresented his identity to facilitate the travel of a minor to engage in prohibited sexual conduct, pursuant to U.S.S.G. § 2G1.3(b)(2)(A) (+2 levels); (2) the offense involved the use of a computer or an interactive computer service to persuade, induce, entice, coerce, or facilitate the travel of a minor to engage in prohibited sexual conduct, pursuant to U.S.S.G. § 2G1.3(b)(3)(A) (+2 levels); (3) the offense involved the commission of a sex act or sexual contact, pursuant to U.S.S.G. § 2G1.3(b)(4)(A) (+2 levels); and (4) the offense involved a minor under the age of 12, pursuant to U.S.S.G. § 2G1.3(b)(5) (+8 levels). Id. at 27-30.

There are no additional adjustments that apply. See id. at 31-36. Accordingly, the United States agrees with the PSR writer that the Total Offense Level is 42. Id. at ¶ 37.

The government agrees with the PSR that the defendant has a criminal history score of eight and is in the Criminal History Category IV as to Counts I and II. See PSR at ¶ 45. This includes six criminal history points (PSR ¶ 43) resulting from defendant's prior criminal convictions, and an additional two points pursuant to U.S.S.G. § 4A1.1(d) because the defendant committed the instant offense while on supervised release in 2006 FEL 0060 and on probation supervision in CT111688X. As to Count III, the United States agrees that the criminal history score is 4, which establishes a criminal history category of D. Id. at ¶ 47.

With an offense level of 42 and a Criminal History Category of IV, the defendant's sentencing guidelines range for Counts I and II is 360 months to life, and a fine range of $25,000 to $250,000. See PSR ¶ 114.

The United States agrees with the PSR writer that the applicable sentencing guidelines range under the District of Columbia Voluntary Sentencing Guidelines for Count III, an M3

8

offense, with the defendant's criminal history score in category D is 126-216 months incarceration.  See PSR at ¶ 94.

## III.   GOVERNMENT'S RECOMMENDATION

### A.   Application of the Federal Sentencing Guidelines

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1).  Booker, 125 S. Ct. at 756.

In post-Booker cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range.  See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").  After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  Id.  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing

Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

### B.   Basis for the Government's Recommendation

Given the particular circumstances of this case, the government submits that incarceration for a period of 600 months, lifetime supervision, and the specific conditions of supervision recommended by the United States Office of Probation, are appropriate and warranted.

The defendant's conduct was calculated, premeditated and predatory.  The defendant went online, sought out his 11-year-old victim, manipulated her into believing he was someone he was not, and used the trust he built with the child to lure her from a place of safety – her elementary school summer camp – to his home so that he could sexually abuse her.   The defendant preyed on a child who had not yet had enough experience in the world to realize that she could not trust a person she met online to be who he said he was.  The defendant took advantage of S.H.'s childlike naiveté in the most opportunistic way, manipulating her to get exactly what he wanted.  As was evident from the emotionally searing trial testimony of the victim and her father, the damage the defendant caused in the victim's life and the lives of her parents is incalculable.  The pain and the trauma that S.H. experienced at the defendant's hand was palpable even as she sat on the witness stand at thirteen years old, crying and attempting to recount the way the defendant manipulated her into doing things that she looked back on with regret and embarrassment.

The defendant's sexual assault of the victim, his planning and conniving to create the circumstances of that assault, and his bold efforts to cover his tracks in the aftermath of his crime, should be seriously punished of their own accord.  However, the defendant's predatory conduct toward the victim in this case does not stand alone.  It occurred in the context of a life of criminal activity for which the defendant has consistently returned no matter the effect he has on the lives of others or the community around him.

Given the defendant's conduct in this case, which fits into a larger pattern of predatory criminal conduct that has spanned the defendant's entire adult life, a sentence that incapacitates him for the bulk of the rest of his life is appropriate and necessary.

    1.        **The Nature and Circumstances of the Offense**

The nature and circumstances of the crimes committed by the defendant are appalling. The Court heard at trial the background facts whereby the defendant sought out a child victim online, manipulated her into believing he was a teenage boy, created an opportunity to get the child away from her place of safety, and sexually abused her.  The Court also heard how, in the aftermath of assaulting S.H., the defendant continued to hide who he was, convinced that he could outsmart detectives and lie his way out of any accountability for his crimes.  There are several aspects of the defendant's crime that bear keeping in mind when considering an appropriate sentence for the defendant's crime.

