UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**          :
                                       :
              **Plaintiff,**           :   Criminal Action
                                       :   No. 16-55
**v.**                                 :
                                       :
**ROBERT KELSEY,**                     :   December 19, 2016
                                       :   9:00 a.m.
                                       :
                                       :
              **Defendant.**           :   Washington, D.C.
                                       :
............................ :

**TRANSCRIPT OF SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE REGGIE B. WALTON,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:      **Andrea Lynn Hertzfeld, Assistant**
                            **U.S. Attorney**
                            U.S. ATTORNEY'S OFFICE FOR THE
                            DISTRICT OF COLUMBIA
                            Criminal Division -- Felony Major
                            Crimes
                            555 Fourth Street, NW
                            Washington, DC 20530
                            (202) 252-7808
                            Fax: (202) 353-7634
                            Email: Andrea.hertzfeld@usdoj.gov

                            **Kenya Davis, Assistant U.S.**
                            **Attorney**
                            U.S. ATTORNEY'S OFFICE FOR THE
                            DISTRICT OF COLUMBIA
                            Criminal Division -- Felony Major
                            Crimes
                            555 Fourth Street, NW
                            Washington, DC 20530
                            (202) 252-7808
                            Email: Kenya.davis@usdoj.gov

APPEARANCES:  Cont.

For the Defendant:          **Christopher Michael Davis, Esq.**
                            DAVIS & DAVIS
                            1350 Connecticut Avenue, NW
                            Suite 202
                            Washington, DC 20036
                            (202) 234-7300
                            Fax: (202) 830-0056
                            Email: Cmdavisdc@gmail.com

For the Probation           **Sheri Brandon, Probation Officer**
Department:

Court Reporter:             **Scott L. Wallace, RDR, CRR**
                            Official Court Reporter
                            Room 6503, U.S. Courthouse
                            Washington, D.C. 20001
                            202.354.3196
                            scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1        <u>**MORNING SESSION, DECEMBER 19, 2016**</u>

2   (9:21 a.m.)

3        MR. DAVIS:  Judge, I want to apologize to the Court and

4   the parties for my late appearance today.  I was actually in the

5   courthouse at 5 to 9.  It just took me a very long time to get

6   through the security line this morning.

7        THE COURT:  It's really not a problem because we didn't

8   have a court reporter anyhow, so...

9        MR. DAVIS:  Oh.  Well, again, my apologies to all

10  concerned.

11       THE COURTROOM CLERK:  Your Honor, this morning is the

12  matter of *United States versus Robert Kelsey*.  This is Criminal

13  Record 16-55.  I'd ask the parties to step forward and identify

14  yourselves for the record, please.

15       MS. HERTZFELD:  Good morning, Your Honor.  Andrea

16  Hertzfeld for the United States.

17       THE COURT:  Good morning.

18       MS. DAVIS:  And good morning, Your Honor, Kenya Davis for

19  the United States.

20       THE COURT:  Good morning.

21       MR. DAVIS:  And good morning, Your Honor.  Christopher

22  Davis on behalf of Robert Kelsey who's seated to my right.

23       THE COURT:  Good morning.  In preparation for this

24  sentencing, I did review the presentence investigation report

25  dated December 12th, 2016; also the government's memorandum in

1   aid of sentencing; also the defendant's memorandum in aid of

2   sentencing; and also there were two victim impact statements that

3   were submitted.

4        Was there anything else I should have reviewed in

5   preparation for the sentencing?

6        MS. HERTZFELD:  No, Your Honor.

7        MR. DAVIS:  Your Honor, I'm just looking at this.

8        Do you have a character letter that I filed over the

9   weekend?

10        THE COURT:  No.

11        MR. DAVIS:  And I also filed a corrected page 2 of my

12   memo.

13        Do you have that also?

14        THE COURT:  No, I don't.

15        MR. DAVIS:  Your Honor, if I may proffer that to the

16   Court, and it's on ECF.

17        THE COURT:  All right.  It just didn't get to me yet.

18        Okay.  I reviewed the corrected page and also the

19   character letter.

20        Government counsel, any allocution -- well, first of all,

21   in reference to the report, it appears that both the government

22   and the defendant have no objections to either the report or the

23   guideline calculations; is that right?

24        MS. HERTZFELD:  That's right, Your Honor.

25        MR. DAVIS:  That is correct, Your Honor.

1          THE COURT:  Very well.  Then I will accept the report and

2      the guideline calculations as accurate.

3          Government counsel allocution.

4          MS. HERTZFELD:  Thank you, Your Honor.  I wanted to start

5      out by allowing the victim in this case and her mother each to

6      come forward to make some additional statements to the Court by

7      way of victim impact statements.  Suni's entire family is here.