First, the circumstances by which the defendant gained access to S.H. – by trolling the internet and finding a child who, from the very beginning, told him she was only eleven years old and in elementary school, and whose resolve not to give her number to a stranger crumbled

quickly with prodding by the defendant – are particularly egregious.  The defendant cannot claim that, in committing his crimes, he made a momentary mistake or committed a crime of opportunity when the chance presented itself.  Rather, the defendant engaged in a premeditated effort to find a child and to follow through with a calculated plan to victimize her.  He created his own opportunity over the course of weeks of planning, lying and effort.

The defendant's choice of medium to initiate his communications with S.H. allowed him to hide who he was.  Through the anonymity afforded him by a messaging application, the defendant was able to hold himself out as a teenager rather than a grown man with a small child of his own.  Even when he called S.H. on the Ovoo video-calling application, the defendant hid himself, displaying to S.H. only a black screen while he asked her to take her clothes off and – as she described at trial through tears of shame and humiliation – show him her genitalia and masturbate for him.  The defendant believed his ability to conceal who he really was leading up to, during, and in the aftermath and investigation of his crime would protect him from ever being held accountable for what he knew was wrong and illegal.

In addition to premeditating his crime, the defendant demonstrated an ongoing determination to carry through with his plan, and a true commitment to his course of conduct.  As became evident at trial, the defendant had many, many moments when he simply could have changed course or chosen a different path.  Chances to rethink what he was doing and to consider the well-being of the child he preyed upon were plentiful.  At any moment when he conversed with S.H., as more and more information about her age and lack of sophistication was presented to him – that S.H. was eleven, that she was a summer camper at an elementary school, that she

had never had a sexual experience before – the defendant could have changed course.  At any point while he was adducing the address of her summer camp, driving there, or making his way through a cafeteria filled with eight to twelve-year-old children sitting at chaperoned tables eating their lunches, the defendant could have changed course.  At any point after he laid eyes on S.H. – an obvious child, clad in childlike attire and needing permission to leave her camp, the defendant could have changed course.  And, at any point while he was touching and feeling her body, taking off her clothing, or telling her how to position herself for him, the defendant could have changed course.  But the defendant was never deterred.  Defendant never stopped, dropping S.H. off a safe distance from her camp, not saying as much as goodbye to her, so that he would not be caught doing what he knew was inexcusable and wrong with an eleven-year-old child.

The defendant's cunning and his efforts to conceal his true identity did not end there.  The defendant's bold behavior during his criminal course endured not just while deceiving and taking advantage of an eleven-year-old-child, but also in confronting the investigation into his wrongdoing with utter confidence that he would simply lie his way out of trouble.  The defendant agreed to meet with detectives, maintained his fabricated story about a friend named "Kevin," the purported "real" perpetrator, and volunteered to give a fabricated statement to police.  Robert Kelsey believed that he could not only deceive and outwit a child, her parents, and the adults charged with her supervision at camp, but also the police charged with investigating him.

Perhaps most telling, having communicated with S.H. for weeks, encountered her in person, and sexually assaulted her, the defendant appeared to have had no concern at any point

that she might tell anyone what had happened.  Defendant's confidence on this score illustrates his certainty in the power he – a grown man – had over this child, and his confidence that he could evade the consequences of his conduct.

The defendant's conduct speaks volumes about his willingness to harm others to get what he wants.  Of course, the damage the defendant inflicted through his actions lies nearly entirely S.H. and her family.  What makes defendant's conduct so predatory is that S.H.'s life circumstances and age no doubt played into the defendant's calculated decision to take advantage of her.

S.H. was only just beginning to experience the world at the time of her assault.  As she testified at trial, and as she told the defendant at the outset of her communications with him, S.H. had never had a sexual experience before, and was just starting out on the course of learning what it means to have an intimate or sexual experience with a man.  Learning about one's sexuality and attempting to navigate development into early adolescence and, eventually, adulthood is difficult for even the most well-situated, grounded, and confident child.  The very beginning of that process, where lessons have yet to be learned and experiences gained, is, for so many kids, entirely overwhelming even when the process is not marred by trauma or victimization.  The child on whom Robert Kelsey decided to prey was one at the beginning of her youth, still attempting to carve out a place in the world, and for whom, going forward, the journey through adolescence will forever be tainted with trauma that no child should have to manage.

Particularly devastating for the victim in this case was the damage done to her sense of self, her confidence, her trust in others, and to her relationship with her parents. S.H. showed tremendous courage telling her father what had happened, reporting her abuse to police, spending over a year meeting with FBI agents and prosecutors preparing for the emotional tumult of trial, and ultimately getting on the witness stand in front of a courtroom filled with strangers and describing her experience. S.H. had the strength to do so with her abuser sitting feet away while she described the assault, including the parts for which she blamed herself and the parts that were intimate and humiliating.