8      Her mother, her father, her sisters, her biological mother are

9      all seated in the audience today, so I'd ask for the Court's

10     permission to allow Suni to come forward first.

11         THE COURT:  They may.

12         FEMALE SPEAKER:  My name is Suni.  Okay.  My life has

13     changed since this has happened.  I blame myself for everything,

14     even though people always tell me that it's not my fault because

15     I was only 11.  I felt uncomfortable being around my dad and my

16     brother because they are men, and I did not know what they would

17     do to me.  I did not trust them.  It made me fearful of all men.

18     It also made me want to act out in the same way again.

19         I also have some anger issues that I took out on my family

20     and friends.  My parents became more watchful than before.  They

21     do not trust me as they used to.  The incident also put a strain

22     on my parents' relationship.  They started to fight and argue

23     more and more as the case went on.  My brother and sisters

24     treated me differently and worried that something would happen to

25     me.

1    After the incident, I had to change schools because

2  everyone found out what happened.  People started to treat me

3  differently.  I did not feel safe anymore.  I was -- I am scared

4  to talk to people on the Internet because I do not know if they

5  are real or not.  I used to go to summer camp, and now I cannot

6  go anymore.  I do not go outside like I used to.  I just stay at

7  home and keep to myself.  When I'm -- when I am out in public, I

8  always, always look around me to make sure no one is watching.

9    It is hard to be a victim of a crime because you went

10  through something that you did not want to happen.  I did not

11  have a choice.  I felt he was an adult and I was a child, and I

12  had to listen to what he had to say.

13    I wish the day never happened.  My life will never be the

14  same.

15    The police on the scene were very warm and comforting, but

16  the police in the police station seemed like they did not want to

17  be on the case and tried to rush.  U.S. attorneys were very nice

18  and caring.  I love my victim advocate Leslie Richardson.  She

19  was very supportive and kept me comfortable through the whole

20  process.

21    Seeing the defendant face to face did not change any

22  feelings toward him.  I was glad the three years of waiting to go

23  to trial was over.  When he was found guilty, it was bitter

24  sweet.  He needed to go to jail for what he done, but it is sad

25  that he's going to be away from his daughters.  His actions is

1    going to ruin other lives besides mine.  That is it.

2         MS. HERTZFELD:  That's all, Your Honor.  Thank you.

3         All right.  Your Honor, and Suni's mother, Ms. Mason,

4    would like to come forward and say a few words to the Court as

5    well.

6         THE COURT:  That's fine.

7         FEMALE SPEAKER:  Good morning.  My name is Vanessa Mason.

8    And, Your Honor, I -- respectfully I would like to address

9    Mr. Kelsey with what I have to say, if that would be possible?

10        THE COURT:  Just talk to me.  He'll hear you.

11        FEMALE SPEAKER:  Okay.  Well, Mr. Kelsey inserted himself

12   into my life and my family's life on July 25th, 2014.  His

13   selfish actions caused him to change everything that we knew from

14   that day forward.  And I know he's sitting here probably pitying

15   himself for the amount of time he's probably going to have to

16   serve, but I want him to take some time during that time to think

17   about how he's affected my child, my family, because she's

18   changed forever.  This will forever be with her.  And as selfish

19   as he was on that day, he affected the life of his family, his

20   mother, his father, his sibling, his children, his children's

21   mother, all for one selfish action.

22        I believe he needs to go away for a very long time.  He

23   does not deserve to walk the streets free again, because he

24   cannot be trusted to do anything he's supposed to do because when

25   he was out, he chose to do things he wasn't supposed to do.

1          And right now, I feel a lot of things toward him right

2     now, but in me trying to make peace with everything, the Lord

3     told me I have to forgive you, so that way I and my family can

4     move on, mercy, God can only provide that.  The only thing I have

5     to do is provide forgiveness to him so me and my family can move

6     on.

7          He does not deserve to walk the streets ever, ever again,

8     because he is just that selfish.  It's deceit and cunning to lure

9     a child out of safety to commit the violations that he committed

10    against her.  Thank you.

11         MS. HERTZFELD:  Thank you, Your Honor.

12         Your Honor, what's clear, I think, from what the United

13    States submitted to the Court in writing on behalf of the family,

14    Suni and her parents, as well as what was said here in court, is

15    that this is a situation where the defendant's actions have

16    changed a child's life irrevocably.

17         Whatever happens in the course of Suni's life now, going

18    forward, she's going to have a different path than she would have

19    had, but for the defendant doing exactly what Ms. Mason said,

20    which is inserting himself into her life, causing trauma to her

21    and her family, and changing the way that she's going to

22    experience the world going forward starting at 11 years old.