S.H. has now spent nearly two years trying to heal. The defendant's refusal to acknowledge his wrongdoing has thrust upon S.H. the complete burden of reconciling the victimization. As the Court will recall from the trial, S.H. is experiencing conflicting emotions about what the defendant did to her. She finds it difficult to reconcile the person she believed the defendant with the man who deceived her, raped her, and discarded her.

S.H. blames herself for not finding a way out of the situation, stating in her victim impact statement: "I blame myself for everything even though people always tell me that it is not my fault because I was only 11." See, Victim Impact Statement of S.H. (herein "VIS," submitted separately under seal). S.H. questions whether her family looks at her differently, and has suffered in her relationships with even the caring, loving men in her life, like her father. S.H. describes in her victim impact statement that her parents have become more watchful, their relationship has suffered strain, and her "brother and sisters treat me differently and worried

15

something would happen to me." Id.  S.H. even had to change schools when people found out what had happened and began to treat her differently there. Id.

Perhaps worst of all, S.H. has had to deal with her own issues learning to trust people again and living in fear of others. Heartbreakingly, at only age eleven, S.H. was stripped of her innocence and sense of security in the world. She has written, "I do not feel safe anymore. I am scared to talk to people on the internet because I do not know if they are real or not. I used to go to summer camp and now I cannot go anymore. I do not go outside like I used to. I just stay at home and keep to myself. When I am out in public I always look around me to make sure no one is watching." Id.  These words demonstrate the price that S.H. has paid for the defendant's victimization of her; her childhood is forever altered by the defendant's crimes. As S.H.'s mother, Ms. Mason, observed, the defendant "took not only her body but also her spirit." Victim Impact Statement for Parents of Child Victims, filed separately under seal (herein "Parental VIS"), at 1.

Additionally, as the Court could no doubt see at trial, the defendant's criminal conduct has had a rippling effect that extends beyond S.H. to her family. S.H.'s mother observed that, "The criminal acts committed by this predator have been devastating to our family. The loving bonds we all once shared have been strained and some broken." Parental VIS at p. 2. S.H.'s parents ask themselves whether they failed to protect their child or missed clues that could have prevented S.H.'s victimization.  Mr. Mason testified at trial that he checked his daughter's cellular phone usage as best he knew how at the time, and had complete trust that, when he dropped his "baby girl" off at the same summer camp where each of his sisters before her had

gone, she was completely safe and would enjoy the day engaged in the child-like activities provided her on school grounds.  S.H.'s parents were devastated to learn that a predator could access their child so easily, and they worry about how best to assist S.H. with her healing.

### 2.    The Defendant's History, Characteristics, and Cooperation

A sentence within the guidelines range and well above the mandatory minimum is warranted by the defendant's refusal to take responsibility for his criminal conduct despite the overwhelming evidence of his guilt and the fact that defendant's conduct was not the product of a single, isolated moment of bad judgment.  On the contrary, defendant's conduct in this case was premeditated and is part of a larger pattern of conduct in which the defendant pursues his own interests over those of the people he victimizes or society at large.

The defendant's career as a criminal began at an early age and with a bold start.  At only eighteen years of age, the defendant was involved in killing a man in an act of vengeance.  The defendant was shown leniency by the sentencing court in that case and was sentenced to only 30 months of imprisonment and a short 3 years of supervised release.  Rather than take the opportunity in his youth to reflect on his wrongful conduct and reform his conduct, the defendant continued on a path of criminal behavior.  While still incarcerated, the defendant had to be disciplined when a homemade weapon was found inside his locker.  When Defendant was ultimately released he could not refrain from violating his release conditions.  Within a year of his release, he was re-arrested and shortly thereafter was testing positive for illegal drug use, with his supervised release ultimately being revoked when the defendant was re-arrested for a second time.

The defendant's second conviction resulted from that arrest – one for auto theft and fleeing and eluding police.  The defendant's course of conduct resulting in that conviction was, again, a dangerous one—the defendant stole an innocent woman's car from a parking lot, then led police on a high speed chase on public streets that only ended when defendant struck a police car.  Fortunately, no bystanders were injured.  The defendant again received a lenient prison sentence.  Within two years of his release defendant was re-arrested again, first in Maryland for disorderly conduct, and then, before that case was resolved, on the instant charges.