23    Suni had barely even turned 11 when this happened, and I think

24    that's the thing that really makes what the defendant did the

25    most reprehensible.

1    You know, the course of Suni's home life, I'm sorry Your

2  Honor read about it in Ms. Mason's statement and heard a little

3  bit about it right now.  Of course her entire life has changed.

4  The relationships with her family, the bonds she had with her

5  parents, those are things that at 11 years old were forever

6  altered for her.

7    The course of her school life, she's moved schools.  She's

8  had to deal with issues with her peers and her friends and her

9  teachers as a result of what Mr. Kelsey did.  And those are the

10  kind of cascading effects that are going to go on for her as she

11  goes through adolescence and into adult hood.

12    We're lucky in many ways in this case that the child that

13  Robert Kelsey chose to victimize is a child who has a loving and

14  supportive family.  She's somebody whose parents have been there

15  every day, every step of the way through this process.  I met

16  Suni when she was 11 right after this happened, and I will tell

17  you, her mother and father have been there for every, you know,

18  appearance in court.  They have brought her countless times to

19  the U.S. Attorney's Office to prepare her for the trauma that a

20  kid undergoes when they have to sit on the witness stand in front

21  of Your Honor and a courtroom full of strangers and talk about

22  these kind of really embarrassing facts.

23    They took her to countless counseling appointments that

24  are ongoing and that she's going to be dealing with for the rest

25  of her life, and they've been a strong supportive unit for her;

1   so's the rest of her family.

2        And by all accounts, this is a child who, when something

3   like this happens, we can consider ourselves lucky that they have

4   that kind of support to give them a chance to be okay.  We're

5   lucky that the child that Suni is, is one with very strong

6   character.  She's somebody who's been very courageous going

7   through this process, who has been willing to put in the work to

8   try to overcome some of the really difficult obstacles that a

9   child that goes through this kind of experience has to overcome.

10        I'm sure Your Honor knows from all your years on the

11  bench, I've seen in the many cases like this with child victims

12  I've worked with, that the outcomes for children who are

13  victimized in this way, especially at such a young age, are often

14  really bad.  It turns out that the life outcomes in terms of

15  their relationships, their developmental abilities, their

16  adjustment issues, their ability to interact with adults and

17  other people going forward in their lives, they're really

18  difficult and they struggle with those things oftentimes.  We

19  have kids that are suicidal as a result of these kinds of things

20  that happened happen.

21        And in this case, like I said, we're lucky that Suni has

22  the support network she does to handle those things and manage

23  and have a chance at being okay.  Kids that are in these

24  situations, they're dealing with not just the fact of some grown

25  man coming into their lives and taking advantage of them and

1  abusing their bodies.  We're talking about somebody who at 11

2  years old faced the kind of betrayal that is really unimaginable

3  for a child of that age to have to confront.  Everybody goes

4  through the world, and at some point in their lives learns that

5  the world is a harsher place than they expected it to be, or that

6  people can be worse than they expected them to be or can betray

7  them, they can't trust people at some level.  Everybody has some

8  experience where they learn some of those hard lessons.  And for

9  Suni, she had to learn that lesson at 11 years old.  And that is

10 something that, as Ms. Mason said, it really is the kind of thing

11 that'll forever change what her world experience is like.

12      At 11, that's an age where you expect a kid to be able to

13 live in a world of, you know, some form of innocence.  11 years

14 old is the age where parents are trying to protect kids, where

15 the rest of the community sees them as young enough to also be

16 meriting its protection.

17      You know, when Mr. Mason was up here on the witness stand

18 at trial saying, "I was checking my child's cell phone.  I was

19 trying to make sure she was safe in the world," parents across

20 the country are trying to check their child's smartphone and

21 their Internet access.  When they're telling their kids "Don't

22 talk to strangers" from the time they're old enough to talk, when

23 they're telling their kids "Don't get in a car with a stranger,"

24 from the time they're old enough to do that, parents are guarding

25 their kids against people like Robert Kelsey.  They are trying to

1   protect their kids from the people in the world that would do the

2   things that Robert Kelsey would do.

3        And it turns out it doesn't matter where that kid's from,

4   what walk of life they're from, whether they have good parents or

5   bad parents or a good childhood or a bad childhood, it doesn't

6   matter what their life circumstances are.  It turns out when you

7   have somebody like Robert Kelsey, there are kids in the world

8   that have to be protected against them, no matter what walk of

9   life they're from.  It could happen to any child, and I think

10  that's one of the scariest lessons that we learned from this

11  case.