The circumstances of the defendant's pending case in Maryland are not adequately reflected in the charge.  While the defendant was arrested for blocking his child's mother's vehicle on the highway, his conduct arose in the context of a domestic dispute in which the defendant tried to impede his child's mother from leaving after a dispute and attempted to restrain her while the defendant's child was in her care.

This history of criminal conduct and victimization of others is difficult to explain given the defendant's reported upbringing and circumstances.  The defendant reported having a happy and "normal" childhood, enjoying the support of his family and no issues of neglect, abuse, deprivation or other issues.  See PSR at ¶ 54.  The defendant appears to have been a good student, involved in sports, and but for the consequences of his criminal conduct, had the ability early in life to maintain work and be a productive member of society.  Nonetheless, rather than pursue such a course, the defendant instead chose a life on the streets committing crimes and victimizing others.  Where many offenders at sentencing point to adversity in their own

upbringing, a lack of resources or their own victimization as providing some explanation for their antisocial conduct, the defendant, by his own report, suffered from no such difficulties.

Equally troubling is defendant's lack of any demonstrated acceptance of responsibility for his crimes.  For example, rather than assist S.H. with her healing and spare her, and by extension her family, the burden of a trial, the defendant has sought only to compound S.H.'s suffering by continuing to deny any wrongdoing.   From the inception of the case defendant disputed the facts and refused to acknowledge his responsibility for the sexual assault and sexual exploitation of S.H.  This was despite overwhelming evidence, including his own admissions and DNA evidence, that he committed the acts for which he was ultimately convicted.

The United States submits that the record supports a period of incarceration at the high end of the guidelines range because the defendant's steadfast refusal to take responsibility for his criminal conduct coupled with his efforts to obfuscate the truth, demonstrate a disturbing lack of insight into his deviant behavior.  A refusal to acknowledge his wrongdoing suggests that he is not even in the contemplation stages of changing his behavior and thus he remains a significant danger to minors.   This factor alone militates strongly in favor of a significant period of incarceration to protect minors in the community.   The government hopes that, during his incarceration, the defendant will engage in therapeutic interventions to help him identify the cause of his sexual preference for minors and his inability to refrain from criminal activity, teach him the self-discipline required not to act upon those urges, and assist him with becoming a future law-abiding member of society should he ever re-enter the community.

In the meantime, S.H., with family support and therapy, will attempt to come to terms with the life-altering crime committed by the defendant against her, but it likely will be a lengthy and slow struggle that will far exceed any sentence that the defendant will serve.

### 3.     Punishment, Deterrence, Protection, and Correction

A sentencing court "shall impose a sentence sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The government's recommended sentence is sufficient, but not greater than necessary in the context of this particular case.  The defendant's conduct for which he was convicted at trial, as well as the surrounding relevant conduct, have inflicted extreme harm to the victim and her family.  The community, and most especially vulnerable, young girls like the victim, must be protected from the kind of ongoing, premeditated, abusive conduct engaged in by the defendant. The kinds of crime committed by the defendant warrants incapacitating him for a long period of time not only to protect society, but also to punish him appropriately for his conduct.

This particular defendant may well be impossible to deter.  The defendant has spent his entire adult life in and out of prison.  His criminal convictions include convictions for auto theft, participation in a murder, and, now, sexually abusing a child.  Defendant has in the past been ordered into treatment, subject to strict supervision, ordered to perform community service thrust

upon him and, at least once, ordered to pay restitution to one of his victims.  None of this seems to have deterred the defendant from continuing on his path of crime and victimization.  In this case, as has been the case when serving prior sentences, the defendant had not even completed his sentence for the last course of criminal conduct before he embarked on a new course of criminal conduct.  The sentences the defendant has been ordered to serve in the past have done nothing to deter him from a life of crime.

A lesser sentence would fall short of deterring the defendant from future criminal conduct.  It is possible, of course, and perhaps at this stage even likely, that Mr. Kelsey is someone who simply cannot be deterred.  In that case, the Court's responsibility to protect the community from a predator requires incapacitating the defendant for as long as needed to ensure that goal.  The statutory mandatory-minimums in this case reflect the legislature's view that for some crimes, this approach is required. Certainly for an offender like this one, who appears undeterrable and who is still young enough to serve the mandatory minimum sentence and return to the community, even the mandatory-minimums are insufficient.

Having demonstrated himself to be a predator on society's most vulnerable victims – children – the Court's only option to protect the community is to incapacitate the defendant.  As S.H.'s mother put it: "This predator should be sentenced to the maximum possible sentence – life.  He should not be given another opportunity to commit criminal acts such as these against another child, not even his own.  The commission of these crimes after he had been paroled on previous felony crimes show he has no desire to live outside the prison system.  Our society and children will be much safer if he is never allowed to walk free again."  Parental VIS at 4.