12       It's lucky, as I said, that the person that Robert Kelsey

13  chose to victimize is a strong person who's had the courage to

14  confront these issues and to keep moving forward.  It's lucky

15  that she has the support network she does, and that she's been as

16  successful in dealing with this as she has.  And if Robert Kelsey

17  had chosen a less well-adjusted, less able-to-cope child, we may

18  not be seeing an outcome as positive as I think the one Suni has

19  given us as an example.

20       And I think what's important about that is that it doesn't

21  matter what kind of kid Robert Kelsey chooses to victimize.  What

22  we're here to account for is that what he did is exactly the

23  same, no matter whether the child turns out okay or not.  And

24  that's the thing that the United States is asking the Court to

25  impose a significant punishment for.

1          The United States submitted a sentencing memo, and in that

2   memo requested that the Court impose a sentence of 600 months,

3   and I want to talk a little bit about why in this case that kind

4   of a sentence, which is even significantly more than the

5   mandatory minimum in this case, is appropriate.

6          In addition to the facts that I set forth in the

7   sentencing memorandum and some of the rationale there, I want to

8   point out that when the legislature considered this kind of a

9   crime, taking a child under 12 years old across state lines and

10  sexually abusing that child, when the Court considered -- or the

11  legislature considered that kind of a crime, it decided that the

12  minimum penalty that a court could impose on that person was 30

13  years in prison.  And that mandatory minimum I would submit to

14  the Court is the kind of sentence that should be imposed for the

15  least bad -- if there is such a thing -- kind of crime like this.

16  And this situation is far from the least bad situation.

17         The facts here are significantly worse than in many cases.

18  I think that what the Court heard at trial, the kind of behavior

19  that the defendant engaged in, in doing exactly what Ms. Mason

20  said, which is luring her child from a place of safety and from

21  the people who protected her and cared about her and did what the

22  community is supposed to do with regard to an 11 year old, to get

23  her in a place where he was able to take advantage of her, that

24  is truly predatory conduct.  And it's not predatory conduct that

25  happened in a moment in time, it was premeditated, ongoing,

1   calculated behavior on Mr. Kelsey's part in order to achieve what
2   he wanted to achieve in this situation.
3        He spent a substantial amount of time, you know,
4   cultivating this child to get her to do what he wanted her to do,
5   lying to her, fabricating an identity, things that indicate that
6   this is somebody who was really working to be able to commit the
7   crime that he knew he was going to commit.
8        Now, we've heard all the stuff about how he didn't know
9   her age.  I think even to this day he's still fighting in the
10  submission to the Court in the sentencing memo about whether he
11  actually knew this child's age, and I want to say two things
12  about that.
13       Number one, Your Honor sat through this trial and knows
14  the facts that make it perfectly clear that Robert Kelsey knew
15  exactly how old Suni was the day he picked her up and the day he
16  took her to have sex with her.  She told him, number one.
17       Number two, as Your Honor knows, he had plenty of
18  opportunity to observe this child.  You saw the picture that the
19  United States put up during the trial that made perfectly clear
20  this was an 11-year-old child.  He had an opportunity to see her
21  on Instagram, which is where he found her.  He had an opportunity
22  to see her in person.  He had an opportunity to go to an
23  elementary school where he walked into a cafeteria full of kids
24  who are 8 to 12 years old and pluck her out from among them.  He
25  had an opportunity to see how she was dressed.  He had an

1    opportunity to observe, when he took her back to his apartment to

2    commit his crimes, that she was wearing little girl underwear,

3    and he proceeded with his crime just the same.  So I don't think

4    there's really any dispute here that the defendant knew perfectly

5    well that Suni was an 11-year-old child.

6         That being said, the jury in this case didn't have to make

7    that determination because for purposes of the crime that this

8    person committed, as a legal matter, it doesn't matter whether he

9    knew she was 11 years old or not.  That being said, for purposes

10   of this sentencing, under 3553, the Court is to consider the

11   nature and circumstances of this offense.  And what I would

12   submit to the Court is that the fact that he did know that she

13   was 11 years old, the fact that he was aware of that, makes it

14   worse, and that a mandatory minimum may be the kind of thing

15   that's appropriate when somebody says, "I just didn't know."

16   This guy did know, and that's yet another reason why I think it's

17   appropriate that the Court impose a sentence significantly above

18   that.

19        At this stage, I think the defendant's statements thus far

20   reflect that even to this day he hasn't really accepted

21   responsibility for what he's done, despite a unanimous jury

22   verdict that was returned indicating exactly what he's done.  And

23   certainly here we're seen no indication at all that he's accepted

24   what he's done, that he's taken responsibility for it, that

25   there's any commitment to any sort of change as a result of the

1   harm and the extreme damage that he's inflicted by his own

2   conduct.