To the extent that the Court's sentence allows the defendant to be returned to the community at some point in his lifetime, a requirement of lifetime supervision, with specific conditions recommended by the probation office, is crucial to ensuring individuals in whatever community ultimately hosts the defendant upon his release are protected. Lifetime supervision also will provide the defendant the opportunity to receive treatment and potentially reduce the likelihood that he does not commit similar offenses in the future.

4. **Available Sentences**

Given the guidelines range applicable to the defendant, he should be sentenced to a term of incarceration. The defendant is in Zone D of the Guidelines and thus he is not eligible for a probationary sentence.

In addition, the court should impose a lifetime term of supervised release, which is appropriate to ensure the defendant's participation in sex offender treatment and, most critically, to safeguard the community through ongoing monitoring. The government believes that the defendant's conditions of release should include the statutorily required sex offender registration and computer search and monitoring. The defendant used electronic devices to search out a victim to sexually abuse. The defendant's known sexual interest in minors and his use of electronic devices to contact minors, including when the defendant was told and clearly knew the age of his victim, justifies monitoring his future use of electronic devices.

In addition, the defendant's conduct in this case demands that the defendant be required to undergo sex offender assessment and treatment, as well as a polygraph examination, to appropriately identify the defendant's needs and risks of reoffending. Given the nature of the

totality of defendant's relevant conduct and his hands-on abuse of S.H., it is clear that the defendant has a sexual interest in minors, and thus these measures are prudent and appropriate. Although the assessment would deprive the defendant of some liberty, that deprivation is more than reasonably necessary to achieve the statutory objective of providing treatment.

### 5. The Sentencing Guidelines

The sentence recommended by the United States does not create unwarranted sentencing disparity. Indeed, the 30-year mandatory minimum associated with the Aggravated Sexual Abuse of a Child charge (Count II), itself minimizes the risk of unwarranted sentencing disparities by narrowing the range to which a court can sentence a defendant who has engaged in this kind of conduct.

There are no directly comparable cases in this jurisdiction with which to compare the United States' proposed sentence. This case is unique in that the defendant: (a) committed an offense against a child under twelve, which carries a 30-year mandatory minimum; (b) has a very significant criminal history, including very serious felony convictions, and (c) was convicted after trial rather than as a result of a plea. However, when compared to the most serious offenses involving child victims, the sentence recommended by the government is in accorded with sentenced recently imposed in this jurisdiction. For example:

- In United States v. Rolando De La Rocha, 15-CR-94 (Boasberg), De La Rocha pled guilty pre-indictment to one count of Production of Child Pornography and one count of First Degree Child Sexual abuse under the D.C. Code for repeatedly filming himself performing oral sex on his girlfriend's 12-year-old daughter. The defendant accepted full

responsibility for his conduct, pled guilty early, was facing deportation, and was sentenced to 22.5 years incarceration.  There, defendant was facing a 15-year mandatory minimum and had no prior criminal record.

- In United States v. Andre Drew, 07-007 (Kessler), the defendant was convicted after trial of sexually abusing and producing child pornography using two young boys ages 8 and 13.  The defendant had two prior convictions for sexually assaulting underage boys.  The defendant was sentenced to 543 months (45.25 years), consecutive sentences to account for the two victims he abused.

### 6.    Restitution

The victim and her family have been advised of their right to seek restitution in this case. The government will submit any request for restitution so that the Court may make a final determination of any victim's losses pursuant to 18 U.S.C. § 3664, under separate cover.

24

IV.     **CONCLUSION**

WHEREFORE, for all of the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of imprisonment of 600 months, to be followed by a lifetime of supervised release, with the recommended conditions of supervision.     The government also recommends that the Court require the defendant to register as a sex offender for the rest of his life.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

/s/_____
Andrea Lynn Hertzfeld, D.C. Bar 494059
Kenya A. Davis
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7808
(202) 252-7059
Andrea.Hertzfeld@usdoj.gov
Kenya.Davis@usdoj.gov

<u>Certificate of Service</u>

I hereby certify that I have caused a copy of the foregoing to be sent by email to counsel for the defendant, Christopher Davis, this 12th day of December, 2016.

/s/_____
Andrea Lynn Hertzfeld
Assistant United States Attorney
D.C. Bar 494059
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7808
Andrea.Hertzfeld@usdoj.gov