3         And the last thing I'll say, Your Honor, is with respect

4   to the defendant's history, and the real need for the Court to

5   incapacitate Mr. Kelsey in light of where he's gone with his

6   life.  You know, at 18 years old, the defendant started down a

7   path of being essentially a career criminal.  By 18 years old he

8   was involved in a murder of a 15-year-old child.  He has stolen

9   cars.  He has essentially victimized the community over and over

10  and over again.  He's still got a domestic-related case that's

11  pending in Maryland.

12        Essentially the kinds of crime that this person's

13  committed run the gamut of potential crimes that someone could

14  commit.  And what's amazing about that, one of the things that I

15  think is important for the Court to consider, is that when

16  Mr. Kelsey committed one of those terrible crimes at 18 years

17  old, when he was involved in this murder of a 15-year-old child,

18  the court system gave him a chance.  He was sentenced under the

19  Youth Act.  He was given an opportunity to turn his life around,

20  to make different choices, and to do better than he did in that

21  situation.  And instead of taking advantage of that tremendous

22  opportunity that was given to him, both while he was in prison

23  continued to -- he was fabricating weapons in his cell and

24  continuing to remain a danger.  But when he got out, it wasn't

25  very long before he was on to the next crime, before he's

1    involved in high-speed police chases and flipping cars and, you

2    know, the kinds of things that Your Honor read about in the

3    presentence report.

4         This is someone who every time he has served a prison

5    sentence and been released, he's just gone on to commit the next

6    crime.  And all of a sudden here we are now, having escalated to

7    the point where he's now out premeditating to find an 11-year-old

8    child to victimize.

9         I think that, you know, one of the things that's clear

10   from the facts of the murder case that's described in the

11   presentence report is, even there it was a premeditated act of

12   vengeance on Mr. Kelsey's part when he went out and did what he

13   did and victimized that child.  And it was a premeditated act

14   when he victimized the child in this case, and that is an ongoing

15   theme that we've seen.  And that's something that doesn't seem to

16   be even remotely susceptible to correction in Mr. Kelsey.

17        This is the kind of case where there's really nothing left

18   for the Court to do besides incapacitate this person.  This is

19   somebody who the community can't be safe when he's out on the

20   streets.  And it's for that reason that the United States submits

21   that a sentence of 50 years is appropriate, and that it is the

22   only way to ensure that the community remain safe from the kinds

23   of acts that Mr. Kelsey's committed.  And that's what the United

24   States would recommend is a 600-month sentence.  Thank you.

25        THE COURT:  Defense.

1          MR. DAVIS:  Thank you, Your Honor.  Your Honor, the

2     victim's mother, her reference to how Mr. Kelsey has affected the

3     lives of both them and his family and his loved ones is very

4     accurate because in the courtroom sits his father in the last

5     row, and I can tell Your Honor that this has had a huge impact on

6     him.

7          I -- personally I still struggle with the mind-boggling

8     difference between the federal and the state sentencing scheme

9     here.  The federal guidelines for Mr. Kelsey, the federal

10    statutory mandatory minimum for intending to do the act and

11    crossing state lines is 30 years.  Under Superior Court voluntary

12    sentencing guidelines, the maximum statutory penalty he could

13    receive is 30 years, and that's for doing the act.  Just looking

14    at the federal low end of the guidelines, which is 30 years, and

15    the D.C. statute or guidelines, voluntary guidelines, which at

16    the high end is 262, the low versus the high between Superior

17    Court and federal is 98 months.  I mean, it's just mind-boggling.

18         This man is 29 years old.  Nothing excuses the conduct for

19    which he has been convicted.  I've seen this before in terms of

20    denial.  I've seen this in a number of cases.  There are some

21    crimes that are so horrific to individuals, they just can't come

22    to grips with it.  Maybe in time thing happen, but it's that type

23    of offense.  It's that type of offense.

24         He's going to pay for this.  He's already paid for it.  He

25    was beaten really badly over at the D.C. jail.  He was housed at

1    CTF.  I mean, this is not going to be an easy next couple of

2    decades for Mr. Kelsey under any circumstances.

3         He seems -- his behavior in the courtroom today is a

4    little bit odd, but again, it's -- I think it's a combination of

5    a number of factors.  I think it's the extreme shame and the

6    humiliation of having done what he did.

7         Were he a predator and a true pedophile, as he's been

8    characterized by the United States, we would have seen some sort

9    of indication, some sort of behavior by this man who's 29 years

10   old, something in his past to indicate that he's a sexual deviant

11   who's prone to engage and prey upon people.  That's not his

12   history, though.

13        He has two prior convictions, he has one conviction for

14   being an accessory after the fact to murder.  He drove his cousin

15   to a location, and his cousin shot someone.  I mean, it's -- I

16   mean, that isn't what you're supposed to do, but that's what he

17   did.  He didn't shoot someone.  He was involved in it, and he did

18   a little bit of jail time.  He didn't do a lot of jail time on

19   that, and I think it was more -- the reason he didn't do an

20   excessive amount of jail time is pretty much based on his

21   conduct.  That's where he fit into what occurred.

22        He did steal a car and drive recklessly, but again, these

23   are -- and he did a short amount of time on that.  And actually,

24   he is going to have his probation violated and get additional

25   time for that on top of whatever Your Honor imposes here.

1          I guess the bottom line is, with regard to Mr. Kelsey, I

2     think his conduct -- the conduct for which he's been convicted is

3     clearly an aberration.  It's not something that is a defining

4     characteristic of him.  It's not something that he has done in

5     the past, and I doubt very seriously it's something that could

6     ever happen again.

7          He has his own issues, as the presentence report

8     indicates.  Again, these aren't excuses, but he has his own

9     issues.  He's carried a diagnosis of depression for ten years.

10    He experiences auditory hallucinations off and on.  These aren't

11    things that excuse his conduct, but he has his own issues.

12         I would ask Your Honor to impose the 30-year mandatory

13    that's applicable in this case.  That's what the legislator --

14    legislation -- legislator -- that's what Congress chose as the

15    mandatory minimum in this case.  And I don't think Mr. Kelsey's

16    offense differs that much from other individuals that are

17    convicted of an offense like this, and I don't think there's

18    anything to go above that.  I don't think there are any

19    aggravating factors to go above that.  That 30-year mandatory

20    statutory mandatory -- by the way, the 30-year to life guidelines

21    also includes an eight point bump for the victim being under 12

22    years of age.  So, I mean, he's -- he's getting -- he's getting

23    an increase no matter what.

24         I think that when Congress passed this statute, just given

25    the differences between the state and the federal, there has to

1   be a reason they did it.  There has to be addressing conduct that

2   can be distinguished from the stateside, and I don't see it here,

3   and for that reason, I think the mandatory minimum is

4   appropriate.

5        If Your Honor imposes the mandatory minimum on the federal

6   sentence, he won't be eligible for at least until he's in his

7   late 50s.  He's going to be revoked on his probation and get

8   additional time.

9        And, finally, I would ask Your Honor to recommend to the

10  Bureau of Prisons -- although I think they will do this -- a

11  designation -- a sexual offender management institute -- program

12  institution.  There are several on the East Coast.  I think it's

13  important for him to go into something like that:  One, for his

14  safety; two, to try to deal with the issues that has brought him

15  before this Court today.  Thank you, Your Honor.

16       MS. HERTZFELD:  Your Honor, may I just make one correction

17  with respect to the statutory scheme, just because I think it's

18  important for purposes of the record, which is that with respect

19  to the D.C. Code violation, the defendant was convicted under 22

20  D.C. Code 3008, and the jury specifically found the aggravating

21  factor that the victim was under 12, under 22 D.C. Code

22  3020(a)(1).  And with the application of that aggravating factor,

23  the guideline and statutory term increases to life without the

24  possibility of release under the D.C. Code.

25       THE COURT:  Does your client desire to say anything?

1          MR. DAVIS:  Your Honor, one moment.

2          He does, Your Honor.

3          Your Honor, I would point out under D.C. Code, my

4     understanding is that life means 30 years, that's why I

5     referenced that.

6          Mr. Kelsey.

7          THE DEFENDANT:  Good morning.  First of all, I would like

8     to say that I apologize for having people to go through this, sit

9     through trial.  And I apologize to my family, the victim family,

10    and I'd like to say that it is really putting a strain on my

11    relationship with my family as well, going through this, taking

12    them through all these legal proceedings and stuff.  And

13    basically that's all I have to say.  That's it.

14         THE COURT:  Mr. Kelsey, it's always unfortunate when

15    individuals end up in a court of law charged with a criminal

16    offense, especially a criminal offense as serious as this

17    offense.  And it's extremely troubling that you, yourself, have

18    children, but yet you took advantage of a child.  A child who's

19    just turned 11 years old should not be subjected to the abuse

20    that you subjected her to.  And I don't buy the proposition that

21    you didn't know what her age was.  She said she told you what her

22    age was and I believe her.

23         But even if that were not the case, you knew you were

24    going to a -- at least you should have known when you got there,

25    that you were at an elementary school.  You went into the school.

1    You had to see these little kids, so you had to know she was a

2    little child.

3          You groomed her.  You lied to her, told her you were a

4    different age than what you were.  And then you go and pick this

5    child up from a school where her parents had dropped her off.

6    You know, being a father of a child, I can appreciate when I took

7    my daughter to school, I expected her to be at that school.  I

8    heard the father get on the stand, and he said how he was just

9    terrified.  Would have to be.  He shows up at the school, and

10   he's told by the people at the school that his daughter has left

11   with some man who's supposed to be her cousin, and he knows that

12   that's not true.  So he doesn't know if he's going to ever see

13   his daughter again.  So he's in trauma for at least a half hour

14   because he doesn't know where she is.

15         And what do you do?  You take this child of 11 years old,

16   you bring her into the District of Columbia from the haven where

17   her parents had taken her.  And what do you do?  In addition to

18   what she said you did in reference to when you were just online

19   with her having her exhibit herself naked, you then bring her

20   into the District of Columbia -- you're shaking your head.  You

21   have no remorse.  You don't care about the fact that you did what

22   you did to that girl.

23         You bring her into the District of Columbia, and then you

24   have sex with an 11-year-old child.  That's outrageous behavior.

25   And then what do you do after that?  You use her up, and then you

1    take her back and you drop her off like she's a piece of trash.

2    That's just totally reprehensible behavior.  It's behavior that

3    society cannot tolerate.

4        I've considered the various factors I have to consider.

5    This is one of the most serious crimes you can inflict upon an

6    innocent child.  I have no reason to believe that you care about

7    what you did to her.  You say you're sorry, but I haven't seen

8    any remorse.

9        You've had chances before.  The case where you were

10   involved in which was a murder case.  It wasn't just as naive and

11   minuscule as what your lawyer indicated.  He's a good lawyer, so

12   he's advocating for you.  But you had been assaulted.  What do

13   you do?  You call your cousin -- according to what I hear and see

14   on the report --

15       THE DEFENDANT:  That's not true.

16       THE COURT:  -- and then you drive him back.  He gets out

17   and shoots somebody and kills a 15-year-old boy.

18       And then you pick up another offense.  You were on

19   probation when you committed this crime.

20       You keep shaking your head.  It just shows me you don't

21   care.  And I have no reason to believe that you won't do it

22   again, if you get the opportunity.  People like you need to

23   understand that if you're going to do this, you're going to be

24   punished.  Other folk who may think about doing it have to

25   understand, if you do it, you're going to get punished.

1        Society has to be protected from you, sir.  If I gave you

2   the sentence that's been recommended, you'd end up doing about 25

3   years.  You're still young.  I don't think that's enough.  And

4   it's rare that I give a sentence above the top of the guidelines

5   because I do believe that it's appropriate for judges to sentence

6   within the guidelines when appropriate.  But when I have somebody

7   who does what you did here to an 11-year-old child and doesn't

8   seem to care about the fact that you did it, and you've had other

9   opportunities.

10       When you got the short sentence that you got in the murder

11  case, you didn't do what you were supposed to do when you got

12  out, which is why your supervised release ended up being revoked.

13  And then you're on probation in the second case.  Obviously, you

14  know, giving you chances, letting you come back into the

15  community is not the answer.

16       So with great reluctance I have to conclude that

17  considering all the factors I have to consider, I have no reason

18  to believe that there's anything that's going to be done in your

19  life that's going to make you not victimize society again.  As I

20  say, I think a message has to be sent to you and others that if

21  you do this, there's going to be a consequence that you're going

22  to pay and it's going to be a significant consequence.

23       The legislature decided that at least a 30-year sentence

24  was appropriate, and I think that that's for individuals who

25  don't have any prior record, who haven't been given an

1    opportunity, who haven't done what you did in this case.  Because

2    as I said, what is, I think, as reprehensible as the sex act that

3    you committed on this child, was the fact that after you did it,

4    sir, you didn't even talk to her when you took her back.  And

5    then you just dropped her off like she was a piece of trash that

6    you had used up.

7          THE DEFENDANT:  Um...

8          THE COURT:  No, you said what you had to say.  I'm

9    talking, sir.  You have forfeited, in my view, the opportunity to

10   any time in the near future walk the streets as a free person,

11   because I think society has to be protected from you.  And

12   accordingly, I'm going to sentence you to a period of 600 months

13   in prison, 50 years.  My calculation is that you'll get about 90

14   months or so off for good time if you conduct yourself

15   appropriately and then you get another six months probably off

16   when you go into a halfway house, and it ends upcoming down to

17   about 42 years in prison.  That's a long time.

18          But you've destroyed, to a degree -- fortunately she has a

19   good family, but this young girl now is in treatment.  She's in

20   counseling.  She had to move from the school that she was in

21   because people found out what had happened to her.  It shouldn't

22   happen to a young child.  And you've created -- I mean, the

23   trauma that you created for her parents.  It's not acceptable.

24          So it's a hard sentence, but I think a hard sentence is

25   appropriate based upon what you did.  So as I say, you're

1   sentenced to 600 months in prison, with credit for any time that

2   you're entitled to receive.  I will require that you be placed on

3   supervised release for the rest of your life, if you are released

4   at some point.  I will not impose a fine, concluding that you

5   don't have the capacity to pay a fine.  I do have to assess a

6   special assessment.  I think it's $200 for this court, but then

7   the victims of violent crimes compensation fund, which is the

8   amount he has to pay for the local crime that he was convicted

9   of, and I'm not sure what that amount is.  I don't know if the

10  presentence report is right in that regard or not.

11        MS. HERTZFELD:  I'll enter a memo on that, Your Honor.

12        THE COURT:  Very well.  I'll impose $100 per offense for a

13  total of $300, special assessment.  So he will be sentenced

14  specifically on the -- on Count 1 of the indictment, which is

15  transportation of a minor with intent to engage in criminal

16  sexual activity, to 600 months in prison.

17        On the aggravated sexual assault of a child offense, he

18  will be sentenced to 30 years in prison.

19        And on the first degree child sexual assault, which is

20  Count 3, he will be sentenced to 260 months in prison.  Those

21  sentences are to run concurrent with each other.

22        And on the -- as far as supervised release is concerned,

23  he'll be sentenced to life, and -- on each of those, and they are

24  to run concurrent with each other -- I'm sorry.

25        He'll be sentenced to life on Counts 1 and 2, and he'll be

1    sentenced to five years on Count 3.  Those terms of supervised

2    release to run concurrent with each other.

3         I will recommend that he receive sex abuse treatment while

4    he is incarcerated, and --

5         MR. DAVIS:  I think Petersburg has a sexual offender

6    management program, maybe Butner also has one.

7         THE COURT:  I'll order he be placed in a facility as close

8    to the District of Columbia as possible so he can maintain

9    contact with his children if that's appropriate.

10        He does have to register as a sex offender once he's

11   released, and he'll have to register for his entire life.  And

12   that's a requirement that he has to keep the authorities aware of

13   where he is, as far as working, where he works, where he lives,

14   and also if he happens to be in school of some nature.

15        I also will order that he have no contact with children

16   who are below the age of 18 without authorization from the

17   probation department.

18        I also will order that he authorize the search of his

19   person, property, house, residence, vehicles, papers, commuters

20   and other electronic communications to see if he is, in fact,

21   using those devices to contact children, since in this case he

22   did use a computer in order to have contact with the victim in

23   this case.

24        I also will require that if he is released that he

25   identify any commuters or any other type of devices that have the

1    capacity to communicate through electronic communications, and

2    that he provide authorization for those devices to be searched,

3    and that they may be searched based upon a determination by the

4    probation department that a search is necessary to make sure he's

5    complying with the conditions of his supervised release.

6         There is a request by the probation department that he

7    provide tax returns.  I don't think that's necessary since this

8    case did not involve anything of that nature.

9         And I will also require that he be tested periodically to

10   see if he's using drugs.

11        Sir, you do have 14 days to appeal your sentence and your

12   conviction to the Court of Appeals.  If you cannot afford to pay

13   for a lawyer to represent you on appeal, that'll be paid for you

14   free of charge by the government.  Also, if you not afford to pay

15   for the cost of noting your appeal with that court, that'll be

16   paid free of charge by the government.

17        Anything else from government counsel?

18        MS. HERTZFELD:  No, Your Honor.  Thank you.

19        THE COURT:  Anything else from probation?

20        THE PROBATION OFFICER:  Your Honor, did you impose or

21   waive the cost of a fine?

22        THE COURT:  Yes, I did.

23        THE PROBATION OFFICER:  Okay.  Thank you.

24        THE COURT:  Anything else?

25        MR. DAVIS:  Nothing further, Your Honor.

1          THE COURT:   Thank you.

2          (Proceedings adjourned at 10:05 a.m.)

3                   **C E R T I F I C A T E**

4

5                      I, Scott L. Wallace, RDR-CRR, certify that
   the foregoing is a correct transcript from the record of
6   proceedings in the above-entitled matter.

7

      /s/ Scott L. Wallace                3/2/17
8     ---------------------------        ----------------
      **Scott L. Wallace, RDR, CRR**          **Date**
9        **Official Court Reporter**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25