# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA        .
                Plaintiff,      .
vs.                             .   Docket No. CR 16-55-RBW
                                .
ROBERT KELSEY                   .   Washington, D.C.
                                .   August 26, 2016
                Defendant.      .
. . . . . . . . . . . . . . . .x    9:38 a.m.
```

### TRANSCRIPT OF JURY TRIAL – DAY 5

### BEFORE THE HONORABLE SENIOR JUDGE REGGIE B. WALTON

#### UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:   Andrea Hertzfeld, AUSA
                      Kenya Davis, AUSA
                      UNITED STATES ATTORNEY'S OFFICE
                      555 Fourth Street, NW
                      Washington, DC 20530


For the Defendant:    Christopher Davis, Esquire
                      DAVIS & DAVIS
                      1350 Connecticut Avenue, NW, Suite 202
                      Washington, DC 20036


Court Reporter:   Cathryn J. Jones, RPR
                  Official Court Reporter
                  Room 6521, U.S. District Court
                  333 Constitution Avenue, N.W.
                  Washington, D.C. 20001




Proceedings recorded by machine shorthand, transcript
produced by computer-aided transcription.

**TABLE OF CONTENTS**

**WITNESSES**

**On behalf of the Government**:

|                      | **Direct** | **Cross** | **Redirect** |
|----------------------|------------|-----------|--------------|
| Shana Mills          |            |           |              |
| (By Ms. Davis)       | 635        |           |              |
| (By Mr. Davis)       |            | 645       |              |
| Daniel Curtis        |            |           |              |
| (By Ms. Davis)       | 710        |           |              |
| Andrew Feiter        |            |           |              |
| (By Ms. Davis)       | 714        |           |              |

**E X H I B I T S**

| **Government's Exhibit Number** | **Identified** | **Admitted** |
|---------------------------------|----------------|--------------|
| Exhibit No. 23                  |                | 717          |

\* \* \*

                    **P R O C E E D I N G S**

1

2          THE DEPUTY CLERK:  This is the matter of United

3   States versus Robert Kelsey, Criminal Record 16-55.  All

4   parties are present.

5          THE COURT:  Okay.  Next witness.  We'll bring the

6   jury in.

7          MS. HERTZFELD:  Your Honor, just so the Court is

8   aware we're going to start by reading the last stipulation.

9          THE COURT:  How many witnesses?

10         MS. HERTZFELD:  Three very brief.

11         THE COURT:  I assume this is a stipulation of

12  fact?

13         MS. HERTZFELD:  Yes, your Honor.

14         [Thereupon, Jury enters courtroom at 9:40 a.m.]

15         THE COURT:  Good morning.  Next witness or, I'm

16  sorry, you have a stipulation you want to read?

17         MS. HERTZFELD:  Yes, your Honor.  I'd ask the

18  clerk to put up on the jury's screen Government's Exhibit

19  14, which has already been admitted into evidence.  This is

20  an exhibit to which the stipulation pertains, ladies and

21  gentlemen.

22         Ladies and gentlemen, the stipulation I'm going to

23  read to you now is a stipulation reached between the United

24  States of America and the defendant, Robert Kelsey.  It

25  pertains to Government's Exhibit 14, which you've already

1    seen and put up on the screen before you.  The stipulation

2    reads as follows; "The parties in this case, the United

3    States of America and the defendant, Robert Kelsey, hereby

4    agree and stipulate as follows; on January 29th, 2015,

5    members of the FBI Child Exploitation Task Force set up an

6    operation to facilitate a phone call between SH and the

7    defendant.  To make this call they used the cellular phone

8    of SH, which was being held in evidence by law enforcement.

9    The three calls made form 240-893-6725, SH's phone to

10   202-257-5159, Robert Kelsey's phone on January 9th 2015

11   depicted in Government's Exhibit 14 were made in the

12   presence of and at the direction of task force agents.

13   Those calls were not initiated by SH."

14           THE COURT:  Very well.  As with the other

15   stipulation of fact you may consider what was just read to

16   you as undisputed evidence.

17           MS. DAVIS:  The government calls Shana Mills.

18           Thereupon,

19                           SHANA MILLS

20   having been called as a witness for and on behalf of the

21   Government, and having been first duly sworn by the Deputy

22   Clerk, was examined and testified, as follows:

23           THE WITNESS:  I do.

24

25

**DIRECT EXAMINATION**

BY MS. DAVIS:

Q    Good morning.

A    Good morning.

Q    In a loud, clear voice give your full name and spell it
for the record.

A    Shana Leona Irene Mills.  S-H-A-N-A, last name Mills,
M-I-L-L-S.

Q    And Ms. Mills, where do you work?

A    I work for the DC Department of Forensic Sciences.

Q    And how long have you worked there?

A    Almost three years.

Q    And what is your position there?

A    I'm a forensic scientist three in the forensic biology
unit.

Q    And what's the distinction of being a forensic
scientist three versus some other number?

A    We go from technician, forensic scientist one, two, and
three and then we have our managers, so forensic scientist
three is somewhat of a more senior analyst.  We have added
responsibilities along with our case work.  We help train
the newer analysts, for example.

Q    And how long have you been doing this type of work?

A    Since 2004, so 12 years.

Q    And what, if any, specialized training did you have to

1    receive in order to be a DNA analyst?

2    A    So I have an undergraduate degree Bachelor's of Science

3    in biology with a minor in chemistry.  I also have a Masters

4    of forensic science with a concentration of molecular

5    biology.  And once I entered the field for each position

6    that I took we had to undergo specific training, so

7    sometimes about six months or thereabouts reading SOPs or

8    standard operating procedures, watching trained analysts

9    perform duties in the lab, reading relative journal articles

10   and processing my own training examples a kind of mock case

11   examples.  Then would have had in some instances a written

12   exam as well as an oral exam and then a mock trial.

13   Q    Okay.  How many -- have you testified before in cases

14   involving DNA analysis?

15   A    Yes, I have.

16   Q    About how many times have you done that?

17   A    Definitely over 35 maybe about 37 times.

18           THE COURT:  Was that after being qualified as an

19   expert?

20           THE WITNESS:  Yes.

21   BY MS. DAVIS:

22   Q    Now you said you're at the DC Department of Forensic

23   Sciences; is that correct?

24   A    Yes.

25   Q    Can you tell us what it is that, what methods were used

1    there at the DC Department of Forensic Sciences to ensure

2    the integrity of the work that's done there?

3    A    Every procedure that we have in the lab utilizes some

4    sort of controls, so positive controls we know what answer

5    we are supposed to be getting and then negative controls to

6    ensure that the regions are working properly and there's no

7    contamination, we have that in every procedure.  We have

8    peer reviews, so technical review of our data before it goes

9    out as well as an administrative review of our data before

10   it goes out.  In the lab we wear proper protective

11   equipment, so lab coats, goggles, gloves, facemask,

12   hairnets.

13   Q    Now I'm going to direct your attention back to the

14   summer of 2014.  Do you remember that summer?

15   A    Somewhat.

16   Q    Okay.  Before coming in today were you able to review

17   the reports that you generated in conjunction with this case

18   that we're here for today?

19   A    Yes.

20   Q    All right.  I'm going to show you what's been marked

21   for identification purposes only, Government's Exhibit 7.

22   And if you could tell us what Government's Exhibit 7 is?

23              MS. DAVIS:  Your Honor, may I approach?

24              THE COURT:  Yes.  Is that in evidence?

25              MS. DAVIS:  No, your Honor.

1              THE COURT:  So it's seven for identification?

2              MS. DAVIS:  Yes, seven for identification only.

3    BY MS. DAVIS:

4    Q    I'm going to ask you, Ms. Mills, what is Government's

5    Exhibit 7?

6    A    This appears to be most, if not all of my technical

7    side of my case file as well as a couple of proficiency test

8    forms.

9    Q    Is that the same package that you reviewed this morning

10   before coming to testify?

11   A    Yes.

12   Q    And what case is that particular packet pertaining to?

13   A    Our DFS number was M140461.

14   Q    Is that the case of United States versus Robert Kelsey?

15   A    I didn't have a suspect known, but yes, the suspect was

16   listed as Robert Kelsey.

17   Q    And that's there on your report; is that correct?

18   A    Yes.

19              MS. DAVIS:  Your Honor, we'd ask that Ms. Mills be

20   able to use Government's Exhibit 7 as a reference for her

21   testimony.

22              MR. DAVIS:  I have no objection.

23              THE COURT:  Very well.  Without objection she may

24   do so.

25

1    BY MS. DAVIS:

2    Q    The first question I want to ask you about this case is

3    what items did you receive for testing in this case?

4    A    So in this case I received a sexual assault examination

5    kit from SH.  And within that it contains some items such as

6    vaginal cervical swabs, anal perianal swabs, a known buckle

7    example, external genitalia swabs, bite marking slash

8    licking swabs from the right side of the neck as well as a

9    couple of samples from the underwear and additional items.

10   Q    And of those items that you received which items did

11   you test at your lab?

12   A    I tested the vaginal cervical swabs, the anal perianal

13   swabs and a known buckle sample.

14   Q    And why did you choose those items as opposed to the

15   litany of items that you just listed?

16   A    When we first receive a case if there's case

17   information or case scenario we will look at that especially

18   for sexual assault cases, and then in this instance we had a

19   serology report from Prince George's County crime lab so

20   based on their results for semen testing I chose certain

21   samples to go onto DNA testing.

22   Q    What if anything is done with those remaining items if

23   you choose not to test them initially?

24   A    So the initial round of testing if those samples didn't

25   give me suitable results then I would have gone on to the

1   additional items in the sexual assault kit, but based on the

2   results that I obtained from the initial samples that I

3   looked at I did not do anything with those additional items,

4   so they would have remained in the sexual assault kit and

5   available for additional testing.

6   Q    Just to be clear when you say that you needed, you

7   would evaluate those items for results what are you looking

8   for?

9   A    So in a sexual assault case if the case scenario says

10  that there's possible ejaculation I would be looking for the

11  presence of semen which would also be the presence of a male

12  profile.  And in this case if the, you know, the victim is

13  female I'm looking for a male profile.  If I didn't find

14  that then I would have gone on to additional items.

15  Q    Is it true you would have tested those additional items

16  if need be?

17  A    Yes.

18  Q    Now for those samples those items that you did list did

19  you in fact find evidence on each of those samples?

20          THE COURT:  Are you seeking to have her provide

21  expert testimony?

22          MS. DAVIS:  No, your Honor, she's offered only as

23  a fact witness today.

24  BY MS. DAVIS:

25  Q    For those items that you did receive and did test did

1   you actually detect, did you actually get results from those

2   items?

3   A    Yes, I did.

4   Q    At any point during your lab's testing of this kit that

5   you've told us about did you have in your lab any known

6   samples from the defendant?

7   A    No, not to my knowledge.

8   Q    And when you completed doing your analysis where did

9   you send those results to?

10  A    So once we issued our report I believe at a later date

11  the data was sent out to a private lab.

12  Q    Do you know that lab?  What do you know that lab to be?

13  A    Bode Technology.

14  Q    Okay.  Now referencing your report I want to direct

15  your attention to what has already been marked and admitted

16  as Government's Exhibit 6B.  And I think it is that you've

17  had an opportunity to review that exhibit; is that correct?

18  A    Portions of it.

19  Q    Portions?

20  A    Portions of it, yes.

21  Q    And did you have an opportunity before testifying today

22  to compare the results from your analysis to the results

23  that are reflected in Government's Exhibit 6B?

24  A    Yes, and I did not prepare this part.  I did however

25  review it just before coming, portions of it.

1    Q    That's correct.  Okay.  So I'm going to direct your

2    attention to -- let me first ask you this; when giving your

3    result to the Bode lab how is it that, what format were the

4    results in since you didn't prepare a table?

5    A    I believe it's usually the raw data, so the very last

6    step in the lab would be a genetic analyzer and there's raw

7    data that comes off of that.  So it would have I believe

8    been given to them probably in a CD format for them to pull

9    into their interpretation software or analysis software.

10   Q    And the format that data is in is it in an allele

11   table?

12   A    It would have been raw data I believe for them to

13   reinterpret.

14   Q    And raw data is it on an electropherogram.  Am I

15   pronouncing that correctly?

16   A    Once they analyze it it is what you would call an

17   electropherogram.

18   Q    The electropherogram read out is that what you used

19   this morning to compare to the allele tables in Government's

20   Exhibit 6B?

21   A    My electropherogram, yes.

22   Q    So first I'm going to direct you to page 26,

23   Government's Exhibit 6B?

24           THE COURT:  Is this in evidence?

25           MS. DAVIS:  Yes, your Honor, Government's Exhibit

1    6B is in evidence.

2    BY MS. DAVIS:

3    Q    Do you have slot 26 in front of you the vaginal

4    cervical swabs and smears, Item 1A.2EF?

5    A    Yes.

6    Q    I direct you to page 30 of your report.

7    A    The corresponding EPG?

8    Q    Yes.

9    A    That would be --

10   Q    Oh, I'm sorry, page 55.

11   A    Pages 55 through 54.

12   Q    Okay.  And tell us what this particular allele table

13   reflects?

14   A    So electropherograms come out as a printout and then in

15   some instances labs will make it, try to make it a little

16   easier to read by putting it in table format, so it's a just

17   a transference of the numbers from our electropherogram and

18   the data that we have here into a table format which is what

19   is on the screen.

20   Q    And do the alleles there in your report correspond with

21   the alleles found here under vaginal cervical swabs and

22   smears EF, Item 1A.2EF?

23   A    Yes.

24   Q    Now I'm going to move to Government's Exhibit 6B slide

25   27.  And I'll refer you to page 30 of your report.  Do the

1    alleles that are reflected in Government's 6B slide 27, do

2    they correspond with the electropherogram you have there in

3    front of you from your report?

4    A    The electropherogram that I'm looking at now is the

5    known reference from the victim, and that would be in the

6    far right-hand column, so Item 1C known sample from SH, is

7    the electropherogram that I'm looking at on page 30 and it

8    does match, yes.

9    Q    Okay.  Now I move to slide 29, and I'll refer you to

10   page 62 of your report.  Do you have it?

11   A    Says pages 62 and 61.

12   Q    Okay.  And do the alleles that are reflected there in

13   electropherogram for the vaginal cervical swabs and smears

14   semen fraction Item 1A.2SF, does that correspond with the

15   alleles that are reflected here in Government's Exhibit 6B?

16   A    The alleles calls, yes.

17   Q    And lastly I'll direct, we need to get to slide 32.

18   And for slide 32 I'd refer you, Ms. Mills, to page 52 of

19   your report.

20   A    Fifty-two and 51.

21   Q    Okay.  And do the alleles that are reflected in

22   Government 6B under the anal perianal swabs epithelial

23   fraction, Item 1BEF, correspond with the electropherogram

24   that you have there from your report?

25   A    Yes, the allele calls.

1    Q    Now were there any analysts at your particular lab that

2    helped you with your evaluation of this case?

3    A    Yes.

4    Q    And who was that?

5    A    Daniel Curtis and Andrew Feiter.

6         MS. DAVIS:  I have no further questions for this

7    witness?

8         THE COURT:  Cross-examination.

9                        **CROSS—EXAMINATION**

10   BY MR. DAVIS:

11   Q    Ma'am, you were working for the DC Department of

12   Forensic Lab back then.

13   A    Yes.

14   Q    And that's basically the crime lab for the District of

15   Columbia, correct?

16   A    Yes.

17   Q    And you testified that the purpose of your review was

18   to identify whether there was a male profile in the sample,

19   correct?

20   A    Correct.

21   Q    That's what you did when you received the evidence,

22   correct?

23   A    Yes.

24   Q    And everything you just testified about, comparisons in

25   alleles and everything else that is not what you did when

1   you received the sample, you identified a male profile,

2   correct?

3   A    I'm not sure I understand the question.

4   Q    You went through a PowerPoint and you made comparisons

5   between people and -- you didn't do anything of that back

6   then, you just identified a male profile, correct?

7   A    So I did not receive a suspect known or any male known

8   sample to compare to the evidence so the kind of the

9   stopping point for my analysis is to say whether a male

10  profile is obtained or not when I look at the data.  So the

11  next step would then be to compare to an actual known sample

12  to that evidence profiles.  And I did not go to that next

13  step because I did not have an additional male known sample

14  to compare to.

15           I did have the victim known, so that I could

16  compare that to the evidence since it was collected from

17  her, but in terms of a male suspect or elimination sample to

18  compare to I did not.  Is that what you're asking?

19  Q    Exactly.  So everything, the majority of what you just

20  testified to you did not do when you did your analysis?  You

21  just basically identified a male profile?

22  A    I would still go through and look at all of the data

23  and, to be able to determine number of contributors and if

24  there's a male profile present or not.  I cannot tell you

25  who that male profile is.

1    Q    Now why was the DC crime lab sending out samples or

2    sending DNA materials, sending DNA analysis out to private

3    companies back during the time period you looked and

4    identified a male profile in this sample?

5              MS. DAVIS:  Objection.

6              THE COURT:  Approach.

7              [Bench conference.]

8              THE COURT:  Are you attacking the credibility of

9    the work that she did?  Because it seems to me the questions

10   about the lab would only be relevant if you're attacking

11   whatever she did.

12             MR. DAVIS:  But the lab --

13             THE COURT:  The fact, as far as the reason they

14   sent it for testing I just don't see how that's going to be

15   relevant in impugning the credibility of what she has said.

16             MR. DAVIS:  Well the reason she couldn't -- the

17   reason I think it's appropriate is because she couldn't do

18   it back then because the lab was precluded from doing it.

19   They were having internal --

20             THE COURT:  How does that impact on what she did?

21             MR. DAVIS:  Because she came in and even though

22   she was precluded from doing that back then she's come in

23   and done it here.  I think it's fair game for the jury to

24   realize that --

25             THE COURT:  But she's not provided any testimony

1   in reference to that.

2          MR. DAVIS:  Well, she went over the testing and

3   she looked over her raw information and she said it matches

4   and she basically is corroborating the other DNA expert's

5   testimony.  The thing is is she couldn't do that back then,

6   so why should she be allowed to do it now?

7          THE COURT:  She's not testifying about a match.

8          MR. DAVIS:  She just went through alleles and how

9   Kelsey's matched the victim and she's going from the data

10  that came from the private lab.  She couldn't do that.

11         MS. DAVIS:  No, she actually was -- her lab

12  actually did a CODIS analysis to tie Robert Kelsey.  That's

13  something that we don't want the jury to hear.

14         THE COURT:  If this is a predicate to challenge

15  the accuracy of what she did and what this jury has just

16  heard about I think that's fair game, but if it's only going

17  to seek to impugn the credibility of the lab to do, to do

18  comparisons for identifications it seems to me that that's

19  really not relevant to what she did.  So I don't have a

20  problem with you challenging what she did and whether the

21  laboratory had issues in reference to its ability to do

22  accurately what she's testified about.  I think that's fair

23  game.

24         What you're doing is seeking to attack the lab or

25  attack her regarding something she didn't do nor did the lab

1   do.

2            MR. DAVIS:  But she's done it now and if she

3   couldn't do it in her lab --

4            THE COURT:  But she hasn't testified about that.

5            MS. DAVIS:  And there weren't any issues with them

6   being able to do it.

7            THE COURT:  Hold on.

8            MS. DAVIS:  I'm sorry.

9            THE COURT:  That's not before the jury though.

10  The fact that she's done it now is not something this jury

11  has heard.

12           MR. DAVIS:  I thought that was the import of her

13  testimony that she went through and looked at her raw data

14  and compared it to the data of the other people that she

15  said that she had a match.  That's what I understood.

16           THE COURT:  No, she hasn't said anything about a

17  match.  All she said is that she looked at what she had and

18  based upon what she looked at she was able to determine what

19  was there.  She hasn't said that then I took that

20  information and compared it to some other samples and made a

21  conclusion as to who those items came from.  She hasn't said

22  that.

23           MR. DAVIS:  I guess the best way I can package

24  this would be that she is testifying as an expert.

25           THE COURT:  She hasn't.  Because that's why I

1    asked if she was going to testify as an expert.

2              MR. DAVIS:  She started out talking about how she

3    had been qualified as an expert for over 13 times.

4              THE COURT:  I asked her that because I thought she

5    was going to be qualified as an expert.  When I asked she

6    said no, she's going to be a fact witness.  Now are you

7    suggesting that what she said was in fact expert testimony?

8              MR. DAVIS:  Well, I couldn't go through the raw

9    data and determine whether --

10             THE COURT:  I guess you should have objected.

11             MR. DAVIS:  Well, I thought she was going to be

12   qualified as an expert after it was brought out that she --

13             THE COURT:  But I asked that question before she

14   went into any of this and counsel said she was only going to

15   testify as a fact witness.

16             MR. DAVIS:  I heard that, but I heard that

17   sometime after.

18             THE COURT:  If you're seeking to strike her

19   testimony on the grounds that what she presented was expert

20   testimony obviously, I'll entertain that and then the

21   government I guess would have to qualify --

22             MR. DAVIS:  I would ask to strike the testimony of

23   her comparisons of her raw data to any additional materials

24   that she looked at in the PowerPoint.  I'm going to ask that

25   all that testimony be stricken because she's not an expert.

1              THE COURT:  What was the PowerPoint, what was that

2    about?

3              MS. DAVIS:  The PowerPoint is the result table

4    from Bode that --

5              THE COURT:  When you say the "result table," what

6    is that?

7              MS. DAVIS:  The allele table, so --

8              THE COURT:  Not a comparison?

9              MR. DAVIS:  It is a comparison.  It's up there.

10             MS. DAVIS:  Well, it's the profile that's already

11   developed from her data.  If she --

12             THE COURT:  Who did that profile?

13             MS. DAVIS:  That profile was done by Bode.

14             THE COURT:  It is it seems to me.

15             MS. HERTZFELD:  She's not testifying to the

16   comparison between those two things.

17             THE COURT:  I understand that.  What she did does

18   that require expertise in order for her to even know what an

19   allele is and --

20             MS. DAVIS:  Well, I mean --

21             THE COURT:  Let me send the jury out.

22             [Open court.]

23             THE COURT:  We need to take a short recess.

24             [Thereupon, Jury exits courtroom at 10:07 a.m.]

25             THE COURT:  Okay, Miss, you can step outside for a

1    minute.  The concern I had and that's why I asked the

2    question whether she was being qualified as an expert, is

3    because although she's not providing testimony of a

4    comparison, I as a layperson never having, and having been

5    horrible in science, I wouldn't know to be able to testify

6    as to what she said absent some expertise.  And that's why I

7    asked was she being qualified as an expert.

8              Is what she testified about purely factual?  Or is

9    it predicated on expert knowledge that she has that gives

10   her the capacity to say what she said?

11             MS. DAVIS:  Well, first I think, you know, the

12   comparison is not between a layperson and someone in her

13   field.  She's able to give the information based on the data

14   that she, that she gathered from her analysis in her field.

15             THE COURT:  And how is that data produced for her

16   to know what it is?

17             MS. DAVIS:  It's produced through her DNA

18   analysis, right?  And so that would be -- she doesn't have

19   to be an expert -- because the expert offers an opinion

20   about the facts.

21             THE COURT:  Isn't she in effect offering an

22   opinion?

23             MS. DAVIS:  She's not offering an opinion.  She's

24   saying what I have here in front of me reflects the alleles

25   that --

 1          THE COURT:  How would she know that without expert
 2    knowledge?
 3          MS. DAVIS:  Well, she has knowledge from her
 4    industry, has like Miss, our nurse has knowledge of the body
 5    parts that she analyzed, right?  But all this aside,
 6    Ms. Mills could easily be qualified as an expert.  And it
 7    really was for sake of expediency that we did not qualify
 8    her as such.
 9          THE COURT:  Because I mean to be very candid I do
10    think what she says does require at least some level of
11    expertise.  And therefore, I would think she would have to
12    be qualified as an expert in order to provide the testimony
13    that she's provided to this jury even though she's not doing
14    some type of comparison.  But to know what these alleles are
15    it seems to me does require expert knowledge.
16          MS. DAVIS:  In light of that, your Honor, it
17    would -- we'd ask the Court to permit us to offer her up as
18    an expert.  I think to argue about this when we've got
19    someone who's even more qualified than our prior expert is
20    fine.
21          THE COURT:  That's fair.  And if the defense has
22    an objection then we can deal with that.  But on the issue
23    that we were talking about that the objection was raised,
24    Mr. Davis, I do have some concerns about the inquiry that
25    you're making in light of the fact that this witness is not

1    testifying about some comparison that the DC lab did.  And

2    the fact that they weren't doing comparisons because there

3    were problems and therefore were sending them out to private

4    labs it seems to me doesn't impugn what she has testified

5    about.

6            Now if you have information that would challenge

7    the ability of the lab to even do what she did then

8    obviously I think that's fair game.

9            MS. DAVIS:  So first point is that the time period

10   that Mr. Davis is referring to is one that doesn't encompass

11   the time she did this analysis, so that should be completely

12   off the table.

13           THE COURT:  So what are you saying?

14           MS. DAVIS:  That there were issues with this lab,

15   but those issues I think were after this point and they were

16   for a completely different type of analysis.  So her --

17           THE COURT:  So why were they sending them out to

18   private labs?

19           MS. DAVIS:  Well, first of all, this particular

20   case like I said up at the bench and didn't want the jury to

21   hear, is a case where they actually did send her results in

22   for a CODIS comparison and they got one.

23           THE COURT:  So she actually did the analysis?

24           MS. DAVIS:  Right, for that stage of it, but

25   that's not what we're talking about.  We're talking about

1    sort of how she analyzed the known sample of the complainant

2    and the evidence samples from the sex kit and we stopped

3    there.  We don't go on to what her lab did in terms of the

4    CODIS fit because a separate and completely different lab

5    got the none sample from Mr. Kelsey and compared his sample

6    to the DNA profile that they were able to gather from the

7    data that came from DFS independent of the CODIS evaluation.

8              THE COURT:  So were they seeking confirmation by a

9    private lab of what she did and what she's testified about?

10             MS. DAVIS:  No, it's just that the comparison

11   needed to be done -- it doesn't need to be done with a

12   different lab, but the choice was made to do it with a

13   completely different lab that helps to keep it separate.

14             THE COURT:  Okay.  Let me hear, Mr. Davis.  Why

15   would the inquiry that you're making be relevant to the

16   testify she's provided?  As I said if it goes to impugn the

17   accuracy of what she said it seems to me that's fair game,

18   but if it's just designed to challenge something totally

19   unrelated to what she said then it seems to me that has no

20   relevance.

21             MR. DAVIS:  Well, she just testified about all the

22   extraordinary measures that were taken in the lab to not

23   contaminate and to keep everything clean; gloves, mask.

24             THE COURT:  And if you want to attack the ability

25   of the lab to do quality work in reference to what she's

1    testified about I think that's fair.  But why they sent the

2    test results out to a private lab for analysis and they're

3    not relying upon analysis that they did, then I just don't

4    see how the fact that they made that decision to send it out

5    for the analysis how that's relevant.

6              MR. DAVIS:  Well the fact that they made the

7    decision to send it out to be analyzed was based on the fact

8    that there were problems on the lab.

9              THE COURT:  But did it result to what she said,

10   what she's testified about?

11             MR. DAVIS:  We can ask her, she worked there.

12   That's why I was asking her, why was your lab sending it out

13   for analysis?  And her response is going to be that we were

14   having some internal reliability issues, quality control

15   issues so we decided --

16             THE COURT:  Again, but do we know that that was

17   based upon the things that she was doing or based upon the

18   things that they send it out to have the private lab do?

19             MR. DAVIS:  Perhaps she should ask her.

20             THE COURT:  Very well.  We'll bring her in and we

21   can do that outside the presence of the jury.

22             MR. DAVIS:  I wouldn't make an issue, such a big

23   issue out of this but the DNA is a fairly big issue in this

24   case.

25             THE COURT:  I understand.  I'm not trying to stop

1   you from trying to make your case.  All I'm saying is that

2   what you're going to attack her on has to be relevant to

3   what she did and not what the Bode lab did.

4           MR. DAVIS:  I'm going to be a little bit more

5   broader since we don't have the jury in here now.

6           THE COURT:  That's fine.  Okay.

7   BY MR. DAVIS:

8   Q    You look surprised.  I just have a few questions.  I'm

9   going to ask you some questions about the lab.  First, the

10  DC forensic lab used to do DNA analysis prior to this case,

11  correct?

12  A    Yes.

13  Q    And you sent this -- you just extracted the male

14  profile and sent the case out because at the time there were

15  concerns about some quality control aspects within the lab,

16  so the lab decided to send things out to be analyzed by a

17  private contractor, correct?

18  A    This case was actually reported out in March, I believe

19  of 2015, so --

20  Q    Do you have that?  Since we're doing this on record we

21  might as well if you could check.

22  A    This was reported out March 26th, 2015 is my report

23  date.

24  Q    So when would you have received the materials then?

25  A    I don't have the administrative side of the case file,

1   but I first started looking at the evidence on November

2   20th, 2014.

3   Q    And you did not do the DNA analysis because at the time

4   your lab had shut down doing DNA analysis and opted to send

5   it out to a private contract?

6   A    I did actually do the DNA analysis and wrote a report

7   with the results, yes.

8   Q    Why is it the lab sent the sample out for DNA analysis

9   to a private contractor?

10  A    On the administrative, on the administrative side of

11  the case file there's an, something to the effect of

12  evidence transfer request from the U.S. Attorney's office

13  for us to transfer the data to Bode Technology, so I had

14  already issued my report and then they requested the data or

15  evidence to be transferred to Bode Technology.

16  Q    Your report which concluded that there was a male

17  profile, correct?

18  A    Correct, major foreign male profile.

19  Q    Major foreign male profile.  Were there any other male

20  profiles within that sample?

21  A    The major foreign male profile which I called male one

22  from the vaginal cervical swabs was the same foreign male

23  profile that I deduced from the anal perianal swabs, the

24  epithelial fraction.

25  Q    So there was only one male profile?

1   A    Only one, yes.

2   Q    And again so if the long and short of it is the reason

3   you sent it out for DNA analysis to Bode, the private lab,

4   was because the United States Attorney's office had

5   indicated they wanted it to go to a private lab, correct?

6   A    Correct.  My results, sorry, my results were already

7   reported out and then they had a request for the data to be

8   sent out.

9          THE COURT:  Do you know why that request was made?

10  Was that ever communicated to you?

11         THE WITNESS:  I don't know specifically in this

12  case.  I can't remember right now specifically in this case.

13  BY MR. DAVIS:

14  Q    There were problems with the lab at one point, correct?

15  A    People raised concerns about the lab.

16  Q    What type of concerns were raised about the lab?

17  A    Concerns were raised about some cases and the mixture

18  interpretation, interpretation that was done in some cases.

19  Q    And the lack of quality control procedures?

20  A    I don't know if it was necessarily quality control or

21  if it was phrased that way.  I think it was our mixture

22  interpretation.

23         THE COURT:  When you say "mixture interpretation,"

24  what are you talking about?

25         THE WITNESS:  So for example, in this case, the

1    vaginal cervical swabs, sperm fraction and the anal perianal

2    swabs, epithelial fraction those both have mixtures.  So I

3    can tell that there's more than one person contributing to

4    their DNA profile, DNA to that sample.  When you have

5    mixtures if you can you need to interpret them, and we

6    utilize a lot of different steps in that, there's a process

7    to that.  So anytime there's more than one person

8    contributing their DNA we would have to see if we can

9    interpret the mixture or not.

10   BY MR. DAVIS:

11   Q    Are you now doing DNA analysis at the DC forensic lab?

12   A    Yes, we are.

13   Q    When do you start resuming those if you recall?

14   A    I believe --

15        THE COURT:  Did you ever stop, because you said

16   you did it in this case?

17        THE WITNESS:  So I did it in this case.  This was

18   reported out towards the end of March.  I actually went out

19   on maternal leave middle of April 2015.  Shortly thereafter

20   about a week or two after we choose to suspend DNA

21   operations.  We never lost accreditation.  We were still

22   able to process samples for serology and then we started

23   back up full processes so serology and DNA.  I believe we

24   were cleared in -- we started back up middle of February

25   this year 2016.

1          MR. DAVIS:  I have no more questions, your Honor.

2          THE COURT:  As far as you know were there any

3  issues raised about the work that you've testified that you

4  did and you told this jury about today?

5          THE WITNESS:  I do not believe that this case was

6  involved in any of --

7          THE COURT:  I'm not talking about the case.  I'm

8  talking about the information that you've imparted about the

9  alleles, was there any question as far as you know raised

10  about the ability or the accuracy or problems related to

11  what you've said today?

12          THE WITNESS:  Not this specific case, no.

13          THE COURT:  But that particular process?

14          THE WITNESS:  So this does include mixture

15  interpretation.

16          THE COURT:  So what you've testified about today

17  does include mixture interpretation?

18          THE WITNESS:  Yes.  There -- sorry.

19          THE COURT:  Yes.

20          THE WITNESS:  Writeups that have come out from the

21  United States Attorney's experts I do not believe -- they

22  were on specific cases and I do not believe this case was in

23  any sort of findings from them.

24          THE COURT:  I'm not talking about this case, I'm

25  talking about the process.  Was that under scrutiny?

1           THE WITNESS:  Mixture interpretation, yes.

2           THE COURT:  Government?

3    BY MS. DAVIS:

4    Q     And why?  Was it a contamination issue or was it some

5    other type of issue?

6    A     It was not contamination.

7    Q     So what was the issue?

8    A     Some of it comes down to difference of opinion in

9    experts.  Some of it comes down to how a general or specific

10   or your standard operating procedures.  So if you have more

11   general standard operating procedures for mixture

12   interpretation there could about be more analyst

13   variability.  Doesn't necessarily mean that that's wrong,

14   that's pretty common across the country in forensics labs.

15          Mixture interpretation is probably one of the

16   hardest things to sort of hone in on and have very specific

17   procedures.  So there will be some analyst variability

18   within the lab and across the country.  And again, doesn't

19   mean that --

20          THE COURT:  But as far as you know was the sample

21   or work that you did sent to Bode to also check what you've

22   just testified about because of concerns regarding the lab?

23          THE WITNESS:  I don't know that it was written

24   that way, but potentially based on the timing of it and the

25   fact that there were mixtures in here that could be a

1    potential.

2              THE COURT:  I mean if you want to seek to qualify

3    her that's fine because as I said I think the substance of

4    what she said does require expertise, but it seems to me now

5    based upon what she's indicated it's fair game because she

6    says that mixture interpretation she's testified about

7    that's a part of what she said, and that the information was

8    being sent to Bode in order to confirm or check on what she

9    has said.

10             I just think it would be reversal error for me not

11   to permit the inquiry to be made.

12             MS. DAVIS:  I think if the inquiry is made then

13   it's going to open the door to the initial --

14             THE COURT:  It may open the door.  It may open the

15   door.  I don't disagree it may open the door then for her to

16   testify as to what her results were, and if they match up

17   with Bode's then that would tend to undermine the suggestion

18   that there was a problem with the lab as it relates to the

19   work she did.

20             MS. DAVIS:  But there's another step in between

21   there that we kept away from the jury which is that her

22   results were sent, were also analyzed in her lab up against

23   CODIS.

24             THE COURT:  That's what I'm talking about.  What's

25   CODIS?

1          MS. DAVIS:  CODIS is the database that has

2     criminals' DNA profiles in it.  That --

3          THE COURT:  How would that need to come out then?

4          MS. DAVIS:  Because if we're going to have --

5          THE COURT:  But Bode is not going to testify about

6     that, are they?

7          MS. DAVIS:  No, but that was done at her lab.

8          THE COURT:  I understand that, but I don't see how

9     if counsel goes into what he wants to pursue how that then

10    opens the door for the CODIS information to come in.

11         MS. DAVIS:  Well, in that she said this is, this

12    was one of the cases where it wasn't, it wasn't brought in

13    to question by the experts that were analyzing her lab.  One

14    of the reasons why --

15         THE COURT:  That would be highly prejudicial

16    obviously, and I don't see how it has significant probative

17    value as it relates to what she's going to be attacked on,

18    not her but the lab.

19         MS. DAVIS:  Right.  But the lab if this was a case

20    they felt confident of because of, one of the reasons they

21    felt confident of it --

22         THE COURT:  You're asking me to have to retry this

23    case.

24         MS. DAVIS:  No.

25         THE COURT:  No, because if I let in this

1   information you're talking about about other criminal

2   behavior you better believe the Court of Appeals is going to

3   send the case back and we'll retry it again.

4           MS. DAVIS:  Precisely, that's why we kept it out,

5   and that's why we want to keep it out.

6           THE COURT:  No, I don't see how he wants to go in

7   to opens the door to bring out this prejudicial information

8   you want to bring out regarding the defendant's prior

9   history.

10          MS. DAVIS:  It's all part of the testing that was

11  done.

12          THE COURT:  No, no, no, I'm not going to do that,

13  uh-uh, because I don't want to have to try this case again.

14  I think that's the posture you're putting me in.  If I let

15  that information in -- number one, if I keep out what you're

16  trying to keep out I think I commit reversal error because

17  if there was a concern in reference to the quality of work

18  the lab was doing as it relates to what she testified about,

19  I think it's fair game to bring out the fact that it was

20  sent to Bode because they wanted to make sure that the work

21  that was being done by this laboratory was in fact accurate.

22          And I think that's fair game.  And if I don't let

23  that in I think I have reversal error.  And I don't think

24  doing that if Bode is only going to testify they actually

25  confirmed the accuracy of what she said, I don't see how

1   that opens the door to bring out this CODIS information

2   that's going to be highly prejudicial.

3           MS. DAVIS:  Court's indulgence.  I'll just let my

4   co-counsel clarify.

5           THE COURT:  Yes.

6           MS. HERTZFELD:  Let me, I might be able to clarify

7   something in terms of the timetable here that will put all

8   these pieces together.

9           When Ms. Mills reported her results out the lab

10   wasn't having any problems in terms of their mixture

11   interpretation at that point.  At that time there was no DNA

12   comparison to be done because we didn't have a male profile

13   from the defendant yet.  The results that Ms. Mills was able

14   to obtain in terms of obtaining the foreign male profile

15   that was uploaded into CODIS, and by the time the Department

16   of Forensic Sciences generated a report indicating there was

17   a match between the defendant's known sample that was in the

18   CODIS database and the results that Ms. Mills got, by that

19   time some of these issues had come up in terms of the lab's

20   mixture interpretation.

21           At that stage when the United States Attorney's

22   office got those results back the reason that these samples

23   were sent to Bode for testing is we didn't want to get into

24   this, weigh into this problem, you know, thicket of problems

25   with the Department of Forensic Sciences lab, so all the

1  data that was done, that was generated by Ms. Mills was sent

2  out to Bode because we already had a CODIS hit and at that

3  point obtained a male profile.  And so rather than generate

4  this issue we sent the materials to Bode for them to be able

5  to just go ahead and perform the comparison.

6          And of course, when they performed that comparison

7  they went back and looked at all the data that was generated

8  that was going to be the basis of that comparison.

9          MR. DAVIS:  Your Honor, may we have the expert

10  step outside.

11          THE COURT:  Yes, she can step outside.

12          [Thereupon, witness excused from courtroom.]

13          MR. DAVIS:  Might I suggest since I am allowed to

14  ask a few questions about this, why don't I ask my questions

15  and then we'll figure out what the consequence of those

16  questions are.

17          THE COURT:  You've got to know what you're going

18  to ask.

19          MR. DAVIS:  I'm going to just ask her why they

20  sent it out, and if there were, the lab wasn't doing DNA

21  analysis because there were some problems with

22  interpretations involving mixtures.  And then I'm going to

23  ask her if she, if in this instance that that's what she was

24  doing if she was interpreting, she was looking at mix

25  substances and she's going to say yes, and I'll say you were

1   extracting a male profile from that mixture.  Yes.

2         I'll ask her when the lab got back up into the

3   business of doing DNA analysis and she'll say February of

4   2016, but I think it's fair game.

5         THE COURT:  And query, if you pursue that and I

6   permit it, does that then open the door for them not to go

7   into this information that's going to implicate him

8   regarding prior crime, but does that then open the door for

9   her to say what her results were and then Bode confirms it.

10  And that would tend then to undermine your suggestion that

11  the work that was being done by the lab at that time as it

12  relates to this case is somehow faulty?

13        MR. DAVIS:  I think she's already pretty much done

14  that.  She has mentioned that she had her raw data and she's

15  looking at their data and she's, I believe I thought she was

16  asked if it was consistent with her data.  I think she's

17  already done that.

18        THE COURT:  I think she did say that, didn't she?

19        MR. DAVIS:  I'm getting slammed here with that,

20  but I can't tell them there's a problem with the lab, and on

21  top of that she indicated --

22        THE COURT:  You haven't gotten slammed because I

23  haven't ruled against you.

24        MR. DAVIS:  I'll sit down.

25        MS. HERTZFELD:  Your Honor, I just want to

1    complete what I was saying because I want the record to be

2    clear about this.  Because I think at the time -- as I said

3    the decision was made to send the materials to Bode for the

4    final, the confirmatory testing or the testing between the

5    defendant's known sample and the male profile that was

6    obtained by Ms. Mills.

7           At that point the United States Attorney's office

8    made the determination to send the materials to Bode having

9    already obtestd a CODIS match from the Department of

10   Forensic Sciences.  I think it would be an unfair impression

11   to leave the jury with to permit counsel to infer by the

12   questions the Department of Forensic Sciences made the

13   decision because of their own problems that hey, this better

14   go to Bode for us to just make sure.  That's not what

15   happened here.  It was sent for the original analysis

16   between the defendant's known sample and the evidentiary

17   samples based on the determination by the United States

18   Attorney's office to send it there for that comparison.

19          It so happened in the end that the results that

20   were obtained via that comparison did, were the same as the

21   results and confirmed the results that the Department of

22   Forensic Sciences got when they compared the evidence

23   samples and the male profile to the CODIS profile for the

24   defendant that was contained there.

25          But it is not correct to say and it wouldn't be

1    fair to leave the jury with the impression the Department of

2    Forensic Sciences had to say hey, we messed up and we've got

3    problems with our lab and so we better send this off to Bode

4    to compare.  That's not the way that this happened and I

5    don't think --

6            THE COURT:  Well it may be fair appropriate for

7    you to bring out the fact that it was the United States

8    Attorney's office that made the request that there be a

9    confirmatory analysis done and it wasn't the lab itself that

10   made that decision and that may be fair.

11           MS. HERTZFELD:  I want to be clear it's not a

12   confirmation -- the United States --

13           THE COURT:  I understand, but I just don't think,

14   I mean if there was a concern as to whether what was being

15   done that she's testified about was accurate I mean how can

16   I preclude the jury from hearing that?

17           MS. HERTZFELD:  Because what I want the Court to

18   understand and I want the record to be clear about is, not

19   that there was a concern about what she had done and that's

20   why it was sent to another lab.

21           THE COURT:  But she said there was concern about

22   this process that she's testified about.

23           MS. HERTZFELD:  So at the time that she generated

24   results that ultimately led to a CODIS match that's not been

25   brought into evidence in this case, and, but based on her

1    results which predated all of this, at the time we got a

2    known buckle swab from the defendant there was no concern

3    that she had gotten incorrect results or anything like that

4    and so we decided to send it to another lab.

5         THE COURT:  But didn't she said there was some

6    concern about what she's told this jury about, the process

7    she engaged in that there was some concern about that?

8         MS. HERTZFELD:  She said that ultimately that with

9    some analysts there were problems with the mixture

10   interpretations and that in those cases had to be reviewed.

11   This was not one of those cases.  This was not one of those

12   cases where there had to be a review and that there were

13   problems uncovered that had, that were the subject of the

14   same disclosures that were pertinent to those other cases.

15   This wasn't that case.

16        This was a case that predated those issues.  It

17   was reviewed.  There was no such problem there.  And the

18   sending out to Bode was the prevention of any sort of, this

19   kind of an issue once the issues had been raised.

20        THE COURT:  So I read about the problem, but I'm

21   not intimately familiar with why there was a concern in

22   reference to your saying other analysts as compared to her?

23   Or was it the process within the laboratory itself?

24        MS. HERTZFELD:  It was the process by which in

25   some cases the mixture data was being interpreted.  That was

1    the problem --

2              THE COURT:  And how was the decision made that

3    this case wasn't one of those cases that needed or

4    conceivably had problems?

5              MS. HERTZFELD:  Your Honor may soon exceed the

6    extent of my knowledge of how that review process happened.

7    There are people in our office that are assigned to be -- we

8    have persons in our office --

9              THE COURT:  Because for example, I assume I could

10   be wrong, I assume that somebody in your office didn't look

11   at every case.  I assume they just looked at some cases and

12   reached the conclusion based upon that analysis of some

13   cases that there was a problem, and therefore, they needed

14   to send it out to this private lab.

15             MS. HERTZFELD:  My understanding is that all the

16   cases that arose in this time period were reviewed including

17   this case was reviewed.

18             THE COURT:  And did they make a decision that this

19   was not a case with a problem but other cases were?

20             MS. HERTZFELD:  Yes, your Honor.

21             THE COURT:  How was that determination made?

22             MS. HERTZFELD:  Your Honor, has exhausted my

23   understanding of how this process worked, but there was

24   consultation with the people that made that determination

25   whether this case had such a problem, and whether or not

 1    this was an issue that we needed to be, you know, having the

 2    lab make disclosures about.

 3            THE COURT:  So it seems to me, I mean, to make a

 4    ruling without knowing that information it seems to me is

 5    problematic.  Because I don't know what that process was,

 6    why a determination was made, if you're correct that this,

 7    was not a problem case but others were.  You know, without

 8    that I just don't see how I can conclude that he can't go

 9    into this.

10            MS. HERTZFELD:  If your Honor wants to take a

11    brief recess I can get some more information about how

12    exactly a determination was made.

13            THE COURT:  I'll take a short break.

14            [Thereupon, recess taken at 10:34 a.m., resuming

15            at 11:07 a.m.]

16            MS. HERTZFELD:  Your Honor, we brought over

17    Michael Ambrosino from our office, who I was attempting to

18    explain to the Court sort of the order of the process here,

19    and indicated I might be able to get somebody who could

20    answer some more of the Court's questions, so he's here to

21    help assist with the Court's understanding of this issue.

22            MR. AMBROSINO:  Good morning, your Honor, Mike

23    Ambrosino.  I oversee the forensics at the U.S. Attorney's.

24    Office.  I understand, and please correct me if I'm not

25    stating the issue that's been presented before your Honor,

1    because I want to try to answer any of your questions as

2    best I can.

3          From what I understand this is a case which was

4    quite common for a period of time at the Department of

5    Forensic Sciences due to issues that arose there where the

6    department did the bench work in a case and we sent the

7    actual data and a known sample out to a private laboratory,

8    Bode Cellmark, to be interpreted by Ms. Parker over there.

9    And the reason for that was that we in the context of a

10   case, *United States versus Tavon Barber*, were alerted by

11   Dr. Bruce Budowle, who's one of the most renown DNA experts

12   in the world, that there was some problems in the way in

13   which the Department of Forensic Sciences was conducting

14   mixture interpretation.

15         We after attempting to resolve that issue

16   unsuccessfully with the department, we at the United States

17   Attorney's office made a decision that we're going to put

18   together a group of renown scientists to look at every

19   single case that the department had touched that had any

20   kind of DNA interpretation.  So I asked Dr. Budowle, who was

21   the, one of the scientists that stood up the laboratory at

22   Quantico and now runs the Health Sciences Center out of the

23   University of North Texas, and Dr. Fred Beaver at Harvard,

24   if they would be willing to conduct a very comprehensive

25   review of very case that the Department had touched since it

1    was stood up and they agreed to do that.

2            What we did is we had them go through the data.  I

3    know your Honor has seen data in this case.  It looks like

4    an EKG.  It's an electropherogram.  And, but there's one

5    important point I want to make to the Court.  One of the

6    things I asked doctors Beaver and Budowle to do was to look

7    at the bench work at DFS.  Because at the time we pulled all

8    of our cases from the Department of Forensic Sciences, one

9    of the questions I asked our panel was --

10           THE COURT:  When you say "bench work," what are

11   you referencing?

12           MR. AMBROSINO:  So the actual physical work.  So

13   if this were a piece of evidence and I took a cutting from

14   it.  I then throw it in a tube to extract the DNA from it,

15   so there's the cutting, the extraction, the amplification --

16   well, first the quantitation of the DNA to figure out how

17   much DNA is in there.  The amplification of DNA, making

18   copies of it, and then the actual running of that DNA

19   through a genetic analyzer for electrophoresis.  That's when

20   this gets spit out.

21           So you go through those actual steps.  And while

22   what we call the bench analyst is physically doing things

23   like cutting and pipetting, the real work is being done by

24   robots.  So basically until they look at this data they're

25   essentially a technician, a very trained and skilled

1    technician because they have to get it right and not make

2    sure samples don't mix together, the tubes are properly

3    capped, things are properly loaded on the instrumentation.

4    But at that time it's a very technical, fact based job.

5    It's when they look at this data and are asked to interpret

6    this data that they are then employing their skills as an

7    expert.

8              And one of the first questions after Drs. Budowle

9    and Beaver had opportunity to go through a large sampling of

10   the cases that I asked was, are you seeing anything that

11   calls into question the bench work?  And the reason why this

12   was critical was because if the bench work, if there was

13   anything that called into question the integrity of the

14   bench work we would have to scrap those results.  We

15   wouldn't be able to rely on them.  And so that was one of

16   the first questions I asked them because I wanted to know

17   whether our office was in a position to always have the data

18   reinterpreted or whether we were going to start from

19   scratch.

20             In a case like this it wouldn't make a difference

21   because, in sexual assault cases you often have large

22   quantities of DNA because you're dealing with bodily fluids.

23   But in some cases that question was critical because if

24   we're testing for touch DNA on a firearm we're only going to

25   get one shot at it.  We're going to have to consume the DNA.

1   And so we would have had to written off a lot of our test

2   results if the bench work was at issue.

3           I was told by all panel members that the bench

4   work was fine, that there was nothing in their review that

5   they ever discovered that undermine the integrity of the

6   bench work.  The only thing that was brought into question

7   was the analysts' interpretation of this data.  And that's

8   why it was our goal with cases that came up both in Superior

9   Court and Federal court to take that interpretation away

10  from the department, to take it off the table and to call --

11  we obviously had to continue to absent a Crawford waiver to

12  satisfy our Crawford obligations.  And so we continued to

13  call DFS experts through this time period, but for these

14  cases that fell within this time period we would bring in

15  outside experts, some from Bode.  Sometimes we would bring

16  in Dr. Budowle or Dr. Beaver themselves to testify about the

17  results of this case.

18          So that was our goal to have a clear demarcation

19  line so that we were able to proffer the DFS witnesses

20  purely as fact witnesses, to answer factual questions about

21  each one of those processes that I just talked about with

22  your Honor which from the cutting to the extraction, the

23  quantitation, the amplification and the actual

24  electrophoresis just loading the robots and getting what was

25  spit out of the machine, all those factual steps.

 1          But the direction to our assistance was not to ask

 2    any expert opinions of those witnesses so that we do not

 3    open up the door.  And that's our goal to be very candid

 4    with your Honor to not open up the door for

 5    cross-examination on the myriad of issues that came up in

 6    the course of this review regarding interpretation.

 7          THE COURT:  So the only thing that this witness

 8    who's from the DC lab testified about was the development of

 9    the male profile that ultimately was used to compare with

10    the known sample of the defendant once they acquired it, and

11    she has not provided any testimony about any analysis of

12    that sample.  All she's testified to is, and she did say

13    there were obviously if you've got sexual activity you've

14    got mixture of DNA, so she did obviously testify about that

15    and the fact that she came up with a profile that ultimately

16    was used to purportedly identify the defendant.

17          So you're saying what she has testified about is

18    not something that these experts who came in concluded there

19    was a problem in reference to it?

20          MR. AMBROSINO:  I want to be very clear with the

21    Court.  It's our, because I didn't sit in on the testimony,

22    so I'm flying blind a little but, so I'm listening carefully

23    to what your Honor is saying.  It's not our intent and I

24    don't believe it was our intent to elicit any testimony

25    regarding the interpretation --

1          THE COURT:  She didn't interpret that, no.  All

2     she said is there's a male profile that she was able to

3     detect from I guess you're saying the bench work that she

4     did.

5          MR. AMBROSINO:  Right, and that's fine just saying

6     there's a male profile, but what she shouldn't do and what I

7     hope and what we'd like to limit it to just that bench work

8     was done, a profile was produced.  Obviously if there's only

9     a single female profile from the sexual assault kit it's not

10    very informant because you expect to get that.  So they're

11    looking to see is there a foreign profile in what we're

12    testing here and then pass it along for interpretation.

13         THE COURT:  She didn't get to the interpretation

14    stage.  She only did what she did she said to develop the

15    male profile.

16         MR. AMBROSINO:  And that's our intent, your Honor,

17    to satisfy our Crawford obligations with putting on the

18    people that were involved in the bench work.  But having

19    that clear demarcation line and sponsoring Ms. Parker to

20    look at that data and to inform the jury as to her

21    conclusions regarding the data, and obviously having her

22    thoroughly cross-examined by the defense.

23         THE COURT:  Mr. Davis, based upon what you just

24    heard is it your position that you still should be able to

25    pursue this line of inquiry?

1          MR. DAVIS:  I do primarily because of the preamble

2    when she was testifying about how the lab is careful and how

3    we do this and that.  And it sounds good that the U.S.

4    Attorney's office was concerned enough to pull all these

5    cases and to review them and talk about demarcation lines

6    and criteria for interpreting mixtures, but we know none of

7    what this is now.  We don't know what her criteria was when

8    she did it.  We don't know what the criteria is now.

9          I wouldn't push it, but they had that, they were

10   referring to the PowerPoint with the alleles.  She did have

11   to go in.  She did have to separate the female, the victim

12   alleles and then extract the male.  I mean that is not a

13   technician.  That's not a robot, that's an expert opinion.

14         THE COURT:  Maybe she needs to be qualified as an

15   expert to testify about that, but based upon what was said

16   to me, I'm not asking you to accept what's being said, but

17   based upon what was said he indicates that these experts who

18   came in said they didn't find any problems with what she has

19   testified.

20         MR. DAVIS:  With this one specific case I would

21   think --

22         THE COURT:  Not just this one particular case but

23   that process that she testified that she had to use in order

24   to establish the profile he says these experts came in and

25   they said that they didn't find any problems in reference to

1    that.  It was the subsequent analysis that was the problem.

2           MR. DAVIS:  I intend and by no means to impugn

3    anyone's credibility or representations here, but the thing

4    is to say that experts came in and everything was okay, when

5    I'm sitting here with a man who's looking at a 30 year

6    mandatory and a potential life sentence I find it hard to be

7    comfortable with that without being able to at least elicit

8    testimony that in some instances and in this particular

9    instance what this tech worker was doing or expert, whatever

10   she may be characterized as, what she was doing has had

11   problems before.  And in particular has had problems --

12          THE COURT:  That's not true.  He says that there

13   were no problems.

14          MR. DAVIS:  There should be some record that her,

15   that there was no -- I mean other than Bode, but we should

16   be able to elicit the fact that it isn't a perfect science.

17          THE COURT:  But that's a different issue as

18   compared to seeking to bring out information that they

19   started to refer their cases to a private lab.  Because you

20   want to suggest that because they were referring some of the

21   work or maybe all of the work, I don't know what it was, to

22   a private lab that that meant that they, the jury should now

23   question the accuracy of what she has testified about.  And

24   if the work was being sent to the private lab not to

25   challenge what she was doing, but to raise, what was raising

1    questions about something that she didn't testify about then

2    it seems to me you're seeking to impugn her on something

3    that she didn't do, and that the lab itself was not being

4    scrutinized about.

5         MR. DAVIS:  Well it wouldn't have been -- I had

6    expected this lady to come in and testify she extracted male

7    profile from the sample she had and that was going to be it.

8    Instead we got alleles, we got numbers, we got comparisons.

9    We heard about how careful the lab is when they're doing

10   this and this is before I even asked a question, so I'm left

11   with all of this.  Now I'm hearing for the first time that

12   there is, that there is a committee put together with a

13   number of esteem scientists who looked over everything

14   without any detail and said everything is okay, and I'm to

15   assume that Mr. Kelsey is okay.

16        I think the best policy here would be to allow me

17   to ask if she was doing mixtures if there was a problem with

18   the criteria, the benchmark that the lab was using in some

19   instances for other cases there.  I'll ask her if that's

20   what she was doing interpreting the mixture, if she sent her

21   conclusion and raw data on to Bode because the DC forensic

22   lab wasn't doing any of this for at least another year until

23   they straightened this out.  Then the United States can get

24   up and they can elicit --

25        THE COURT:  I could be wrong but I didn't think

1   that there was an indication that they weren't doing what

2   she's testified about.

3          MR. DAVIS:  I don't know.

4          THE COURT:  That's my understanding.  What I

5   understand they stopped doing was the actual analysis once

6   they got the profile, the analysis to see if they could make

7   a match.

8          MR. DAVIS:  Well, I understood it to be that the

9   benchmark also tied in to the extraction of the profile.

10  Maybe I misunderstood.  I mean we're getting pretty

11  technical here.

12         THE COURT:  I'm understanding something different.

13  I'm understanding what they concluded there were problems

14  with was once they established the profile then using that

15  profile to compare against other items to see if a

16  comparison could be made.  That's what I'm understanding.

17  He's saying that these, that there was a concern about.  So

18  I mean it's a perplexing situation because if I let you go

19  into then I think in fairness to the government I've got to

20  let them maybe bring in these experts if they want to to say

21  hey, we came in and we did this analysis and we found there

22  was nothing wrong with what this witness has testified that

23  she did.

24         MR. DAVIS:  If I could look to my colleagues,

25  maybe we should do it on the record.  Are we saying that her

1   results went to Bode and they confirmed that her

2   interpretation of the mixture meant the benchmark criteria

3   that you were referring to that was set up after this

4   committee got together and reviewed the policy?

5          MR. AMBROSINO:  Can I address the Court on that,

6   on that question?  So there are three points I want to make

7   to try to clarify some of the things that counsel addressed.

8   First, counsel talked about how the witness said they're

9   careful, meaning that there's quality assurance standards

10  that they follow when they're doing bench work.  Dr. Budowle

11  wrote those standards when he was the chair of the

12  scientific working group for DNA.

13         He actually wrote those standards, so the person

14  conducting the review is the actual person that wrote all of

15  the quality assurance standards so the bench work throughout

16  the world.  This is not just followed by accredited labs in

17  the United States.  All laboratories around the world follow

18  those standards that Dr. Budowle set forth about a decade

19  ago.

20         What's important is what that means is they are

21  using positive and negative controls during the testing to

22  make sure there's no contamination and to make sure that the

23  instrumentation is functioning properly, that they don't

24  test known samples and evidence samples together at the same

25  time to avoid cross contamination.  That's what they mean

1    when they talk about carefully.  Has nothing to do with

2    interpreting the data.  That's the first point I want to

3    make.  Because that's, as a factual matter they have to

4    follow the QA standards in the laboratories.  That is part

5    of their accreditation process.  Has nothing to do with how

6    they interpret data.

7            So the second point I want to make is that one of

8    the things that we made absolutely sure of when we conducted

9    this review is that once we pulled our cases when we sent

10   over cases for Bode's interpretation we had three

11   possibilities.  We had the possibility that DFS had already

12   issued a report with some conclusions in it.  We had the

13   possibility they had issued a draft report but hadn't gotten

14   around to finalizing it yet.  And we had the third

15   possibility that they had done the bench work but they

16   hadn't gotten around to drafting any kind of report.

17           Regardless of the situation our clear instructions

18   to the chief of the case work unit at Bode was to take the

19   materials and to sanitize them for whoever the analyst was

20   that was reinterpreting it so they would not be bias,

21   prejudice, or influenced in any way by anything that came

22   out of the DFS.  That they would look at --

23           THE COURT:  When you say "sanitize," can you

24   explain what you're saying?

25           MR. AMBROSINO:  Yes.  To the extent there are any

1   conclusions, any kind of report issued by the Department of

2   Forensic Sciences or even any preliminary conclusions

3   reached by them as to the proper allele calls, as to any

4   kind of mixture interpretation we made sure that the analyst

5   such as Ms. Parker never saw that, so that they would be

6   interpreting the data 100 percent on their own.

7          Because we wanted to avoid this, and this is a

8   very legitimate question that counsel is asking.  We wanted

9   to avoid this very issue that well, Ms. Parker, you already

10  knew that the Department of Forensic Sciences pulled a male

11  profile out of a sperm fraction of a sexual assault kit,

12  didn't you?  You already saw the interpretation that was,

13  that was conducted by the Department of Forensic Sciences

14  because we were concerned that type of cross-examination

15  could legitimately open the door to these issues and that's

16  why we made sure that the only thing that went before the

17  analyst was the raw data, so that they were looking as if

18  their laboratory produced that data itself.

19         Because there aren't many laboratories.  We tried

20  to do what we call vertical testing so we have to call fewer

21  witnesses.  But oftentimes, laboratories such as the Federal

22  Bureau of Investigation will have other people do this bench

23  work.  They call them technicians.  And then they bring in

24  the higher ranking scientists to come in and interpret the

25  data for them.  And so we were treating Ms. Parker as if she

1    was the analyzing scientist from DFS to come in, look at the

2    bench work that was done during the process, and analyze the

3    data fresh with no influence or potential bias, and that way

4    we felt it was the cleanness and best way to take --

5              THE COURT:  So the bench work wasn't being redone

6    by Bode?

7              MR. AMBROSINO:  Never.

8              THE COURT:  Okay.

9              MR. AMBROSINO:  Never.  It was not.  Now it would

10   have been had Drs. Budowle and Beaver questioned the

11   integrity of any part of the bench work because that would

12   have brought with it a whole series of issues that would

13   have undermined the integrity of our prosecutions.  And

14   that's why that was the very first question I asked them

15   once they had had that.  We reviewed north of 150 cases.

16   And when we were about 30 or 40 in I asked them that

17   question, and made it very clear to them in the course of

18   their review they ever saw everything that undermine the

19   integrity of the bench work they were to notify me

20   immediately because it would have changed the entire

21   character of the review.

22             And as your Honor well knows when you do these

23   kind of reviews it's a moving target sometimes you find

24   things that you don't know what you're going to find until

25   the review is done.

1           With every single case, and this is the answer to

2    counsel's last question.  With every single case that was

3    reviewed if there were any problems the panel issued a

4    report setting forth those problems and we took that

5    language that they issued and we put it into a discovery

6    disclosure because scientists speak in very specific terms.

7    We didn't want to misstate what they were finding, so we

8    would literally block quote it and stick it into a discovery

9    letter and say your case has been reviewed as part of this

10   project and our experts have made the following findings

11   regarding the work done in this case.

12           THE COURT:  Okay.  And the testimony of this

13   witness gave about the alleles was that anything that came

14   understood scrutiny?

15           MR. AMBROSINO:  It would depend on the context of

16   it.  If the witness is saying this is the data in looking at

17   the data from the case.  There's just a chart that's filled

18   with data.  If the witness is saying this is the work that

19   was done and this is the data that was passed along that's

20   one thing.  If the witness is saying it's my opinion that

21   within this data I interpret this data as follows, I

22   interpret this data means that at each of these markers

23   these are the proper allele calls that's very different from

24   this is the data that I passed forward to, that was passed

25   forward to Bode Cellmark for interpretation.

1              So that's really, that's the demarcation language,

2    that there shouldn't -- this witness should not be asked in

3    your opinion if you look at this first marker D18, is it

4    your opinion that's an 1113?  That should be off limits.

5              THE COURT:  Government counsel asked a question

6    about a comparison between something that she did and

7    something else, what was that related to?

8              MS. DAVIS:  That was related to her raw data which

9    is this, I can show it to the Court because the jury is not

10   here.  Her raw data.  So let's say for instance, 1A2FS.  The

11   specific question I asked her was, are those alleles

12   reflected in Government's Exhibit 6B, page 29?  Are the

13   same, are the same alleles there.  I did not ask her -- I

14   purposely did not show her anything other than this allele

15   table.

16             THE COURT:  Right.

17             MS. DAVIS:  For that, for this data is basically

18   are these alleles present in this chart?  That's what I

19   asked her.

20             THE COURT:  And that chart, the two different

21   sources are what?  The chart is --

22             MS. DAVIS:  This chart is from Bode and this is

23   from her.

24             THE COURT:  From Bode, okay.  So you're just

25   trying to establish that what Bode had was the same thing as

1    she had?

2           MS. DAVIS:  Same as what she sent over.  Right.

3    And part of why we, part of why this is sort of in the order

4    that it's in is because we of course have to offer up the

5    witnesses that provide that raw data.  And with the DNA

6    expert and the travel schedule of both of them our DNA

7    expert went first and established that the comparison was

8    correct and everything.  And then we're coming in to fill in

9    the information that she based her opinion on.

10          THE COURT:  Anything you want to add in reference

11   to --

12          MR. AMBROSINO:  I do, your Honor.  So looking at

13   this exhibit where counsel would have gone into

14   interpretation issues is to ask the witness the type of

15   questions like well, now I noticed here that if you look at

16   any location along the left-hand side here that there's only

17   as many as four alleles per genetic marker what conclusions

18   can you draw from that.  The witness might say well, you

19   know, based on this data as a whole it's very clear to me

20   that there's only two persons in this mixture, a male and a

21   female.  And that I can in my opinion there's one of them is

22   a stronger contributor than the other.

23          THE COURT:  She didn't do that.

24          MR. AMBROSINO:  Those are the things we want to

25   know.  We want to know can we subtract out one of the

1    contributors here.  Can we pull a major contributor out?  Is

2    that major obviously.  If it's a sexual assault kit, we're

3    looking for the male contributor.  And are you able to do

4    that, or is this what we call a resolver mixture where you

5    have more balancing of the peaks.

6              THE COURT:  As I understand she said the alleles

7    she was able to detect from her bench work were consistent

8    with the alleles that the lab, the private lab would have

9    had that they used do their work.

10             MR. AMBROSINO:  Yes.  All counsel is trying to

11   establish is that they had the data, that they had the data

12   to interpret not what was your interpretation of the data.

13   It's just what you received was the same that I produced.

14             THE COURT:  And you're saying that this expert

15   analysis that you had done of the work that the DC lab was

16   doing did not detect any problems in reference to that

17   aspect of their work?

18             MR. AMBROSINO:  No, then we'd be in a completely

19   different world because we would not have been able to

20   sponsor the bench work in court.

21             THE COURT:  Okay.  Anything else, Mr. Davis, you

22   want to say in reference to this?

23             MR. DAVIS:  I think I have said about everything

24   that I can say on this.

25             THE COURT:  Well, I mean obviously I accept what

1    government counsel who came over who's the DNA expert at the

2    U.S. Attorney's office, as an officer of the court, I credit

3    what he says in reference to what was done to assess if

4    there was a problem in reference to the work that the DC lab

5    was doing.  And by my understanding of what this witness

6    said -- now whether she should have been qualified as an

7    expert and whether you want her qualified as an expert

8    that's a different issue.  But on the issue as to what she

9    actually said it seems to me that the evidence clearly shows

10   that there ultimately were no concerns about the quality of

11   work that the DC lab was doing in reference to what she

12   testified about.  So the decision to send the work to the

13   private lab had nothing to do with that.

14          So it seems to me to now permit an inquiry to be

15   made about well you know why were these samples being sent

16   to the private lab, it seems to me then opens the door in

17   fairness to the government to then permit the government to

18   bring in, may take until Monday or Tuesday to get them here,

19   these experts who would then be able to testify about the

20   fact that there in fact were no problems detected in

21   reference to the bench work, and therefore, the fact that

22   the information was sent out to the private lab has no

23   bearing on whether or not the testimony given by this

24   witness should be credited.

25          And it just seems to me that being the status that

1  we find ourselves in that I just don't see how it would then

2  under the circumstances be appropriate to go into that line

3  of inquiry.  In addition, it seems to me if I did permit

4  that it would also open the door because if there's a

5  question raised about the credibility of the work that was

6  done by the DC lab, it seems to me that then opens the door

7  because she said ultimately she did do an analysis, although

8  the jury hasn't heard anything about that because the

9  government didn't go into that, that would open the door to

10  show that the work she did was in fact consistent with what

11  the private lab ultimately determined to undermine the

12  suggestion that what the DC lab did and what she testified

13  about should not be credited.

14         So under the circumstances I just don't see how it

15  would be appropriate to go into that since it's my

16  conclusion based upon what we heard that the decision to

17  send the information to the private lab and the analysis

18  that was done by these two experts who came in to look at

19  what was being done by the DC lab, that the line of inquiry

20  would not be relevant to whether or not the testimony she

21  gave should be credited.

22         MR. DAVIS:  Court's indulgence?

23         THE COURT:  Yes.

24         MR. DAVIS:  I just wanted to confirm something to

25  make sure I understood this.  So the record is very clear

1    and so I am clear there's no issue with quality control at

2    the DC forensic lab.  The issue at the DC forensic lab dealt

3    with an interpretation, dealt with problems that they were

4    having with interpretation of DNA analysis.  So what they

5    decided to do is they shut down the DNA analysis at the DC

6    forensic lab.  They allowed them to do the extractions of

7    different materials and generate raw data.  And in our case

8    the raw data that this DC forensic worker extracted the male

9    profile was sent on along with the rest of the samples to

10   Bode, who then interpreted her raw data.

11           So I'm what, I'm hearing is the United States is

12   saying that there's no problem with the raw data she

13   generated, the problem was just with the interpretation and

14   therefore, there's no issue here because it was sent on and

15   it was interpreted by a private contractor.

16           THE COURT:  Is that an accurate summation?

17           MR. AMBROSINO:  That is correct, your Honor, there

18   were no problems with any of the quality assurance work done

19   at Department of Forensic Sciences that was then sent on to

20   interpretation by Bode.

21           THE COURT:  Very well.  I will sustain the

22   government's objection.  Let's bring the jury in and bring

23   the witness in.

24           MR. DAVIS:  We don't all end up at the bench I do

25   want to ask -- I want to take her through what she did.

1    I'll have her testify that she looked at the mixture

2    extracted, the male profile, sent all the samples onto Bode

3    and Bode did the actual analysis and interpretation of the

4    DNA materials and I would like to ask her factor in that

5    time period.  DC forensics were they doing DNA analysis and

6    she'll say no and I'll sit down.

7              THE COURT:  Any objection to that last question?

8              MS. DAVIS:  Court's indulgence.

9              MR. DAVIS:  And in closing argument I will not

10   forget our conversation that we had here.

11             THE COURT:  Any objection to that question?

12             MR. AMBROSINO:  Your Honor, I'm not sure what the

13   relevance was --

14             THE COURT:  I don't know what the relevance would

15   be that the DC lab was not doing analysis at that time.  I

16   guess there's a subliminal message that may be sent through

17   that question, but --

18             MR. AMBROSINO:  It's also a tricky question

19   because we only had the power --

20             THE COURT:  The problem with that question is that

21   the last question is that she in fact did do an analysis.

22   And if you ask that question then it seems to me that opens

23   the door for her to say well, actually I did although the

24   laboratory at some point did stop doing it that I in fact

25   did an analysis in this case and I came up with this result,

1    and then I think that only bolsters what Bode has to say

2    because Bode will say they reached the same conclusion that

3    she reached.

4              MR. AMBROSINO:  And it's a little complicated

5    because we pulled our cases on January 12th.  The

6    Metropolitan Police Department the other major client of the

7    Department of Forensic Sciences continued to send cases for

8    case work, so although we had pulled cases --

9              THE COURT:  So they did continue to do some work?

10             MR. AMBROSINO:  They continued until the

11   accreditation took them offline.  The accreditation agency

12   took them offline until corrections were made to the

13   interpretation process, but it was -- so it's a complicated

14   question and answer.  It's not so straightforward.

15             THE COURT:  I think based upon what's been said

16   that last question does create a problem.  Because as I say

17   if that last question is asked then that opens the door for

18   other information to come in.  And specifically, because it

19   seems to me the only reason that question would be asked

20   would be possibly raising a question about the worthiness of

21   the work being done by the lab as it relates to analysis.

22   But then as I say that would open the door it seems to for

23   the government to then bring out you in fact did do an

24   analysis in this case, didn't you?  Yes, I did.  And then

25   what was that result?  And she would say what that result is

1   without saying where the source of the known sample came

2   from, just that at some point she became aware of a known

3   sample that she compared and she made a comparison.  And

4   then Bode says we made the same comparison.  It seems to

5   that only bolsters of Bode because now you've got not only

6   Bode saying it's his DNA, but you also had this analyst

7   saying it was.

8           MR. AMBROSINO:  And your Honor also anticipated

9   the other ask that we would make of the Court were this door

10  to be opened which would be to bring in Dr. Budowle as a

11  rebuttal witness to make sure that the jury was not left

12  with the false impression that the integrity of the bench

13  work had been called into question, as your Honor also

14  anticipated would take time.  I know he's back in the

15  country as of two days ago we still would have to get him

16  here from Texas.

17          THE COURT:  If that door was opened I'd have to

18  let him testify because I think it would be only fair for

19  him to set the record straight about the analysis of the

20  situation revealed.  Okay.  Thank you.  So the last question

21  I would have to rule would not be appropriate.

22          MR. DAVIS:  Your Honor, since she did interpret

23  the data to some extent when she was testifying she looked

24  at the -- we didn't see the PowerPoint.  We saw the one

25  segment from the PowerPoint and she identified certain

 1   alleles in there and I think she was talking about how --

 2             THE COURT:  What was the Power -- I don't even

 3   know.  I heard her say the PowerPoint.  What was the

 4   PowerPoint information?  I don't even know what it was.

 5             MR. DAVIS:  I just think she should be qualified

 6   as an expert in light of her testimony on that.

 7             MS. DAVIS:  Again, your Honor, this was the --

 8             THE COURT:  If that's the only thing he's asking

 9   just qualify her then.

10             MS. DAVIS:  I think what mister -- well, I'll let

11   him say it.

12             MR. AMBROSINO:  I think one of the things that

13   counsel for the prosecution was obligated to do was to

14   connect up the evidence that was interpreted.  It's no

15   different from if you have a fingerprint examiner on the

16   stand you have to make sure they were looking at the right

17   latent print.

18             THE COURT:  I just don't know what the PowerPoint

19   was.

20             MR. AMBROSINO:  The PowerPoint is just showing

21   that analyst had the proper alleles, the proper results,

22   that she was looking at the same results --

23             THE COURT:  So the PowerPoint would be this

24   witness saying these are the alleles that I was able to

25   detect and that they're consistent or identical to the

1   alleles that the private lab used to for the comparison.

2          MR. AMBROSINO:  Exactly just to connect up the

3   evidence.  Otherwise, the jury is left to wonder well, was

4   she looking at the same -- do we know that she was looking

5   at the right evidence?  That's just a factual laying a

6   proper foundation so that, what the -- I know the testimony

7   came in in reverse order as often does with experts, but

8   making sure that the foundation is proper.

9          THE COURT:  But does it require any level of

10  expertise for someone to testify about the fact that they

11  were able to observe alleles?

12         MR. AMBROSINO:  Not to say these are the alleles

13  that was passed on.  This is the data that was passed on.

14  Now --

15         THE COURT:  But in order to even say what they're

16  looking at when they do the bench work does that require a

17  level of expertise?

18         MR. AMBROSINO:  Well, not to just pass the data

19  on.  It would be if the Court were to ask the analyst or one

20  of the parties was to ask the analyst what does this mean.

21         THE COURT:  This is all new to me.  What's the

22  process in, that's done in order to develop the identity of

23  the alleles?  How does that happen?

24         MR. AMBROSINO:  The machine spits them out.

25  They're right here.  So if you track the results and I'm not

1    quite sure that this chart tracks what this particular

2    electropherogram, but it seems to because the alleles are

3    indicated here.  So on the first marker, on the first marker

4    it says you've got three alleles 11, 13 and a 14.  And on

5    this first, on this graph right here you have an 11, 13 and

6    14.

7            THE COURT:  So the machine is actually telling you

8    what it is?

9            MR. AMBROSINO:  Yeah, this chart is just a

10   reflection of what's here on the machine.  Now, if the

11   analyst were to go forward and interpret this data the

12   analyst would do all sorts of things with this.  They'd look

13   at this and see are these really true alleles?  Could some

14   of this be artifact?  Who's the major contributor here?  How

15   many people are in this mixture?  When you start getting

16   into analyzing this data and trying to figure out what it

17   means then you're in the expert witness, but if you're just

18   taking what was spit out of the electropherogram and putting

19   it in a chart just to link up what Bode was looking at is

20   what DFS produced then that's purely a factual matter.

21           THE COURT:  Okay.  I didn't understand how that

22   whole process worked, but it seems to me that what I'm being

23   told now that would not require expertise in order to just

24   put down on the chart that the government showed what this

25   machine is detecting.  I don't see how that's expert opinion

1    or expert testimony, so I wouldn't require that she be

2    qualified unless the government wants to qualify her.

3            MS. DAVIS:  No, your Honor.

4            THE COURT:  All right.  Let's bring the jury in.

5            MR. AMBROSINO:  May I be excused?

6            THE COURT:  Yes, thank you.

7            MR. DAVIS:  My cross-examination will be much

8    shorter.

9            THE COURT:  Very well.

10           [Thereupon, Jury enters courtroom at 11:51 a.m.]

11           THE COURT:  You may be seated.  I apologize for

12   the delay.  I know jurors have concerns about these type of

13   delays, but there was a legal matter I had to resolve and it

14   just took a little time to resolve.  If you want to be mad

15   at anybody be mad at me not at them.  You may proceed.

16                       **CROSS-EXAMINATION**

17   BY MR. DAVIS:

18   Q    We're back.  The facts you talked about how you

19   reviewed the facts that had been given to you in order to

20   decide what samples you would work with in the DC forensic

21   lab, correct?

22   A    Correct.

23   Q    And those facts are detailed on the evidence packages

24   and reports that come to the lab, correct?

25   A    Some of the details, yes.

1  Q    And the actual samples they have documents where

2  they've been before and you document that they've been with

3  you after you conclude your testing, correct?

4  A    Correct.

5  Q    You make notions on the envelopes, correct?

6  A    Yes.

7  Q    So at every stage of the game someone makes a notation

8  indicating when they had it and when it goes out, correct?

9  A    If you've handled the evidence, yes.

10  Q    And that's chain of custody?

11  A    Correct.

12  Q    That's done to prevent contamination or any questions

13  about the sample?

14  A    Yes.  To help prevent -- to document where the evidence

15  has been and prevent tampering and show exactly where it's

16  been throughout the lab.

17  Q    So that any conclusions that are ultimately arrived at

18  are reliable, correct?

19  A    Correct.

20  Q    Now you were requested to look at a mixture, correct?

21  A    The profiles I developed two out of the four were

22  mixtures, yes.

23  Q    And when you developed the mixture what did you do with

24  the mixture --

25            THE COURT:  Let me just ask, before you do that

1    when you say a mixture what are you talking about, tell the

2    jury?

3              THE WITNESS:  So a mixture DNA profile occurs when

4    more than one person has contributed their DNA to that

5    sample.  So for example, if I touch this desk and then

6    somebody else comes along and touches this desk and I swab

7    this area, I may get a mixture of two people and I can

8    determine based on the electropherograms that I'm looking at

9    and the data that's in the electropherograms.

10   BY MR. DAVIS:

11   Q    And when you say you interpret that how do you

12   interpret that?

13   A    So the data comes off the instrument in the lab, and we

14   put it through a software program to help determine the

15   different cause for each location that we're looking at.

16   And then once we're looking at those electropherograms like

17   I said we can determine if it's a single source profile or

18   if it's a mixture and we can try to determine how many

19   people are contributing to that mixture.  So sometimes two

20   people, three people, four people and so on.

21             The more people contributing to a mixture the more

22   complex it is.  Single search profiles are fairly easy to

23   interpret.  Then once we have a mixture profile we will try

24   to determine the number of contributors.  Like I say in this

25   instance the two profiles that were mixtures were mixtures

1   of two individuals.

2   Q    How is it that you determine that it was a mixture of

3   two individuals?

4   A    So the data we look at looks at 16 locations one of

5   which is a gender specific location, so they tell you if the

6   profiles are male or female.  In this instance, we had what

7   we call intimate samples, so we had a vaginal cervical

8   sample and an anal perianal sample.  So I would, when it is

9   an intimate sample, I can potentially assume that the

10  contributor of that sample is, their DNA profile is in

11  there.  If I can do that I can utilize their profile to help

12  --

13  Q    I don't mean to interrupt you, when you say "utilize

14  their profile," can you explain to us what you did?

15  A    So because I know that the sexual assault kit came from

16  SH, I have her known sample that I've produced a single

17  source profile for or developed a single source profile for.

18  I will take that information I have and look at the mixture

19  because it's coming from her vaginal cervical sample.  I can

20  assume that she could or should be a contributor in that

21  mixture.

22  Q    So when you say compare her profile what is it you're

23  comparing?

24  A    So the tables that you guys have seen in the

25  presentation that Ms. Davis put up there is multiple columns

1    in the table.  So one would be an evidence profile, profiles

2    developed from the evidence, and one would be the victim's

3    known sample.  So I can go location by location and look and

4    see if I think if she's in that mixture or not.  Like I said

5    because it's an intimate sample I can assume if I'm looking

6    at that mixture and I do think indeed she's there, I can

7    assume that she's in there and kind of pull out her

8    information to then figure out who that second, or what the

9    profile is for the second person in there.

10          It's not always that easy, so if you don't have an

11   intimate sample say you have a swab from a doorhandle or

12   something that's not an intimate sample, so we can't assume,

13   necessarily assume anybody in that mixtures.  Those types of

14   mixtures can be more difficult to kind of part out who's in

15   there.  When it's an intimate sample my ability to utilize

16   her as contributor to that mixture helps me pull out better

17   and use math and what not to determine who that second

18   profile or what that second profile is.

19          When we say for a sexual assault samples that

20   we're looking -- if it's a female victim we're in the case

21   says there's a male had interactions with her then we're

22   looking at that gender specific location and looking for a

23   male contributor.  And that way I can say it's a male

24   profile that I'm separating out because I didn't see any

25   indication of male at that gender location then it would

 1  just be two female profiles.

 2  Q    But you, you did find you -- when you looked at that

 3  location you did, the location that was gender specific you

 4  did identify a male profile, correct?

 5  A    Yes, I did.  There were, females are XX and males are

 6  XY, and at that gender location there was X and Y present.

 7  Q    Is there any way that you can assess from what you did

 8  the quantity of the male contribution versus the female

 9  contribution?

10  A    So there's kind of two --

11  Q    I'm not asking you if you could have, did you?

12  A    Yes.

13  Q    Okay.

14  A    So sometimes in mixtures you can determine that there's

15  somebody contributing a lot more DNA than another person.

16  And we at the time could call that a major contributor and a

17  minor contributor.  And when I'm looking at that data it's

18  very obvious and kind of try to equate it to if you

19  visualize a bowl of M&Ms, and you have 75 red M&Ms and 25

20  blue M&Ms, you guys can tell right away that the red M&Ms

21  are the major contributor to that set of M&Ms.  If there's

22  50 blue M&Ms and 50 red M&Ms that's obviously equal and you

23  can't necessarily tell who's major minor.

24        Because, so the fact that I can assume the victim

25  in this mixture and there was major minor proportions, it's,

1    I would consider this in my experience a rather easy

2    situation to separate out the two contributors.

3    Q    Criteria for a major contributor is there a certain

4    quantification or is it more contextual comparison of the --

5    if you have a mixture of two people, is it more contextual

6    or is there a certain quantification?

7    A    To be honest I can't remember right now how our SOP at

8    the time or standard operating procedure at the time if it

9    had a specific number or not.

10   Q    That brings me to another question, a lot of these are

11   governed by benchmarks, standard operating, standard

12   protocols, correct?

13   A    Yes.

14   Q    Do they change?

15   A    They can -- there can be minor changes.  There can be

16   major changes over time as technology improves.  If you

17   valid a new procedure some settings that we have could

18   change.  The general basis or the foundation for it is all

19   the way, I wouldn't say all the same, but we kind of have

20   that training.  And you have to have kind of a foundation

21   for your training and looking at lots of mixtures to kind of

22   know what you're doing.

23          Like I said if it was one to one that's not going

24   to be a major to me.  I think more along the lines of a 60

25   percent 40 percent type of ratio to get more towards the

1    major minor, but like I said I just can't quite remember

2    right now how exactly --

3    Q    How --

4              MS. DAVIS:  I'm sorry, may we approach?

5              [Bench conference.]

6              MS. DAVIS:  It feels like we're getting into an

7    area where --

8              MR. DAVIS:  I'm not going any further.  I'm moving

9    right out of this now.  That's as far as I'm going.

10             THE COURT:  Okay.

11             MS. DAVIS:  I just was afraid we were getting

12   there.

13             [Open court.]

14   BY MR. DAVIS:

15   Q    On the victim profile how many locate points did you

16   look at?

17   A    All of the profiles we look at 15 locations plus the

18   one gender location.

19   Q    And you had the victim's profile when you did this?

20   A    Correct.

21   Q    But you had no male profiles to compare?

22   A    No male known standards.

23   Q    And then when you concluded everything you were

24   doing -- and you got it in the fall?  You began work in the

25   fall?

1    A    I believe late fall 2014.

2    Q    And you finished in the spring?

3    A    Yes.

4    Q    In march of two thousand?

5    A    March of 2015.

6    Q    Okay.  And then you packaged everything up that you

7    did, your raw data and your conclusion that there was a

8    major male contributor?

9    A    I issued a report on my results, yes.

10   Q    And then do you actually -- did you actually send the

11   material on to the private contracting lab Bode?

12   A    I believe I, I'm not exactly sure when it went out, but

13   I was potentially on maternity leave, so --

14   Q    Thank you.

15             MS. DAVIS:  Court's indulgence.  No redirect.

16             THE COURT:  Just one question, when you say you've

17   got a mixture and you've got to make a determination as to

18   whether it's coming from two different sources, is it a

19   machine or are you making that determination?

20             THE WITNESS:  I am doing that interpretation.

21             THE COURT:  Anything else?  Approach.

22             [Bench conference.]

23             THE COURT:  "In the past ten years to the best of

24   your knowledge has your lab ever contaminated the collection

25   specimens?"

1          MR. DAVIS:  I don't even think that's appropriate.

2    We're not going there.

3          MS. HERTZFELD:  I don't think so.

4          [Open court.]

5          THE COURT:  Okay.  Again, as I indicated if I make

6    a decision not to ask a question submitted it's because I've

7    made a legal determination that it's not a question relevant

8    to these proceedings.

9          Okay.  Thank you, Miss.  Next witness.

10          Thereupon,

11                         DANIEL CURTIS

12    having been called as a witness for and on behalf of the

13    Government, and having been first duly sworn by the Deputy

14    Clerk, was examined and testified, as follows:

15          THE WITNESS:  I do.

16                    **DIRECT EXAMINATION**

17    BY MS. DAVIS:

18    Q    Good morning.

19    A    Good morning.

20    Q    In a loud, clear voice can you give us your full name

21    and spell it for the record.

22    A    My name is Daniel Curtis, D-A-N-I-E-L, C-U-R-T-I-S.

23    Q    Sir, where do you work?

24    A    I work with the Washington, D.C. Department of Forensic

25    Sciences.

1    Q    And what do you do there?

2    A    I'm a forensic scientist two, so I perform analysis on

3    items of evidence, write reports to my findings, and testify

4    as needed.

5    Q    I'm going to direct your attention to an analysis that

6    was done back in the spring of 2015, involving a case of

7    United States versus Robert Kelsey.  Do you -- were you

8    involved in that case?

9    A    Yes, I was.

10   Q    And what was your role in that case?

11   A    I performed the lab work on the items of evidence for

12   that case, and then handed off the, those results to third

13   party analyst.

14   Q    And who was the reporting analyst?

15   A    It was Shana Mills.

16   Q    And can you tell us what were the evidence samples in

17   that case?

18   A    I believe the evidence samples were vaginal cervical

19   swabs and I can't recall the other swab.

20   Q    At this time I'm going to approach you with what has

21   already been marked for identification as Government's

22   Exhibit 7.  Do you recognize Government's Exhibit 7?

23   A    I do.

24   Q    What do you recognize it to be?

25   A    It's a case report that was reported by Shana Mills.

1   Q    Okay.  And using Government's Exhibit 7, if you could

2   review to see what, if any, of the evidence samples you

3   processed?

4   A    We processed the vaginal cervical swabs as well as the

5   anal slash perianal swabs.

6   Q    And in processing those swabs how is it that you know

7   those were the swabs that you analyzed?

8   A    The corresponding item numbers that we would correspond

9   to the two, that's how we would identify each item as we

10  process it through the lab.

11  Q    And how do you know that you are the person that

12  analyzed those particular samples versus someone else in the

13  lab using that report?

14  A    Using the actual report I wouldn't know just based off

15  of that, but the corresponding, we have worksheets that

16  document which samples were processed through which steps of

17  the DNA analysis process.  Those, I've checked that those

18  have been documented with my information.

19  Q    Okay.  And when you issued those worksheets what would

20  put on them to signify that you were the person that worked

21  on those samples?

22  A    I would put my initials D-S-C.

23  Q    So I'm going to direct your attention to in

24  Government's 7, I'm going to direct your attention to page

25  62.  And in looking at Government's Exhibit 7, page 62, is

1   that a page of information that reflects that that was in

2   fact an analysis that you performed?

3   A    Yes, my initials are on that page as well as pages 61

4   and 60, which correspond to sample M140461-18.2SFM.

5   Q    2SFM, is that right?

6   A    Yes.

7   Q    And you say your initials are there; is that correct?

8   A    Yes, they are.

9   Q    What are your initials just for the record?

10  A    My initials are D-S-C.

11  Q    And just for completion I'm going to direct your

12  attention to page 52 of that report.  Does page 52 reflect

13  your initials as well?

14  A    Yes, they do.

15  Q    And what was analyzed -- what was analyzed in

16  reflection in page 52?

17  A    This is sample M140461-1BEFM.

18       MS. DAVIS:  No more questions.

19       THE COURT:  Cross-examination.

20       MR. DAVIS:  No questions.

21       THE COURT:  Questions from the jury.  Thank you

22  sir.  Next witness.

23       Thereupon,

24                 ANDREW FEITER

25  having been called as a witness for and on behalf of the

1    Government, and having been first duly sworn by the Deputy

2    Clerk, was examined and testified, as follows:

3         THE WITNESS:  I do.

**DIRECT EXAMINATION**

5    BY MS. DAVIS:

6    Q    Good morning.

7    A    Good morning.

8    Q    In a loud, clear voice give us your name and spell it

9    for the record?

10   A    My Andrew Feiter, A-N-D-R-E-W, Feiter, F-E-I-T-E-R.

11   Q    And Andrew, where do you work?

12   A    I work at the DC Department of Forensic Sciences.

13   Q    How long have you worked there?

14   A    I've been there since October of 2014.

15   Q    I'm going to direct your attention to a case that was

16   processed back in the spring of 2015, United States versus

17   Robert Kelsey.  Were you involved in that case?

18   A    Yes, I was.

19   Q    What was your involvement in that case?

20   A    I processed the reference sample.

21   Q    What does that mean?

22   A    I processed a known sample that came along with the

23   evidence.

24   Q    Okay.  And was the known sample separate and apart from

25   the evidence samples in that case?

1    A     When I worked it, yes, it was.

2    Q     And did you have any involvement with processing the

3    evidence samples in that case?

4    A     I had no involvement with the evidence samples at all.

5          MS. DAVIS:  I have no further questions of this

6    witness.

7          MR. DAVIS:  No questions.

8          THE COURT:  Any questions from the jury?  Thank

9    you, sir.  Next witness.

10         MS. HERTZFELD:  Your Honor, that concludes the

11   witness testimony that the United States has to present.  I

12   think at this time the United States would wish to publish

13   to the jury Government's Exhibit 16A through C, which are

14   video recordings of the defendant's interview that were

15   subject of yesterday's stipulation.

16         THE COURT:  Very well.

17         MS. HERTZFELD:  At this time the United States

18   will publish to the jury Government's Exhibit 16A.

19         THE COURT:  Very well.  And that is already in

20   evidence?

21         MS. HERTZFELD:  It is, your Honor.

22         THE COURT:  Very well.

23         [Videotape played.]

24         THE COURT:  Let me just give an instruction to you

25   which I will repeat in my final instructions to you.  You're

1   being shown a tape recording that is in evidence and below

2   that you see a transcript of what purportedly is being said.

3   What is evidence in this case are the actual words that are

4   being spoken not what is written at the bottom.  What is

5   written at the bottom is only being provided to you as an

6   aid in helping you to understand exactly what is being

7   spoken.

8            And to the extent that what you hear is different

9   or perceived to be different than what you see it's what you

10  hear that controls because the actual words are not the

11  evidence, it's actually the spoken information that's being

12  presented to you.  And to the extent that you can't

13  determine what is being spoken but there are words that are

14  saying what's being spoken if that's the case then you have

15  to disregard the words because again, it's what you're

16  hearing that's being said that is the evidence and not what

17  is written.  Okay.

18           MS. HERTZFELD:  Thank you, your Honor.  The United

19  States would move to publish Government's Exhibit 16B.

20           THE COURT:  Very well.

21           [Videotape played.]

22           MS. HERTZFELD:  The United States would move to

23  publish Government's Exhibit 16C.

24           THE COURT:  Very well.

25           MR. DAVIS:  No objection.

1                [Videotape played.]

2                MS. HERTZFELD:  Thank you, your Honor.  At this

3     time the United States would move to admit into evidence

4     Government's Exhibit 23, which was the stipulation read to

5     the jury at the beginning of the day today.  And I think --

6                THE COURT:  Any objection?

7                MR. DAVIS:  No objection.

8                THE COURT:  Very well, admitted.

9                [Thereupon, Government's Exhibit No. 23 admitted

10               into evidence.]

11               THE COURT:  In reference to the tapes obviously

12    you could tell that you only saw parts of the tapes because

13    a consideration was made that the parts that were shown to

14    you were the only parts relevant to this case, and you

15    should not speculate as to what was on those parts of the

16    tape that were not shown to you because that's not relevant

17    to this case.

18               Okay.  The government has completed the

19    presentation of its case.  We'll take a short recess.

20               [Thereupon, Jury exits courtroom at 12:26 p.m.]

21               THE COURT:  Mr. Davis, anything at this point you

22    want to raise?

23               MR. DAVIS:  Yes, your Honor, I'd like to address a

24    Motion for Judgment of Acquittal.

25               THE COURT:  Okay.

1          MR. DAVIS:  With respect to Counts one and two, I

2     would raise insufficient evidence on and intent to travel

3     interstate to engage in sexual activity or sexual act.

4          THE COURT:  Basis for that position?

5          MR. DAVIS:  Sufficiency of evidence.

6          THE COURT:  I would conclude in reference to that

7     that the evidence would if believed by the jury would

8     clearly indicate that considering the conversations that had

9     taken place purportedly between the alleged victim and the

10     defendant it clearly was of a sexual nature, and according

11     to victim or alleged victim, that immediately after he

12     picked her up and when they stopped at a stop sign he

13     immediately -- I think when she said when she got in the car

14     he kissed her which would indicate sexual intent.  And

15     therefore I think that coupled with what subsequently

16     occurred allegedly is sufficient to show that there was an

17     intent to bring her into the District of Columbia to have

18     sex with her, so in reference to those two counts on that

19     argument I deny the motion.

20          MR. DAVIS:  And with respect to three and four, I

21     would also submit insufficient evidence that the events

22     occurred in the District.

23          THE COURT:  In reference to that she's identified

24     the location where it occurred.  She gave a description of

25     the house consistent with someone who has lived in the

1    house.  And I think that is sufficient to indicate that it

2    did occur in the District, plus to the extent that the

3    defendant's statement is believed he himself admits that he

4    brought her into the District of Columbia although he says

5    he dropped her off for somebody, and also the victim did say

6    that she saw the sign indicating the District of Columbia,

7    and that they passed that sign before they got to the

8    location where the alleged assault occurred.

9         MR. DAVIS:  And additionally with respect to Count

10   four, penetration of the victim's vulva by the defendant's

11   finger with an intent to abuse, humiliate, harass, degrade,

12   arouse or gratify we would submit there's insufficient

13   evidence on that.  There was testimony that --

14        THE COURT:  Government, what's your response to

15   that?  I do have some questions about that.  In fact, I

16   asked the court reporter to get me a copy of the transcript

17   because I do recall the testimony, and I had concerns about

18   whether there was any evidence of penetration.  And upon

19   getting the transcript and reviewing it, I did not see

20   anything that would indicate that there was penetration of

21   the vulva by with the finger.

22        MS. HERTZFELD:  Your Honor, the government's

23   response is that the victim testified that as she was

24   traveling into the District of Columbia and in fact just

25   within a couple of minutes of parking when the defendant was

1   touching her on the vagina with her fingers he was rubbing

2   her making contact between her vagina and his fingers and

3   pressing upward.  And I think based on the testimony of the

4   SANE nurse that in fact --

5          THE COURT:  How do I know pressing upward means

6   that the finger actually penetrated the vulva?

7          MS. HERTZFELD:  Well, I think based on the

8   testimony of the SANE nurse the vulva is just the very most

9   outer part of the vagina there's an inference to be drawn by

10  the jury that it is penetration however slight and in fact

11  that meets --

12         THE COURT:  How do I know pushing up means that

13  there was even slight penetration?  I don't -- the jury

14  would have to speculate that when she said she pushed up

15  that that meant there was some level of penetration.  I just

16  don't know how they can do that other than speculation.  I

17  thought there would have been a question asked after that

18  when you say he pushed up what do you mean he did and that

19  didn't come.  And that's why I had a concern and that's why

20  I asked the court reporter to get me a copy of the

21  transcript.

22         MS. HERTZFELD:  Yes, your Honor.  I think based on

23  the position she indicated she was in in the driver's seat

24  with his reaching his hand down and pressing upward from the

25  angle he was sitting with his hand making contact with her

1    vagina pressing up she made a demonstration there of the

2    gesture that she was talking about.

3              I think that given that coupled with the SANE

4    nurse's testimony that would be the basis for the inference,

5    the positioning of his hand.  The way she described her body

6    positioning relative to his hand that pushing up would be up

7    into the vagina.

8              THE COURT:  Mr. Davis?

9              MR. DAVIS:  The only thing I would add to that is

10   is the forensic nurse, the first individual to examine the

11   victim indicated in her report and during her testimony that

12   there was no finger penetration.  I asked her specifically

13   about her report where she indicated that there was no

14   finger penetration and she got her information from the

15   victim.

16             THE COURT:  I do think that there's just not

17   sufficient evidence of any level of penetration.  I just

18   think the jury would have to speculate that when she said he

19   pushed up, which she did say on two different occasions,

20   that meant he inserted to some degree his finger into the

21   vulva and I just don't think speculation is a sufficient

22   predicate to establish guilt beyond a reasonable doubt.  So

23   I will grant the defense motion to dismiss that particular

24   count of the indictment.

25             Anything else, Mr. Davis?

1          MR. DAVIS:  Nothing further, your Honor.  Well,

2     actually, your Honor, in addition to the MJOA, I renew all

3     motions made both pretrial and during trial and all

4     objections made during trial.

5          THE COURT:  Very well.  I have two options because

6     we're going to have lunch.  I'm going to now have some

7     changes made to the instructions because I have to take out

8     all the language, substantive instructions regarding the

9     alleged use of the finger and I'm going to have to put

10    together another instruction regarding the fact that at

11    least one charge has been dismissed mid-trial.  And that

12    won't take obviously a lot of time but it will take a little

13    bit of time, and we've got to go for lunch, so we get back

14    from lunch probably around 1:45.

15         And if we have argument as I said yesterday I

16    don't like giving instructions to the jury on a Friday

17    evening when they may feel pressure to try and resolve the

18    case so they don't have to come back on Monday.  And since

19    they should not be trying to resolve a case quickly

20    especially a case of this significance I wouldn't be

21    inclined to give instructions to the jury today.

22         However, we do have enough time for arguments to

23    be made so you can either make arguments today and jury

24    instructions on Monday morning or we can have arguments and

25    instructions on Monday.  I'll hear from counsel.  I have

1   nothing on my calendar on Monday, so we would start promptly

2   at 9:30.

3        MS. HERTZFELD:  Would your Honor be incline to

4   allow us to close and still instruct them today and then

5   just begin deliberations on Monday?

6        THE COURT:  No.  I would rather give them the

7   instructions before they go out.  I don't see the

8   difference.  I mean it will take about 45 minutes to give

9   the instructions.  You can do the arguments today and

10  closing instructions first thing Monday morning or we can do

11  both closings and instructions Monday morning.

12       MS. HERTZFELD:  I would prefer to have them

13  instructed and argue on the same day.

14       THE COURT:  That's fine.  Mr. Davis, you have a

15  problem with that?

16       MR. DAVIS:  I want to get this over, but I don't

17  have a legal basis.

18       THE COURT:  We'll do everything on Monday.  If we

19  start at 9:30, we should be finished by noon at least at the

20  latest.

21       MR. DAVIS:  Are we going to bring the jury in?

22       THE COURT:  I will bring in the jury.  Mr. Kelsey

23  --

24       THE DEFENDANT:  Yes.

25       THE COURT:  You want to bring him up, marshal.

1          MR. DAVIS:  Before we begin this I just want to

2     represent to the Court I've had conversations with

3     Mr. Kelsey about the pros and cons of testifying and how

4     ultimately it is his decision and his decision alone as to

5     whether or not to testify and I'll let him respond to your

6     Honor's inquiry.

7          THE COURT:  Mr. Kelsey, as your lawyer indicated

8     he told you, you do have the absolute right to take the

9     witness stand and testify in your own defense.  And

10    regardless of what advice your lawyer has given you as to

11    whether you should or should not testify the ultimate

12    decision as to whether you testify is your decision because

13    it is your life.  So I need to know whether you appreciate

14    the fact that you do have the absolute right to testify in

15    this case if you choose to?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Understanding that you have that

18    right, is it your desire to testify or not to testify?  And

19    you should understand that once you make that decision

20    that's a final decision.  You can't -- depended upon what

21    happens in the case you can't later say well I made a

22    mistake, so you have to be sure one way or the other which

23    way you want to go.

24         THE DEFENDANT:  Not to testify.

25         THE COURT:  Not to testify?  You're absolutely

 1    certain of that?

 2              THE DEFENDANT:  Yes.

 3              THE COURT:  Very well.  Thank you.  Thank you,

 4    marshal.  Okay.  We'll bring the jury in and I'll release

 5    them, tell them to be here at 9:30 on Monday.

 6              [Thereupon, Jury enters courtroom at 12:41 p.m.]

 7              THE COURT:  Approach for a minute.

 8              [Bench conference.]

 9              THE COURT:  Do you want to actually rest before

10    the jury, or do you want to wait until Monday?

11              MR. DAVIS:  Just make certain that Mr. Kelsey,

12    otherwise --

13              THE COURT:  Okay.

14              [Open court.]

15              THE COURT:  Ladies and gentlemen, the trial is

16    almost over.  We're not going to be able to proceed further

17    today, but I am confident, pretty confident, that we should

18    be able to have you start to deliberate before noon on

19    Monday, so we would ask that you be here at 9:30 on Monday

20    morning.  And at that time we will complete the trial which

21    would include at least the closing arguments of the lawyers

22    and my final instructions to you.  And I like I say expect

23    if we start on time at 9:30, we should have you starting

24    your discussions about the case by noon.

25              Please continue to comply with all of the

1  instructions I've previously given about how you should

2  conduct yourself while you're in recess.  Don't talk about

3  the case even amongst yourselves.  Don't have contact with

4  anyone associated with the case.  Don't do any type of

5  research to try and find out anything about the case or

6  about language or definitions related to the case, that

7  would be totally inappropriate.  As I said you have to rely

8  upon what you hear and what you see in the courtroom in your

9  decision that you have to render in this case.

10        And I don't believe there will be anything in the

11  media about this case, but by chance there was remember your

12  obligation not to have contact with that.  But if you do

13  have contact your obligation to immediately turn your

14  attention elsewhere, but to let me know about that but don't

15  tell one of your fellow jurors what occurred because that

16  may have disqualified you as a juror and if you tell one of

17  your fellow jurors you also would be disqualifying that

18  person.

19        I hate to have you start your weekend early, but

20  we do have to stop now so you'll just have to enjoy the rest

21  of the day.  Have a nice rest of the day on Friday, enjoy

22  the weekend and we'll see you on Monday at 9:30.

23        [Thereupon, Jury exits courtroom at 12:41 p.m.]

24

25

1                          CERTIFICATE

2              I, Cathryn J. Jones, an Official Court Reporter

3    for the United States District Court of the District of

4    Columbia, do hereby certify that I reported, by machine

5    shorthand, the proceedings had and testimony adduced in the

6    above case.

7              I further certify that the foregoing 726 pages

8    constitute the official transcript of said proceedings as

9    transcribed from my machine shorthand notes.

10             In witness whereof, I have hereto subscribed my

11   name, this the 15th day of June, 2017.

12

13

14

15                             /s/_Cathryn J. Jones
16                             Cathryn J. Jones, RPR
                               Official Court Reporter
17

18

19

20

21

22

23

24

25

**BY MR. DAVIS: [7]** 645/9 657/6
659/12 660/9 701/16 703/9 708/13
**BY MS. DAVIS: [9]** 635/1 636/20
638/2 638/24 640/23 643/1 662/2
710/16 714/4
**MR. AMBROSINO: [28]** 673/21
675/11 678/19 679/4 679/15 684/4
685/24 687/6 687/8 688/14 690/11
690/23 691/9 691/17 694/16 695/11
695/17 696/3 696/9 697/7 698/11
698/19 699/1 699/11 699/17 699/23
700/8 701/4
**MR. DAVIS: [61]** 638/21 647/11
647/15 647/20 648/1 648/7 649/1
649/11 649/24 650/1 650/7 650/10
650/15 650/21 651/8 655/20 656/5
656/10 656/18 656/21 657/3 660/25
667/8 667/12 667/18 668/12 668/18
668/23 679/25 680/19 681/1 681/13
682/4 683/2 683/7 683/23 691/22
693/21 693/23 694/23 695/8 697/21
698/4 701/6 708/7 709/25 713/19
715/6 716/24 717/6 717/22 717/25
718/4 718/19 719/8 721/8 721/25
723/15 723/20 723/25 725/10
**MS. DAVIS: [52]** 634/16 637/22
637/24 638/1 638/18 640/21 642/24
645/5 647/4 648/10 649/4 649/7 651/2
651/6 651/9 651/12 651/19 652/10
652/16 652/22 653/2 653/15 654/8
654/13 654/18 654/23 655/9 663/11
663/19 663/25 664/3 664/6 664/10
664/18 664/23 665/3 665/9 666/2
689/7 689/16 689/21 690/1 695/7
698/6 698/9 701/2 708/3 708/5 708/10
709/14 713/17 715/4
**MS. HERTZFELD: [30]** 633/6 633/9
633/12 633/16 651/14 666/5 668/24
670/10 670/16 670/22 671/7 671/23
672/4 672/14 672/19 672/21 673/9
673/15 710/2 715/9 715/16 715/20
716/17 716/21 717/1 719/21 720/6
720/21 723/2 723/11
**THE COURT: [183]**
**THE DEFENDANT: [4]** 723/23 724/15
724/23 725/1
**THE DEPUTY CLERK: [1]** 633/1
**THE WITNESS: [13]** 636/19 659/10
659/24 660/16 661/4 661/11 661/13
661/17 661/19 661/25 662/22 703/2
709/19

**.**

**.x [1]** 631/6

**/**

**/s [1]** 727/15

**1**

**100 [1]** 686/6
**10:07 [1]** 651/24
**10:34 [1]** 673/14
**11 [2]** 700/4 700/5
**1113 [1]** 689/4
**11:07 [1]** 673/15
**11:51 [1]** 701/10

---

**12 [1]** 635/24
**12:26 [1]** 717/20
**12:41 [2]** 725/6 726/23
**12th [1]** 696/5
**13 [3]** 650/3 700/4 700/5
**1350 [1]** 631/16
**14 [5]** 633/19 633/25 634/11 700/4
700/6
**15 [1]** 708/17
**150 [1]** 687/15
**15th [1]** 727/11
**16 [1]** 704/4
**16-55 [1]** 633/3
**16-55-RBW [1]** 631/4
**16A [2]** 715/13 715/18
**16B [1]** 716/19
**16C [1]** 716/23
**18.2SFM [1]** 713/4
**1:45 [1]** 722/14
**1A.2EF [2]** 643/4 643/22
**1A.2SF [1]** 644/14
**1A2FS [1]** 689/10
**1BEF [1]** 644/23
**1BEFM [1]** 713/17
**1C [1]** 644/6

**2**

**20001 [1]** 631/21
**20036 [1]** 631/17
**2004 [1]** 635/24
**2014 [4]** 637/14 658/2 709/1 714/14
**2015 [8]** 634/4 634/10 657/19 657/22
660/19 709/5 711/6 714/16
**2016 [3]** 631/5 660/25 668/4
**2017 [1]** 727/11
**202 [1]** 631/16
**202-257-5159 [1]** 634/10
**20530 [1]** 631/14
**20th [1]** 658/2
**23 [3]** 632/15 717/4 717/9
**240-893-6725 [1]** 634/9
**25 [1]** 706/19
**26 [3]** 631/5 642/22 643/3
**26th [1]** 657/22
**27 [2]** 643/25 644/1
**29 [2]** 644/9 689/12
**29th [1]** 634/4
**2SFM [1]** 713/5

**3**

**30 [5]** 643/6 643/25 644/7 681/5
687/16
**32 [2]** 644/17 644/18
**333 [1]** 631/20
**35 [1]** 636/17
**37 [1]** 636/17

**4**

**40 [2]** 687/16 707/25
**45 [1]** 723/8

**5**

**50 [2]** 706/22 706/22
**51 [1]** 644/20
**5159 [1]** 634/10
**52 [4]** 644/18 713/12 713/12 713/16
**54 [1]** 643/11

---

**55 [3]** 633/3 643/10 643/11
**555 [1]** 631/13

**6**

**60 [2]** 707/24 713/4
**61 [2]** 644/11 713/3
**62 [4]** 644/10 644/11 712/25 712/25
**635 [1]** 632/6
**645 [1]** 632/6
**6521 [1]** 631/20
**6725 [1]** 634/9
**6B [10]** 641/16 641/23 642/20 642/23
643/1 643/24 644/1 644/15 644/22
689/12

**7**

**710 [1]** 632/8
**714 [1]** 632/11
**717 [1]** 632/15
**726 [1]** 727/7
**75 [1]** 706/19

**9**

**9:30 [6]** 723/2 723/19 725/5 725/19
725/23 726/22
**9:38 [1]** 631/6
**9:40 [1]** 633/14
**9th [1]** 634/10

**A**

**A-N-D-R-E-W [1]** 714/10
**a.m [6]** 631/6 633/14 651/24 673/14
673/15 701/10
**ability [5]** 648/21 654/7 655/24 661/10
705/15
**able [27]** 637/16 638/20 646/23 649/6
649/18 652/5 652/13 655/6 660/22
666/6 666/13 667/4 673/19 676/15
677/19 679/2 679/24 681/7 681/16
691/3 691/7 691/19 692/19 698/24
699/11 725/16 725/18
**about [116]**
**above [1]** 727/6
**absent [2]** 652/6 677/11
**absolute [2]** 724/8 724/14
**absolutely [2]** 685/8 724/25
**abuse [1]** 719/11
**accept [2]** 680/16 691/25
**according [1]** 718/10
**accreditation [4]** 660/21 685/5 696/11
696/11
**accredited [1]** 684/16
**accuracy [5]** 648/15 655/17 661/10
665/25 681/23
**accurate [3]** 665/21 670/15 694/16
**accurately [1]** 648/22
**acquired [1]** 678/10
**Acquittal [1]** 717/24
**across [2]** 662/14 662/18
**act [1]** 718/3
**activity [2]** 678/13 718/3
**actual [13]** 646/11 674/7 675/12
675/18 675/21 677/23 683/5 684/14
695/3 702/1 712/14 716/3 716/10
**actually [20]** 641/1 641/1 648/11
648/12 654/21 654/23 657/18 658/6
660/18 665/24 684/13 692/9 695/23

**actually... [7]** 700/7 709/10 709/10
716/11 720/6 722/2 725/9
**add [2]** 690/10 721/9
**added [1]** 635/20
**addition [2]** 693/3 722/2
**additional [8]** 639/9 640/1 640/3 640/5
640/14 640/15 646/13 650/23
**additionally [1]** 719/9
**address [2]** 684/5 717/23
**addressed [1]** 684/7
**adduced [1]** 727/5
**administrative [4]** 637/9 657/25
658/10 658/10
**admit [1]** 717/3
**admits [1]** 719/3
**admitted [5]** 632/14 633/19 641/15
717/8 717/9
**advice [1]** 724/10
**afraid [1]** 708/11
**after [11]** 636/18 650/12 650/17
654/15 660/20 674/15 676/8 684/3
702/3 718/11 720/17
**again [8]** 656/16 659/2 662/18 665/3
665/13 698/7 710/5 716/15
**against [3]** 663/22 668/23 683/15
**agency [1]** 696/11
**agents [1]** 634/12
**ago [2]** 684/19 697/15
**agree [1]** 634/4
**agreed [1]** 675/1
**ahead [1]** 667/5
**aid [1]** 716/6
**aided [1]** 631/24
**alerted [1]** 674/10
**all [40]** 633/3 637/20 638/6 646/22
649/17 650/25 653/5 654/19 655/21
657/1 665/10 666/7 666/25 667/7
671/1 672/15 675/7 677/3 677/25
678/12 679/1 680/4 681/21 682/11
684/14 684/17 691/10 694/24 695/2
699/21 700/12 701/4 707/18 707/19
708/17 715/4 722/2 722/3 722/8
725/25
**alleged [4]** 718/9 718/11 719/8 722/9
**allegedly [1]** 718/16
**allele [9]** 642/10 642/19 643/12 644/25
651/7 651/19 686/3 688/23 689/14
**alleles [32]** 643/20 643/21 644/1
644/12 644/15 644/16 644/21 645/25
648/8 652/24 653/14 661/9 680/10
680/12 682/8 688/13 689/11 689/13
689/18 690/17 691/6 691/8 698/1
698/21 698/24 699/1 699/11 699/12
699/23 700/2 700/4 700/13
**allow [2]** 682/16 723/4
**allowed [3]** 648/5 667/13 694/6
**almost [2]** 635/12 725/16
**alone [1]** 724/4
**along [8]** 635/21 679/12 688/19
690/16 694/9 703/6 707/24 714/22
**already [15]** 633/19 633/25 641/15
651/10 658/14 659/6 667/2 668/13
668/17 669/9 685/11 686/9 686/12
711/21 715/19
**also [13]** 636/3 640/11 662/21 663/22
683/9 693/4 695/18 697/6 697/8

697/13 718/21 719/5 726/17
**although [5]** 652/3 695/7 695/23 696/8
719/4
**always [2]** 676/17 705/10
**am [5]** 642/14 667/13 694/1 709/20
725/17
**Ambrosino [2]** 673/17 673/23
**AMERICA [3]** 631/3 633/24 634/3
**amongst [1]** 726/3
**amplification [3]** 675/15 675/17
677/23
**anal [1]** 639/6 639/12 644/22 658/23
660/1 704/8 712/5
**analysis [51]** 636/14 641/8 641/22
642/9 646/9 646/20 647/2 648/12
652/14 652/18 654/11 654/16 654/23
656/2 656/3 656/5 656/13 657/10
658/3 658/4 658/6 658/8 659/3 660/11
667/21 668/3 669/15 670/9 672/12
678/11 681/1 683/5 683/6 683/21
691/15 693/7 693/17 694/4 694/5
695/3 695/5 695/15 695/21 695/25
696/21 696/24 697/19 711/2 711/5
712/17 713/2
**analyst [16]** 635/20 636/1 662/12
662/17 675/22 685/19 686/4 686/17
697/6 698/21 699/19 699/20 700/11
700/12 711/13 711/14
**analysts [5]** 635/22 636/8 645/1 671/9
671/22
**analysts' [1]** 677/7
**analyze [2]** 642/16 687/2
**analyzed [9]** 653/5 655/1 656/7 657/16
663/22 712/7 712/12 713/15 713/15
**analyzer [2]** 642/6 675/19
**analyzing [3]** 664/13 687/1 700/16
**Andrea [1]** 631/12
**Andrew [5]** 632/10 645/5 713/24
714/10 714/11
**angle [1]** 720/25
**another [6]** 663/20 670/20 671/4
682/22 706/15 707/10 722/10
**answer [6]** 637/4 673/20 674/1 677/20
688/1 696/14
**anticipated [2]** 697/8 697/14
**any [52]** 635/25 641/4 641/5 645/1
646/7 647/25 649/5 650/14 650/23
658/19 661/2 661/6 661/9 661/23
666/10 671/18 674/1 674/19 678/2
678/11 678/11 678/24 680/18 680/25
682/14 682/22 685/16 685/21 685/25
686/1 686/2 686/3 687/11 688/3
690/16 691/16 694/18 695/7 695/11
699/9 702/12 702/17 705/24 706/7
708/8 712/2 715/2 715/8 717/6 719/18
721/17 726/4
**anybody [2]** 701/15 705/13
**anyone [1]** 726/4
**anyone's [1]** 681/3
**anything [19]** 639/22 640/3 646/5
649/16 651/3 670/10 676/13 685/21
688/13 689/14 690/10 691/21 693/8
709/21 717/21 719/20 721/25 726/5
726/10
**anytime [1]** 660/7
**apart [1]** 714/24
**apologize [1]** 701/11

**appears [1]** 638/6
**appreciate [1]** 724/13
**approach [6]** 637/23 647/6 708/4
709/21 711/20 725/7
**appropriate [6]** 647/17 670/6 693/2
693/15 697/21 710/1
**April [1]** 660/19
**are [69]** 633/4 637/5 637/6 640/7
640/20 641/23 644/1 644/12 644/15
644/21 647/8 650/6 653/14 654/13
659/24 660/11 660/12 664/6 667/16
672/7 672/7 675/10 676/2 676/3 676/5
676/6 676/10 683/25 684/6 684/20
685/25 688/23 689/11 689/12 689/13
689/18 689/21 690/24 691/3 698/24
699/12 700/2 700/13 700/15 701/23
702/17 702/18 703/1 703/19 703/22
704/6 706/5 706/5 706/21 707/10
709/19 712/11 713/3 713/7 713/8
713/9 713/10 715/13 716/3 716/3
716/10 716/13 716/13 723/21
**area [2]** 703/7 708/7
**aren't [1]** 686/19
**argue [2]** 653/18 723/13
**argument [3]** 695/9 718/19 722/15
**arguments [5]** 722/22 722/23 722/24
723/9 725/21
**arose [2]** 672/16 674/5
**around [4]** 684/17 685/14 685/16
722/14
**arouse [1]** 719/12
**arrived [1]** 702/17
**articles [1]** 636/9
**artifact [1]** 700/14
**as [121]**
**aside [1]** 653/5
**ask [31]** 633/17 638/4 638/19 639/2
642/2 650/22 650/24 653/17 656/11
656/19 657/9 667/14 667/14 667/18
667/19 667/23 668/2 678/1 682/17
682/19 689/13 690/14 694/25 695/4
695/22 697/9 699/19 699/20 702/25
710/6 725/19
**asked [26]** 650/1 650/4 650/5 650/13
652/1 652/7 668/16 674/20 675/6
675/9 676/5 676/10 676/16 682/10
687/14 687/16 689/2 689/5 689/11
689/19 696/17 696/19 719/16 720/17
720/20 721/12
**asking [7]** 646/18 656/12 664/22
680/16 686/8 698/8 706/11
**aspect [1]** 691/17
**aspects [1]** 657/15
**assault [12]** 639/4 639/18 640/1 640/4
640/9 676/21 679/9 686/11 691/2
704/15 705/19 719/8
**assess [2]** 692/3 706/7
**assigned [1]** 672/7
**assist [1]** 673/21
**assistance [1]** 678/1
**associated [1]** 726/4
**assume [12]** 633/11 672/9 672/10
672/11 682/15 704/9 704/20 705/5
705/7 705/12 705/13 706/24
**assurance [3]** 684/9 684/15 694/18

**A**

**attack [4]** 648/24 648/25 655/24 657/2
**attacked [1]** 664/17
**attacking [2]** 647/8 647/10
**attempting [2]** 673/17 674/15
**attention [9]** 637/13 641/15 642/2 711/5 712/23 712/24 713/12 714/15 726/14
**ATTORNEY'S [12]** 631/13 658/12 659/4 661/21 666/21 669/7 669/18 670/8 673/23 674/17 680/4 692/2
**August [1]** 631/5
**AUSA [2]** 631/12 631/12
**available [1]** 640/5
**Avenue [2]** 631/16 631/20
**avoid [3]** 684/25 686/7 686/9
**aware [3]** 633/8 697/2
**away [3]** 663/21 677/9 706/20

**B**

**Bachelor's [1]** 636/2
**back [19]** 637/13 645/12 646/5 647/3 647/18 647/22 648/5 660/23 660/24 665/3 666/22 667/7 668/2 697/14 701/18 711/6 714/16 722/13 722/18
**balancing [1]** 691/5
**Barber [1]** 674/10
**based [25]** 639/20 640/1 649/18 652/13 656/7 656/17 656/17 662/24 663/5 669/17 670/25 672/12 676/4 679/23 680/15 680/17 690/9 690/19 693/16 696/15 703/8 712/14 720/3 720/7 720/22
**basically [5]** 645/14 646/21 648/4 675/24 689/17
**basis [5]** 667/8 707/18 718/4 721/4 723/17
**be [139]**
**bearing [1]** 692/23
**Beaver [5]** 674/23 675/6 676/9 677/16 687/10
**became [1]** 697/2
**because [88]** 646/13 647/9 647/17 647/18 647/21 649/25 650/4 650/25 652/3 652/19 653/9 654/2 655/4 657/14 658/3 659/4 660/15 662/22 663/3 663/5 664/4 664/20 665/23 665/13 665/16 665/20 666/12 667/2 667/21 668/22 669/1 669/2 669/13 670/17 672/9 673/5 674/1 675/7 676/1 676/12 676/16 676/21 676/22 676/23 678/21 679/10 680/1 681/19 681/20 682/21 683/18 685/3 686/7 686/14 686/19 687/11 687/20 688/6 689/9 690/4 691/19 693/4 693/7 693/8 694/14 695/19 696/2 696/5 696/16 696/18 697/5 697/18 700/2 704/15 704/19 705/5 705/24 706/24 710/6 716/10 716/15 717/12 717/16 719/17 722/5 722/7 724/12 726/15
**been [34]** 633/19 634/20 634/21 635/23 637/20 641/15 642/8 642/12 650/3 652/4 670/24 671/19 673/25 682/5 687/10 688/9 691/19 692/6 696/15 697/13 701/19 702/2 702/2 702/15 702/16 710/12 710/13 711/21 712/18 713/25 714/1 714/14 720/17

**before [22]** 631/19 634/1 636/13 637/8 637/9 637/16 638/10 641/21 641/25 649/9 650/13 673/25 681/11 682/10 686/16 702/2 702/25 719/7 723/7 724/1 725/9 725/18
**began [1]** 708/24
**begin [2]** 723/5 724/1
**beginning [1]** 717/5
**behalf [3]** 632/3 634/20 710/12 713/25
**behavior [1]** 665/2
**being [31]** 634/8 635/16 636/18 649/6 652/2 652/7 663/8 665/21 668/11 670/14 671/25 675/23 680/16 681/7 681/24 682/3 687/5 692/15 692/25 693/19 696/21 700/22 716/1 716/2 716/4 716/5 716/6 716/11 716/13 716/14 716/16
**believe [17]** 641/10 642/5 642/7 642/12 657/18 660/14 660/23 661/5 661/21 661/22 665/2 668/15 678/24 709/1 709/12 711/18 726/10
**believed [2]** 718/7 719/3
**below [1]** 716/1
**bench [32]** 647/7 654/20 674/6 675/7 675/10 675/22 676/11 676/12 676/14 677/2 677/3 677/6 679/3 679/7 679/18 684/10 684/15 685/15 686/22 687/2 687/5 687/11 687/19 691/7 691/20 692/21 694/24 697/12 699/16 708/5 709/22 725/8
**benchmark [3]** 682/18 683/9 684/2
**benchmarks [1]** 707/11
**best [5]** 649/23 674/2 682/16 687/4 709/23
**better [4]** 665/2 669/13 670/3 705/16
**between [12]** 633/23 634/6 646/5 651/16 652/12 663/20 666/17 669/4 669/16 689/6 718/9 720/2
**beyond [1]** 721/22
**bias [2]** 685/20 687/3
**big [2]** 656/22 656/23
**biology [3]** 635/14 636/3 636/5
**bit [2]** 657/4 722/13
**bite [1]** 639/7
**blind [1]** 678/22
**block [1]** 688/8
**blue [2]** 706/20 706/22
**Bode [44]** 641/13 642/3 651/4 651/13 657/3 658/13 658/15 659/3 662/21 663/8 664/5 665/20 665/24 666/23 667/2 667/4 668/9 669/3 669/8 669/14 670/3 671/18 674/8 677/15 681/15 682/21 684/1 685/18 687/6 688/25 689/22 689/24 689/25 694/10 694/20 695/2 695/3 696/1 696/2 697/4 697/5 697/6 700/19 709/11
**Bode's [2]** 663/17 685/10
**bodily [1]** 676/22
**body [2]** 653/4 721/5
**bolsters [1]** 691/5
**both [5]** 660/2 677/8 690/6 722/3 723/1
**bottom [2]** 716/4 716/5
**bowl [1]** 706/19
**break [1]** 673/13
**brief [2]** 633/10 673/11

**bring [23]** 633/5 656/20 665/7 665/8 665/19 666/7 670/7 677/14 677/15 681/18 683/20 686/23 692/18 694/22 694/22 696/23 697/10 701/4 718/17 723/21 723/22 723/25 725/4
**brings [1]** 707/10
**broader [1]** 657/5
**brought [7]** 650/12 664/12 670/25 673/16 677/6 687/12 719/4
**Bruce [1]** 674/11
**buckle [1]** 639/6 639/13 671/2
**Budowle [9]** 674/11 674/20 675/6 676/8 677/16 684/10 684/18 687/10 697/10
**Bureau [1]** 686/22
**business [1]** 668/3

**C**

**C-U-R-T-I-S [1]** 710/22
**calendar [1]** 723/1
**call [12]** 634/6 634/7 642/16 675/22 677/10 677/13 686/20 686/20 686/23 691/4 704/7 706/16
**called [6]** 634/20 658/21 676/13 697/13 710/12 713/25
**calls [8]** 634/9 634/13 634/17 644/16 644/25 676/11 686/3 688/23
**came [21]** 647/21 648/10 649/21 655/7 677/8 678/5 678/15 678/18 680/18 680/24 681/4 683/21 685/21 688/13 692/1 693/18 695/25 697/1 699/7 704/15 714/22
**can [51]** 636/25 649/23 651/25 653/22 656/11 656/21 660/3 660/5 660/8 667/11 670/15 673/8 673/11 674/2 682/23 682/24 684/5 685/23 689/9 690/18 690/21 690/25 691/1 691/24 703/7 703/17 703/18 704/9 704/11 704/11 704/14 704/19 705/3 705/5 705/6 705/14 705/23 706/7 706/14 706/20 706/24 707/15 707/15 710/20 711/16 720/16 722/23 722/24 723/9 723/10
**can't [11]** 659/12 668/20 673/8 705/12 706/23 707/7 708/1 711/19 716/12 724/20 724/21
**candid [2]** 653/9 678/3
**cannot [1]** 646/24
**capacity [1]** 652/10
**capped [1]** 676/3
**car [1]** 718/13
**careful [3]** 680/2 682/9 684/9
**carefully [2]** 678/22 685/1
**case [100]**
**cases [31]** 636/13 639/18 659/17 659/18 661/22 664/12 671/10 671/11 671/12 671/14 671/25 672/3 672/11 672/13 672/16 672/19 676/10 676/10 676/21 676/23 677/8 677/14 680/5 681/19 682/19 685/9 685/10 687/15 696/5 696/7 696/8
**Cathryn [4]** 631/19 727/2 727/15 727/16
**cause [1]** 703/15
**CD [1]** 642/8
**Cellmark [2]** 674/8 688/25
**cellular [1]** 634/7

Case 1:16-cr-00055-RBW Document 68 Filed 06/15/17 Page 101 of 115

Center [1] 674/22
certain [6] 639/20 697/25 707/3 707/6
725/1 725/11
CERTIFICATE [1] 727/1
certify [2] 727/4 727/7
cervical [11] 639/6 639/12 643/4
643/21 644/13 658/22 660/1 704/7
704/19 711/18 712/4
chain [1] 702/10
chair [1] 684/11
challenge [4] 648/14 654/6 655/18
681/25
challenging [1] 648/20
chance [1] 726/11
change [2] 707/14 707/18
changed [1] 687/20
changes [3] 707/15 707/16 722/7
character [1] 687/21
characterized [1] 681/10
charge [1] 722/11
chart [9] 688/17 689/18 689/20 689/21
689/22 700/1 700/9 700/19 700/24
check [3] 657/21 662/21 663/8
checked [1] 712/17
chemistry [1] 636/3
chief [1] 685/18
Child [1] 634/5
choice [1] 655/12
choose [4] 639/14 639/23 660/20
724/15
chose [1] 639/20
Christopher [1] 631/15
circumstances [2] 693/2 693/14
clarify [3] 666/4 666/6 684/7
clean [1] 655/23
cleanness [1] 687/4
clear [15] 635/5 640/6 669/2 670/11
670/18 677/18 678/20 679/19 685/17
687/17 690/19 693/25 694/1 710/20
714/8
cleared [1] 660/24
clearly [3] 692/9 718/8 718/10
clerk [4] 633/18 634/22 710/14 714/2
client [1] 696/6
close [1] 723/4
closing [3] 695/9 723/10 725/21
closings [1] 723/11
co [1] 666/4
co-counsel [1] 666/4
coats [1] 637/11
CODIS [15] 648/12 654/22 655/4 655/7
663/23 663/25 664/1 664/10 666/1
666/15 666/18 667/2 669/9 669/23
670/24
colleagues [1] 683/24
collected [1] 646/16
collection [1] 709/24
COLUMBIA [7] 631/2 645/15 718/17
719/4 719/6 719/24 727/4
column [1] 644/6
columns [1] 704/25
come [13] 643/14 647/22 661/20 664/3
664/10 666/19 682/6 686/24 687/1
696/18 701/24 720/19 722/18
comes [5] 642/7 662/8 662/9 703/6
703/13

comfortable [1] 681/7
coming [6] 637/16 638/10 641/25
690/8 704/19 709/18
commit [1] 665/16
committee [2] 682/12 684/4
common [2] 662/14 674/4
communicated [1] 659/10
companies [1] 647/3
compare [12] 641/22 642/19 646/8
646/11 646/14 646/16 646/18 670/4
678/9 683/15 704/22 708/21
compared [7] 649/14 649/20 655/5
669/22 671/22 681/18 697/3
comparing [1] 704/23
comparison [22] 651/8 651/9 651/16
652/4 652/12 653/14 654/1 654/22
655/10 666/12 667/5 667/6 667/8
669/18 669/20 683/16 689/6 690/7
697/3 697/4 699/1 707/4
comparisons [6] 645/24 646/4 648/18
650/23 654/2 682/8
complainant [1] 655/1
complete [2] 669/1 725/20
completed [2] 641/8 717/18
completely [5] 654/11 654/16 655/4
655/13 691/18
completion [1] 713/11
complex [1] 703/22
complicated [2] 696/4 696/13
comply [1] 725/25
comprehensive [1] 674/24
computer [1] 631/24
computer-aided [1] 631/24
conceivably [1] 672/4
concentration [1] 636/4
concern [11] 652/1 665/17 670/14
670/19 670/21 671/2 671/6 671/7
671/21 683/17 720/19
concerned [2] 680/4 686/14
concerns [9] 653/24 657/15 659/15
659/16 659/17 662/22 692/10 701/12
719/17
conclude [3] 673/8 702/3 718/6
concluded [4] 658/16 678/18 683/13
708/23
concludes [1] 715/10
conclusion [6] 649/21 672/12 682/21
693/16 696/2 709/7
conclusions [6] 679/21 685/12 686/1
686/2 690/17 702/17
conduct [2] 674/24 726/2
conducted [2] 685/8 686/13
conducting [2] 674/13 684/14
conference [4] 647/7 708/5 709/22
725/8
confident [4] 664/20 664/21 725/17
725/17
confirm [2] 663/8 693/24
confirmation [2] 655/8 670/12
confirmatory [2] 669/4 670/9
confirmed [3] 665/25 669/21 684/1
confirms [1] 668/9
conjunction [1] 637/17
connect [2] 698/14 699/2
Connecticut [1] 631/16
cons [1] 724/3
consequence [1] 667/15

consider [2] 634/15 707/1
consideration [1] 717/13
considering [1] 718/8
consistent [5] 668/16 691/7 693/10
698/25 718/25
constitute [1] 727/8
Constitution [1] 631/20
consultation [1] 672/24
consume [1] 676/25
contact [5] 720/2 720/25 726/3 726/12
726/13
contained [1] 669/24
contains [1] 639/5
contaminate [1] 655/23
contaminated [1] 709/24
contamination [6] 637/7 662/4 662/6
684/22 684/25 702/12
CONTENTS [1] 632/1
context [2] 674/9 688/15
contextual [1] 707/4 707/5
continue [3] 677/11 696/9 725/25
continued [3] 677/12 696/7 696/10
contract [1] 658/5
contracting [1] 709/11
contractor [3] 657/17 658/9 694/15
contributed [1] 703/4
contributing [5] 660/3 660/8 703/19
703/21 706/15
contribution [2] 706/8 706/9
contributor [13] 690/22 691/1 691/3
700/14 704/10 704/20 705/16 705/23
706/16 706/17 706/21 707/3 709/8
contributors [4] 646/23 691/1 703/24
707/2
control [5] 656/14 657/15 659/19
659/20 694/1
controls [5] 637/4 637/4 637/5 684/21
716/10
conversation [1] 695/10
conversations [2] 718/8 724/2
copies [1] 675/18
copy [2] 719/16 720/20
correct [37] 636/23 638/17 641/17
642/1 645/15 645/19 645/20 645/22
646/2 646/6 657/11 657/17 658/17
658/18 659/5 659/6 659/14 669/25
673/6 673/24 690/8 694/17 701/21
701/22 701/24 702/3 702/4 702/5
702/8 702/11 702/18 702/19 702/20
706/4 707/12 708/20 713/7
corrections [1] 696/12
correctly [1] 642/15
correspond [6] 643/20 644/2 644/14
644/23 712/8 713/4
corresponding [3] 643/7 712/8 712/15
corroborating [1] 648/4
could [20] 637/22 646/15 653/6
657/21 662/12 662/25 672/9 673/19
682/25 683/6 683/16 683/24 686/15
700/13 704/20 706/11 706/16 707/17
712/1 717/12
couldn't [6] 647/16 647/17 648/5
648/10 649/3 650/8
counsel [13] 650/14 664/9 666/4
669/11 684/7 684/8 686/8 689/5
690/13 691/10 692/1 698/13 722/25
counsel's [1] 688/2

Case 1:16-cr-00055-RBW    Document 133    Filed 06/15/17    Page 102 of 115

**count [2]** 719/9 721/24
**country [3]** 662/14 662/18 697/15
**counts [2]** 718/1 718/18
**County [1]** 639/19
**couple [3]** 638/7 639/9 719/25
**coupled [2]** 718/15 721/3
**course [4]** 667/6 678/6 687/17 690/4
**court [29]** 631/1 631/19 631/19 631/20 633/7 651/22 653/17 665/2 670/17 673/18 675/5 677/9 677/9 678/21 684/5 689/9 691/20 692/2 697/9 699/19 708/13 710/4 719/16 720/20 724/2 725/14 727/2 727/3 727/16
**Court's [6]** 666/3 673/20 673/21 693/22 695/8 709/15
**courtroom [8]** 633/14 651/24 667/12 701/10 717/20 725/6 726/8 726/23
**CR [1]** 631/4
**Crawford [3]** 677/11 677/12 679/17
**create [1]** 696/16
**credibility [5]** 647/8 647/15 648/17 681/3 693/5
**credit [1]** 692/2
**credited [3]** 692/24 693/13 693/21
**crime [4]** 639/19 645/14 647/1 668/8
**criminal [2]** 633/3 665/1
**criminals' [1]** 664/2
**criteria [6]** 680/6 680/7 680/8 682/18 684/2 707/3
**critical [2]** 676/12 676/23
**cross [10]** 632/4 645/8 645/9 678/5 679/22 684/25 686/14 701/7 701/16 713/19
**cross-examination [7]** 645/8 645/9 678/5 686/14 701/7 701/16 713/19
**cross-examined [1]** 679/22
**Curtis [3]** 632/7 645/5 710/11 710/22
**custody [1]** 702/10
**cutting [4]** 675/13 675/15 675/23 677/22

**D**

**D-A-N-I-E-L [1]** 710/22
**D-S-C [2]** 712/22 713/10
**D.C [3]** 631/5 631/21 710/24
**D18 [1]** 689/3
**Daniel [4]** 632/7 645/5 710/11 710/22
**data [77]** 637/8 637/9 641/11 642/5 642/7 642/10 642/12 642/14 643/18 646/10 646/22 648/9 649/13 649/14 650/9 650/23 651/11 652/13 652/15 655/7 658/13 658/14 659/7 667/1 667/7 668/14 668/15 668/16 671/25 674/7 675/2 675/3 675/24 676/5 676/6 676/17 677/7 679/20 679/21 682/21 685/2 685/6 686/6 686/17 686/18 686/25 687/3 688/16 688/17 688/18 688/19 688/21 688/21 688/22 688/24 689/8 689/10 689/17 690/5 690/19 691/11 691/11 691/12 694/7 694/8 694/10 694/12 697/23 699/13 699/18 700/11 700/16 703/9 703/13 704/4 706/17 709/7
**database [2]** 664/1 666/18
**date [2]** 641/10 657/23
**Davis [18]** 631/12 631/15 631/16
631/16 632/6 632/6 632/8 632/11
633/24 634/10 635/14 679/23 697/21
704/25 717/21 721/8 721/25 723/14
**day [6]** 631/8 717/5 723/13 726/21
726/21 727/11
**days [1]** 697/15
**DC [26]** 631/14 631/17 635/10 636/22
637/1 645/11 647/1 654/1 657/10
660/11 678/8 682/21 691/15 692/4
692/11 693/6 693/12 693/19 694/2
694/2 694/5 694/8 695/5 695/15
701/20 714/12
**deal [1]** 653/22
**dealing [1]** 676/22
**dealt [2]** 694/2 694/3
**decade [1]** 684/18
**decide [1]** 701/20
**decided [4]** 656/15 657/16 671/4
694/5
**decision [18]** 656/4 656/7 669/3
669/13 670/10 672/2 672/18 674/17
692/12 693/16 710/6 724/4 724/4
724/12 724/12 724/19 724/20 726/9
**deduced [1]** 658/23
**defendant [13]** 631/6 631/15 633/24
634/3 634/7 641/6 666/13 669/24
671/2 678/10 678/16 718/10 719/25
**defendant's [7]** 665/8 666/17 669/5
669/16 715/14 719/3 719/10
**defense [4]** 653/21 679/22 721/23
724/9
**Definitely [1]** 636/17
**definitions [1]** 726/6
**degrade [1]** 719/11
**degree [2]** 636/2 721/20
**delay [1]** 701/12
**delays [1]** 701/13
**deliberate [1]** 725/18
**deliberations [1]** 723/5
**demarcation [4]** 677/18 679/19 680/5
689/1
**demonstration [1]** 721/1
**deny [1]** 718/19
**department [26]** 635/10 636/22 637/1
645/11 666/15 666/25 669/9 669/12
669/21 670/1 674/4 674/6 674/13
674/16 674/19 674/25 675/8 677/10
686/1 686/10 686/13 694/19 696/6
696/7 710/24 714/12
**depend [1]** 688/15
**depended [1]** 724/20
**depicted [1]** 634/11
**Deputy [3]** 634/21 710/13 714/1
**described [1]** 721/5
**description [1]** 718/24
**designed [1]** 655/18
**desire [1]** 724/19
**desk [2]** 703/5 703/6
**detail [1]** 682/14
**detailed [1]** 701/23
**details [1]** 701/25
**detect [5]** 641/1 679/3 691/7 691/16
698/25
**detected [1]** 692/20
**detecting [1]** 700/25
**determination [9]** 669/8 669/17
672/21 672/24 673/6 673/12 709/17
709/19 710/7
**determine [12]** 646/23 649/18 650/9
703/8 703/14 703/17 703/18 703/24
704/2 705/17 706/14 716/13
**determined [1]** 693/11
**develop [2]** 679/14 699/22
**developed [5]** 651/11 702/21 702/23
704/17 705/2
**development [1]** 678/8
**DFS [9]** 638/13 655/7 675/7 677/13
679/19 685/11 685/22 687/1 700/20
**did [107]**
**didn't [29]** 638/15 639/24 640/13
642/4 646/5 648/25 654/20 666/12
666/23 668/18 671/5 672/10 678/21
679/1 679/13 680/18 680/25 682/1
682/3 682/25 686/12 688/7 690/23
693/9 696/24 697/24 700/21 705/24
720/19
**difference [7]** 662/8 676/20 723/8
**different [18]** 654/16 655/4 655/12
655/13 660/6 681/17 683/12 688/23
689/20 691/19 692/8 694/7 698/15
703/15 709/18 716/8 716/9 721/19
**difficult [1]** 705/14
**direct [15]** 632/4 635/1 637/13 641/14
642/1 642/22 643/6 644/17 710/16
711/5 712/23 712/24 713/11 714/4
714/15
**direction [2]** 634/12 678/1
**disagree [1]** 663/15
**disclosure [1]** 688/6
**disclosures [2]** 671/14 673/2
**discovered [1]** 677/5
**discovery [2]** 688/5 688/8
**discussions [1]** 725/24
**dismiss [1]** 721/23
**dismissed [1]** 722/11
**disqualified [1]** 726/16
**disqualifying [1]** 726/17
**disregard [1]** 716/15
**distinction [1]** 635/16
**DISTRICT [13]** 631/1 631/2 631/10
631/20 645/14 718/17 718/22 719/2
719/4 719/6 719/24 727/3 727/3
**DNA [50]** 636/1 636/14 639/21 647/2
647/2 648/4 652/17 655/6 656/23
657/10 658/3 658/4 658/6 658/8 659/3
660/4 660/4 660/8 660/11 660/20
660/23 664/2 666/11 667/20 668/3
674/11 674/20 675/14 675/16 675/17
675/17 675/18 676/22 676/24 676/25
678/14 684/12 690/5 690/6 692/1
694/4 694/5 695/4 695/5 697/6 703/3
703/4 704/10 706/15 712/17
**do [112]**
**Docket [1]** 631/4
**doctors [1]** 675/6
**document [3]** 702/2 702/14 712/16
**documented [1]** 712/18
**documents [1]** 702/1
**does [19]** 644/8 644/14 647/20 651/17
653/10 653/15 661/14 661/17 663/4
668/6 668/8 696/16 699/7 699/9
699/16 699/20 699/23 713/12 714/21
**doesn't [6]** 652/18 654/4 654/10
655/11 662/13 662/18

## D

**doing [36]** 635/23 641/8 647/18 647/22 648/24 653/13 654/2 656/17 657/20 658/4 660/11 665/18 665/24 667/20 667/24 680/3 675/22 681/9 681/10 681/25 682/9 682/17 682/20 682/22 683/1 683/5 684/10 691/16 692/5 692/11 695/5 695/15 695/24 707/22 708/24 709/20

**don't [55]** 647/14 648/13 648/19 655/3 656/3 657/5 657/25 659/11 659/20 662/23 663/15 664/8 664/16 665/6 665/13 665/22 665/23 665/25 667/14 670/5 670/13 673/5 673/8 676/2 678/24 680/7 680/8 681/21 683/3 684/23 687/24 693/1 693/14 694/24 695/14 698/2 698/4 698/18 700/25 704/13 705/10 710/1 710/3 720/13 720/16 721/21 722/16 722/18 723/7 723/16 726/2 726/3 726/4 726/10 726/14

**done [38]** 636/16 637/2 639/22 647/23 649/2 649/10 651/13 655/11 655/11 659/18 664/7 665/11 665/21 666/12 667/1 668/11 668/13 668/17 670/9 670/15 670/19 675/23 679/8 685/15 687/2 687/25 688/11 688/19 691/15 692/3 693/6 693/18 693/19 694/18 696/21 699/22 702/12 711/6

**door [21]** 663/13 663/14 663/15 663/15 664/10 665/7 666/1 668/6 668/8 678/3 678/4 686/15 692/16 693/4 693/6 693/9 695/23 696/17 696/22 697/9 697/17

**doorhandle [1]** 705/11

**doubt [1]** 721/22

**down [8]** 658/4 662/8 662/9 668/24 694/5 695/6 700/24 720/24

**Dr [1]** 674/23

**Dr. [7]** 674/11 674/20 677/16 677/16 684/10 684/18 697/10

**Dr. Beaver [1]** 677/16

**Dr. Bruce [1]** 674/11

**Dr. Budowle [5]** 674/20 677/16 684/10 684/18 697/10

**draft [1]** 685/13

**drafting [1]** 685/16

**draw [1]** 690/18

**drawn [1]** 720/9

**driver's [1]** 720/23

**dropped [1]** 719/5

**Drs [2]** 676/8 687/10

**due [1]** 674/5

**duly [3]** 634/21 710/13 714/1

**during [7]** 641/4 647/3 684/21 687/2 721/11 722/3 722/4

**duties [1]** 636/9

## E

**each [6]** 636/5 640/19 677/21 688/22 703/15 712/9

**early [1]** 726/19

**easier [1]** 643/16

**easily [1]** 653/6

**easy [3]** 703/22 705/10 707/1

**EF [1]** 643/22

**effect [2]** 652/21 658/11

**either [1]** 722/23

**ejaculation [1]** 640/10

**EKG [1]** 675/4

**electropherogram [13]** 642/14 642/17 642/18 642/21 643/17 644/2 644/4 644/7 644/13 644/23 675/4 700/2 700/18

**electropherograms [4]** 643/14 703/8 703/9 703/16

**electrophoresis [2]** 675/19 677/24

**elicit [4]** 678/24 681/7 681/16 682/24

**elimination [1]** 646/17

**else [7]** 645/25 689/7 691/21 703/6 709/21 712/12 721/25

**elsewhere [1]** 726/14

**employing [1]** 676/6

**encompass [1]** 654/10

**end [3]** 660/18 669/19 694/24

**enforcement [1]** 634/8

**engage [1]** 718/3

**engaged [1]** 671/7

**enjoy [2]** 726/20 726/21

**enough [2]** 680/4 722/22

**ensure [2]** 637/1 637/6

**entered [1]** 636/5

**enters [3]** 633/14 701/10 725/6

**entertain [1]** 650/20

**entire [1]** 687/20

**envelopes [1]** 702/5

**EPG [1]** 643/7

**epithelial [3]** 644/22 658/24 660/2

**equal [1]** 706/22

**equate [1]** 706/18

**equipment [1]** 637/11

**error [3]** 663/10 665/16 665/23

**especially [2]** 639/17 722/20

**Esquire [1]** 631/15

**essentially [1]** 675/25

**establish [4]** 680/24 689/25 691/11 721/22

**established [2]** 683/14 690/7

**esteem [1]** 682/13

**evaluate [1]** 640/7

**evaluation [2]** 645/2 655/7

**even [13]** 647/21 651/18 653/13 653/19 654/7 682/10 686/2 698/2 698/4 699/15 710/1 720/13 726/3

**evening [1]** 722/17

**events [1]** 718/21

**ever [5]** 659/10 660/15 677/5 687/18 709/24

**every [7]** 637/3 637/7 672/11 674/18 688/1 688/2 702/7

**everything [13]** 645/24 645/25 646/19 655/23 681/4 682/13 682/14 687/18 690/8 691/23 708/23 709/6 723/18

**evidence [51]** 633/19 634/8 634/16 637/24 640/19 642/24 643/1 645/21 646/8 646/12 646/16 655/2 658/1 658/12 658/15 669/22 670/25 675/13 684/24 692/9 698/14 699/3 699/5 701/23 702/9 702/14 705/1 705/2 711/3 711/11 711/16 711/18 712/2 714/23 714/25 715/3 715/4 715/20 716/1 716/3 716/11 716/16 717/3 717/10 718/2 718/5 718/7 718/21 719/13 719/18 721/17

**evidentiary [1]** 669/16

**exactly [7]** 646/19 673/12 699/2 702/15 708/2 709/12 716/6

**exam [2]** 636/12 636/12

**examination [11]** 635/1 639/4 645/8 645/9 678/5 686/14 701/7 701/16 710/16 713/19 714/4

**examine [1]** 721/10

**examined [4]** 634/22 679/22 710/14 714/2

**examiner [1]** 698/15

**example [5]** 635/22 639/7 659/25 672/9 703/5

**examples [2]** 636/10 636/11

**exceed [1]** 672/5

**excused [2]** 667/12 701/5

**exhausted [1]** 672/22

**exhibit [30]** 632/14 632/15 633/18 633/20 633/25 634/11 637/21 637/22 638/5 638/20 641/16 641/17 641/23 642/20 642/23 642/25 643/24 644/15 689/12 690/13 711/22 711/22 712/1 712/25 715/13 715/18 716/19 716/23 717/4 717/9

**exits [3]** 651/24 717/20 726/23

**expect [2]** 679/10 725/22

**expected [1]** 682/6

**expediency [1]** 653/7

**experience [1]** 707/1

**expert [37]** 636/19 640/21 649/24 650/1 650/3 650/5 650/7 650/12 650/19 650/25 652/2 652/7 652/9 652/19 652/19 653/1 653/6 653/12 653/15 653/18 653/19 667/9 676/7 678/2 680/13 680/15 681/9 690/6 690/7 691/14 692/1 692/7 692/7 698/6 700/17 700/25 701/1

**expert's [1]** 648/4

**expertise [7]** 651/18 652/6 653/11 663/4 699/10 699/17 700/23

**experts [15]** 661/21 662/9 664/13 674/11 677/13 677/15 678/18 680/17 680/24 681/4 683/20 688/10 692/9 693/18 699/7

**explain [3]** 673/18 685/24 704/14

**Exploitation [1]** 634/5

**extent [6]** 672/6 685/25 697/23 716/8 716/12 719/2

**external [1]** 639/7

**extract [2]** 675/14 680/12

**extracted [4]** 657/13 682/6 694/8 695/2

**extracting [1]** 668/1

**extraction [3]** 675/15 677/22 683/9

**extractions [1]** 694/6

**extraordinary [1]** 655/22

## F

**F-E-I-T-E-R [1]** 714/10

**facemask [1]** 637/11

**facilitate [1]** 634/6

**fact [38]** 633/12 634/15 640/19 640/23 647/13 649/10 650/6 650/7 650/15 653/25 654/2 656/4 656/6 656/7 662/25 665/19 665/21 670/7 676/4 677/20 678/15 681/16 692/20 692/20 692/21 693/10 695/21 695/24 696/23

## F

**fact... [9]** 699/10 706/24 713/2 719/15 719/24 720/4 720/10 722/10 724/14
**factor [1]** 695/4
**facts [4]** 652/20 701/18 701/19 701/23
**factual [6]** 652/8 677/20 677/25 685/3 699/5 700/20
**fair [15]** 647/23 648/16 648/22 653/21 654/8 655/17 656/1 663/5 665/19 665/22 668/4 670/1 670/6 670/10 697/18
**fairly [2]** 656/23 703/22
**fairness [2]** 683/19 692/17
**fall [3]** 708/24 708/25 709/1
**false [1]** 697/12
**familiar [1]** 671/21
**far [6]** 644/6 647/13 661/2 661/9 662/20 708/9
**faulty [1]** 668/12
**FBI [1]** 634/5
**February [2]** 660/24 668/3
**Federal [2]** 677/9 686/21
**feel [1]** 722/17
**feels [1]** 708/6
**Feiter [5]** 632/10 645/5 713/24 714/10 714/10
**fell [1]** 677/14
**fellow [2]** 726/15 726/17
**felt [3]** 664/20 664/21 687/4
**female [8]** 640/13 679/9 680/11 690/21 704/6 705/20 706/1 706/8
**females [1]** 706/5
**few [2]** 657/8 667/14
**fewer [1]** 686/20
**field [3]** 636/5 652/13 652/14
**Fifty [1]** 644/20
**Fifty-two [1]** 644/20
**figure [4]** 667/15 675/16 700/16 705/8
**file [3]** 638/7 657/25 658/11
**fill [1]** 690/8
**filled [1]** 688/17
**final [4]** 669/4 715/25 724/20 725/22
**finalizing [1]** 685/14
**find [10]** 640/13 640/19 680/18 680/25 681/6 687/23 687/24 693/1 706/2 726/5
**finding [1]** 688/7
**findings [3]** 661/23 688/10 711/3
**fine [6]** 653/20 657/6 663/3 677/4 679/5 723/14
**finger [7]** 719/11 719/21 720/6 721/12 721/14 721/20 722/9
**fingerprint [1]** 698/15
**fingers [2]** 720/1 720/2
**finished [2]** 709/2 723/19
**firearm [1]** 676/24
**first [26]** 634/21 639/2 639/16 642/2 642/22 652/11 654/9 654/19 657/9 658/1 675/16 676/8 676/16 682/11 684/8 685/2 687/14 689/3 690/7 700/3 700/3 700/5 710/13 714/1 721/10 723/10
**fit [1]** 655/4
**fluids [1]** 676/22
**flying [1]** 678/22
**follow [3]** 684/10 684/17 685/4
**followed [1]** 684/16

**following [1]** 688/10
**follows [6]** 634/2 634/4 634/22 688/21 710/14 714/2
**force [2]** 634/5 634/12
**foregoing [1]** 727/7
**foreign [6]** 658/18 658/19 658/21 658/22 666/14 679/11
**forensic [36]** 635/10 635/14 635/14 635/16 635/18 635/19 636/4 636/22 637/1 645/12 657/12 660/11 666/16 666/25 669/10 669/12 669/22 670/2 674/5 674/13 675/8 682/21 686/2 686/10 686/13 694/2 694/2 694/6 694/8 694/19 696/7 701/20 710/24 711/2 714/12 721/10
**forensics [3]** 662/14 673/23 695/5
**forget [1]** 695/10
**form [1]** 634/9
**format [5]** 642/3 642/8 642/10 643/16 643/18
**forms [1]** 638/8
**forth [2]** 684/18 688/4
**forward [3]** 688/24 688/25 700/11
**found [2]** 643/21 683/21
**foundation [4]** 699/6 699/8 707/18 707/20
**four [5]** 690/17 702/21 703/20 718/20 719/10
**Fourth [1]** 631/13
**fraction [6]** 644/14 644/23 658/24 660/1 660/2 686/11
**Fred [1]** 674/23
**fresh [1]** 687/3
**Friday [2]** 722/16 726/21
**front [3]** 643/3 644/3 652/24
**full [3]** 635/5 660/23 710/20
**functioning [1]** 684/23
**further [6]** 645/6 708/8 715/5 722/1 725/16 727/7

## G

**game [10]** 647/23 648/16 648/23 654/8 655/17 663/5 665/19 665/22 668/4 702/7
**gather [1]** 655/6
**gathered [1]** 652/14
**gave [3]** 688/13 693/21 718/24
**gender [6]** 704/5 705/22 705/25 706/3 706/6 708/18
**general [3]** 662/9 662/11 707/18
**generate [2]** 667/3 694/7
**generated [6]** 637/17 666/16 667/1 667/7 670/23 694/13
**genetic [3]** 642/6 675/19 690/17
**genitalia [1]** 639/7
**gentlemen [3]** 633/21 633/22 725/15
**George's [1]** 639/19
**gesture [1]** 721/2
**get [18]** 641/1 644/17 666/23 673/11 673/19 676/1 676/25 679/10 679/13 682/23 692/18 697/15 703/7 707/25 719/16 720/20 722/13 723/16
**gets [1]** 675/20
**getting [8]** 637/5 668/19 677/24 683/10 700/15 708/6 708/11 719/19
**give [9]** 635/5 639/25 652/13 710/20 714/8 715/24 722/21 723/6 723/6

**given [6]** 642/8 692/23 701/19 721/3 724/19 726/7
**gives [1]** 652/9
**giving [2]** 642/2 722/16
**gloves [2]** 637/11 655/23
**go [25]** 635/18 639/21 646/12 646/22 650/8 655/3 659/5 665/6 667/5 668/6 669/14 673/8 675/2 675/21 676/9 680/11 683/18 693/2 693/9 693/15 700/11 705/3 722/13 723/7 724/23
**goal [3]** 677/8 677/18 678/3
**goes [5]** 637/8 637/10 655/16 664/9 702/8
**goggles [1]** 637/11
**going [56]** 633/8 633/22 637/13 637/20 638/4 642/1 642/22 643/24 647/14 648/9 648/16 650/1 650/5 650/6 650/11 650/14 650/24 656/13 657/2 657/4 657/9 663/13 664/4 664/5 664/17 665/2 665/12 665/24 666/2 667/8 667/17 667/19 667/22 667/25 668/7 674/17 676/8 676/24 676/25 682/7 687/24 707/23 708/8 708/9 710/2 711/5 711/20 712/23 712/24 713/11 714/15 722/6 722/6 722/9 723/21 725/16
**gone [3]** 639/25 640/14 690/13
**good [9]** 633/15 635/3 635/4 673/22 680/3 710/18 710/19 714/6 714/7
**got [27]** 653/18 654/22 655/5 666/18 666/22 667/17 668/2 669/22 670/2 671/1 678/13 678/14 682/8 682/8 682/8 683/6 683/19 684/4 697/5 700/4 708/24 709/17 709/17 718/13 719/7 721/14 722/13
**gotten [4]** 668/22 671/3 685/13 685/16
**governed [1]** 707/11
**government [20]** 631/12 632/3 634/17 634/21 644/22 650/21 662/2 683/19 689/5 692/1 692/17 692/17 693/9 696/23 700/24 701/2 710/13 714/1 717/18 719/14
**government's [30]** 632/14 633/18 633/25 634/11 637/21 637/22 638/4 638/20 641/16 641/23 642/19 642/23 642/25 643/24 644/1 644/15 689/12 694/22 711/21 711/22 712/1 712/24 712/25 715/13 715/18 716/19 716/23 717/4 717/9 719/22
**grant [1]** 721/23
**graph [1]** 700/5
**gratify [1]** 719/12
**grounds [1]** 650/19
**group [2]** 674/18 684/12
**guess [5]** 649/23 650/10 650/21 669/3 695/16
**guilt [1]** 721/22
**guys [2]** 704/24 706/20

## H

**had [76]** 636/6 636/11 639/18 641/17 648/21 649/15 649/17 650/3 652/1 658/4 658/13 659/4 659/7 666/19 667/2 668/14 670/2 670/19 671/3 671/10 671/12 671/13 671/19 672/4 672/25 674/19 674/19 674/25 675/2 676/9 677/1 677/11 680/9 680/23

Downloaded

**had...** [42] 681/10 681/11 682/5 682/7
685/10 685/11 685/11 685/12 685/13
685/14 685/15 687/10 687/15 687/15
689/25 690/1 691/9 691/11 691/11
691/15 692/13 695/10 695/19 696/8
697/6 697/13 698/21 701/13 701/19
702/8 704/6 704/7 705/21 707/9
708/19 708/21 715/4 718/8 719/17
720/19 724/2 727/5
**had that** [1] 687/15
**hadn't** [2] 685/13 685/16
**hairnets** [1] 637/12
**hand** [6] 644/6 690/16 720/24 720/25
721/5 721/6
**handed** [1] 711/12
**handled** [1] 702/9
**happen** [1] 699/23
**happened** [4] 669/15 669/19 670/4
672/6
**happens** [1] 724/21
**harass** [1] 719/11
**hard** [1] 681/6
**hardest** [1] 662/16
**Harvard** [1] 674/23
**has** [40] 633/19 641/15 647/15 648/15
649/11 652/9 653/3 653/4 653/4
653/21 654/4 655/19 657/2 663/9
664/1 664/16 668/14 672/22 675/9
678/11 678/17 680/18 681/10 681/11
681/23 683/22 685/1 685/5 688/9
692/22 696/1 702/15 703/4 709/24
711/20 715/11 717/18 718/25 722/11
724/10
**hasn't** [6] 649/4 649/16 649/19 649/21
649/25 693/8
**hate** [1] 726/19
**have** [150]
**haven't** [2] 668/22 668/23
**having** [16] 634/20 634/21 647/19
652/4 652/4 656/14 656/10 669/8
673/1 679/18 679/21 694/4 710/12
710/13 713/25 714/1
**he** [23] 664/9 665/6 673/8 680/17
680/24 681/12 684/11 684/13 692/3
718/11 718/12 718/14 719/3 719/3
719/4 719/5 720/1 720/18 720/18
720/25 721/18 721/20 724/8
**he's** [4] 673/20 683/17 697/14 698/8
**Health** [1] 674/22
**hear** [7] 648/13 654/21 655/14 716/8
716/10 722/25 726/8
**heard** [9] 648/16 649/11 650/16
650/16 679/24 682/9 693/8 693/16
698/3
**hearing** [4] 670/16 682/11 694/11
716/16
**held** [1] 634/8
**help** [5] 635/21 673/21 702/14 703/14
704/11
**helped** [1] 645/2
**helping** [1] 716/6
**helps** [2] 655/13 705/16
**her** [102]
**here** [33] 637/18 643/18 643/21
644/15 647/23 652/24 657/5 662/25
666/7 668/19 669/15 673/18 673/20

679/12 681/3 681/5 682/16 683/11
689/10 690/15 690/16 691/1 692/18
694/14 695/10 697/16 699/25 700/3
700/5 700/10 700/14 725/5 725/19
**hereby** [2] 634/3 727/4
**hereto** [1] 727/10
**Hertzfeld** [1] 631/12
**hey** [3] 669/13 670/2 683/21
**higher** [1] 686/24
**highly** [2] 664/15 666/2
**him** [7] 668/7 697/15 697/18 697/19
698/11 723/25 724/5
**himself** [1] 719/3
**his** [11] 655/5 697/6 720/2 720/24
720/24 720/25 721/5 721/6 721/20
724/4 724/4
**history** [1] 665/9
**hit** [1] 667/2
**Hold** [1] 649/7
**hone** [1] 662/16
**honest** [1] 707/7
**Honor** [43] 633/7 633/13 633/17
637/23 637/25 638/19 640/22 642/25
653/16 661/1 667/9 668/25 672/5
672/20 672/22 673/10 673/16 673/22
673/25 675/3 677/22 678/4 678/23
679/16 687/22 690/12 694/17 695/12
697/8 697/13 697/22 698/7 701/3
715/10 715/21 716/18 717/2 717/23
719/22 720/22 722/1 722/2 723/3
**Honor's** [1] 724/6
**HONORABLE** [1] 631/9
**hope** [1] 679/7
**horrible** [1] 652/5
**house** [2] 718/25 719/1
**how** [59] 633/9 635/11 635/23 636/13
636/16 642/3 647/14 647/20 648/8
650/2 652/15 653/1 655/1 656/4 656/5
662/9 664/3 664/8 664/9 664/16 665/6
665/25 670/15 672/2 672/6 672/21
672/23 673/8 673/11 675/16 680/2
680/2 682/9 684/8 685/5 693/1 693/14
698/1 699/23 700/14 700/21 700/25
701/18 703/11 703/18 704/2 707/7
708/2 708/3 708/15 712/6 712/9
712/11 714/13 720/5 720/12 720/16
724/3 726/1
**however** [3] 641/24 720/10 722/22
**humiliate** [1] 719/11

**I**

**I'd** [4] 633/17 644/18 697/17 717/23
**I'll** [16] 643/25 644/9 644/17 650/20
666/3 667/25 668/2 668/24 673/13
682/19 695/1 695/6 698/10 722/25
724/5 725/4
**I'm** [65] 633/15 633/22 635/14 637/13
637/20 638/4 640/13 642/1 642/22
643/10 643/24 644/4 644/7 646/3
649/8 650/24 656/25 657/1 657/4
657/8 661/7 661/7 661/24 661/24
663/24 665/12 667/19 667/22 668/19
671/20 673/24 678/22 678/22 680/16
681/5 682/10 682/11 682/14 683/12
683/13 683/16 694/11 694/11 695/12
699/25 700/22 703/8 705/5 705/24
706/11 706/17 708/4 708/8 708/8

709/9 709/12 711/2 711/5 711/20
712/23 712/24 713/11 714/15 722/6
722/9
**I've** [7] 683/19 704/16 710/6 712/17
714/14 724/2 726/1
**identical** [1] 698/25
**identification** [4] 637/21 638/1 638/2
711/21
**identifications** [1] 648/18
**identified** [7] 632/14 646/1 646/6
646/21 647/4 697/25 718/23
**identify** [4] 645/18 678/16 706/4 712/9
**identity** [1] 699/22
**immediately** [4] 687/20 718/11 718/13
726/13
**impact** [1] 647/20
**imparted** [1] 661/8
**implicate** [1] 668/7
**import** [1] 649/12
**important** [2] 675/5 684/20
**impression** [3] 669/10 670/1 697/12
**improves** [1] 707/16
**impugn** [5] 648/17 654/4 655/16 681/2
682/2
**impugning** [1] 647/15
**inappropriate** [1] 726/7
**incline** [1] 723/3
**inclined** [1] 722/21
**include** [3] 661/14 661/17 725/21
**including** [1] 672/16
**incorrect** [1] 671/3
**indeed** [1] 705/6
**independent** [1] 655/7
**indicate** [4] 718/8 718/14 719/1
719/20
**indicated** [10] 659/5 663/5 668/21
673/19 700/3 710/5 720/23 721/11
721/13 724/7
**indicates** [1] 680/17
**indicating** [3] 666/16 702/8 719/6
**indication** [2] 683/1 705/25
**indictment** [1] 721/24
**individual** [1] 721/10
**individuals** [2] 704/1 704/3
**indulgence** [4] 666/3 693/22 695/8
709/15
**industry** [1] 653/4
**infer** [1] 669/11
**inference** [2] 720/9 721/4
**influence** [1] 687/3
**influenced** [1] 685/21
**inform** [1] 679/20
**informant** [1] 679/10
**information** [27] 639/17 648/3 649/20
652/13 654/6 661/8 663/7 664/10
665/1 665/7 665/15 666/1 668/7 673/4
673/11 681/18 690/9 692/22 693/17
696/18 698/4 704/18 705/8 712/18
713/1 716/11 721/14
**initial** [3] 639/24 640/2 663/13
**initially** [1] 639/23
**initials** [6] 712/22 713/7 713/7 713/9
713/10 713/13
**initiated** [1] 634/13
**inquiry** [9] 653/24 655/15 663/11
663/12 679/25 692/14 693/3 693/19

**I**

**inserted [1]** 721/20
**instance [6]** 639/18 667/23 681/9 689/10 703/25 704/6
**instances [4]** 636/11 643/15 681/8 682/19
**Instead [1]** 682/8
**instruct [1]** 723/4
**instructed [1]** 723/13
**instruction [2]** 715/24 722/10
**instructions [14]** 685/17 715/25 722/7 722/8 722/16 722/21 722/24 722/25 723/7 723/9 723/10 723/11 725/22 726/1
**instrument [1]** 703/13
**instrumentation [2]** 676/3 684/23
**insufficient [3]** 718/2 718/21 719/12
**integrity [7]** 637/2 676/13 677/5 687/11 687/13 687/19 697/12
**intend [1]** 681/2
**intent [7]** 678/23 678/24 679/16 718/2 718/14 718/17 719/11
**interactions [1]** 705/21
**internal [2]** 647/19 656/14
**interpret [14]** 660/5 660/9 676/5 679/1 685/6 686/24 688/21 688/22 691/12 697/22 700/11 703/11 703/12 703/23
**interpretation [35]** 642/9 659/18 659/18 659/22 659/23 661/15 661/17 662/1 662/12 662/15 663/6 666/11 666/20 674/14 674/20 677/7 677/9 678/6 678/25 679/12 679/13 684/2 685/10 686/4 686/12 688/25 690/14 691/12 694/3 694/4 694/13 694/20 695/3 696/13 709/20
**interpretations [2]** 667/22 671/10
**interpreted [5]** 671/25 674/8 694/10 694/15 698/14
**interpreting [5]** 667/24 680/6 682/20 685/2 686/6
**interrupt [1]** 704/13
**interstate [1]** 718/3
**interview [1]** 704/7 704/9 705/5 705/11 705/12 705/15
**intimate [6]** 704/7 704/9 705/5 705/11 705/12 705/15
**intimately [1]** 671/21
**Investigation [1]** 686/22
**involved [4]** 661/6 679/18 711/8 714/17
**involvement [3]** 714/19 715/2 715/4
**involving [3]** 636/14 667/22 711/6
**Irene [1]** 635/7
**is [211]**
**isn't [2]** 652/21 681/16
**issue [21]** 653/22 656/22 656/23 656/23 662/4 662/5 662/7 667/4 671/19 673/1 673/21 673/25 674/15 677/2 681/17 686/9 692/8 692/8 694/1 694/2 694/14
**issued [9]** 641/10 658/14 685/12 685/13 686/1 688/3 688/5 709/9 712/19
**issues [15]** 648/21 649/5 654/14 654/15 656/14 656/15 661/3 666/19 671/16 671/19 674/5 678/5 686/15 687/12 690/14
**it [231]**

**it's [55]** 638/1 642/5 643/16 647/17 647/23 648/16 651/9 651/10 652/17 655/10 655/18 663/5 663/13 665/10 665/19 668/4 670/11 675/4 676/4 676/5 678/21 678/23 679/9 683/18 687/23 688/20 690/4 690/19 691/2 691/13 693/15 695/18 696/4 696/13 696/14 697/6 698/14 702/15 703/17 703/18 704/19 705/5 705/10 705/15 705/20 705/23 706/17 706/25 709/18 710/6 710/7 711/25 716/9 716/11 716/15
**item [7]** 643/4 643/22 644/6 644/14 644/23 712/8 712/9
**items [20]** 639/3 639/5 639/9 639/10 639/10 639/14 639/15 639/22 640/1 640/3 640/7 640/14 640/15 640/18 640/25 641/2 649/21 683/15 711/3 711/11
**its [2]** 648/21 717/19
**itself [4]** 670/9 671/23 682/3 686/18

**J**

**January [3]** 634/4 634/10 696/5
**job [1]** 676/4
**Jones [4]** 631/19 727/2 727/15 727/16
**journal [1]** 636/9
**JUDGE [2]** 631/9 631/10
**Judgment [1]** 717/24
**June [1]** 727/11
**juror [1]** 726/16
**jurors [3]** 701/12 726/15 726/17
**jury [49]** 631/8 633/6 633/14 647/23 648/13 648/15 649/9 649/10 651/21 651/24 653/13 654/20 656/21 657/5 661/4 663/21 669/11 670/1 670/16 671/6 679/20 681/22 689/9 693/8 694/22 697/11 699/3 701/4 701/10 703/2 713/21 715/8 715/13 715/18 717/5 717/20 718/7 720/10 720/13 721/18 722/16 722/21 722/23 723/21 723/22 725/4 725/6 725/10 726/23
**jury's [1]** 633/18
**just [76]** 633/7 634/15 639/15 640/6 641/25 643/16 645/24 646/6 646/19 646/21 647/14 648/8 648/15 655/10 655/18 655/21 656/3 657/8 657/13 662/22 663/10 666/3 667/5 667/19 668/25 669/14 670/13 672/11 673/8 677/21 677/24 679/5 679/7 679/23 680/22 684/16 688/17 689/24 691/13 692/25 693/1 693/14 693/24 694/13 697/2 698/5 698/9 698/18 698/20 699/2 699/5 699/18 700/9 700/17 700/19 700/23 701/14 702/25 706/1 708/1 708/11 709/16 712/14 713/9 713/11 715/24 719/24 720/8 720/15 721/16 721/17 721/21 723/5 724/1 725/11 726/20

**K**

**keep [5]** 655/13 655/23 665/5 665/15 665/16
**KELSEY [15]** 631/5 633/3 633/24 634/3 638/14 638/16 648/12 655/5 682/15 711/7 714/17 723/22 724/3 724/7 725/11

**Kelsey's [2]** 634/10 648/9
**Kenya [1]** 651/12
**kept [2]** 663/21 665/4
**kind [15]** 636/10 646/8 671/19 674/20 685/16 686/1 686/4 687/23 705/7 705/14 706/10 706/18 707/19 707/20 707/21
**kissed [1]** 718/14
**kit [9]** 639/5 640/1 640/4 641/4 655/2 679/9 686/11 691/2 704/15
**knew [1]** 686/10
**know [53]** 637/4 640/12 641/12 641/12 651/18 652/5 652/12 652/16 653/1 653/14 656/16 659/9 659/11 659/20 661/2 661/9 662/20 662/23 666/24 667/17 673/1 673/5 673/7 675/3 676/16 680/6 680/7 680/8 681/21 683/3 687/24 690/19 690/25 690/25 692/15 695/14 697/14 698/3 698/4 698/18 699/4 699/6 701/12 704/15 707/22 712/6 712/11 712/14 720/5 720/12 720/16 724/13 726/14
**knowing [1]** 673/4
**knowledge [8]** 641/7 652/9 653/2 653/3 653/4 653/15 672/6 709/24
**known [26]** 638/15 639/6 639/13 641/5 644/5 644/6 646/7 646/7 646/11 646/13 646/16 655/1 666/17 669/5 669/16 671/2 674/7 678/10 687/22 697/1 697/2 704/16 705/3 708/22 714/22 714/24
**knows [1]** 687/22

**L**

**lab [110]**
**lab's [2]** 641/4 666/19
**laboratories [4]** 684/17 685/4 686/19 686/21
**laboratory [7]** 648/21 665/21 671/23 674/7 674/21 686/18 695/24
**labs [5]** 643/15 654/4 654/18 662/14 684/16
**lack [1]** 659/19
**ladies [3]** 633/20 633/22 725/15
**lady [1]** 682/6
**language [4]** 688/5 689/1 722/8 726/6
**large [2]** 676/9 676/21
**last [9]** 633/8 635/7 642/5 688/2 695/7 695/21 696/16 696/17 697/20
**lastly [1]** 644/17
**late [1]** 709/1
**latent [1]** 698/17
**later [2]** 641/10 724/21
**latest [1]** 723/20
**law [1]** 634/8
**lawyer [2]** 724/7 724/10
**lawyers [1]** 725/21
**laying [1]** 699/5
**layperson [2]** 652/4 652/12
**least [6]** 653/10 681/7 682/22 722/11 723/19 725/21
**leave [4]** 660/19 669/11 670/1 709/13
**led [1]** 670/24
**left [4]** 682/10 690/16 697/11 699/3
**left-hand [1]** 690/16
**legal [3]** 701/13 710/7 723/17
**legitimate [1]** 686/8

**L**

**legitimately [1]** 686/15
**Leona [1]** 635/7
**let [16]** 642/2 651/21 655/14 664/25 665/14 665/22 666/3 666/6 683/18 683/20 697/18 698/10 702/25 715/24 724/5 726/14
**let's [3]** 689/10 694/22 701/4
**letter [1]** 688/9
**level [5]** 653/10 699/9 699/17 720/15 721/17
**licking [1]** 639/8
**life [2]** 681/6 724/13
**light [3]** 653/16 653/25 698/6
**like [18]** 653/4 654/20 671/3 675/3 675/23 676/20 679/7 690/15 695/4 703/16 703/24 705/4 707/23 708/1 708/6 717/23 722/16 725/22
**limit [1]** 679/7
**limits [1]** 689/4
**line [5]** 677/19 679/19 679/25 693/2 693/19
**lines [2]** 680/5 707/24
**link [1]** 700/19
**list [1]** 640/18
**listed [2]** 638/16 639/15
**listening [1]** 678/22
**litany [1]** 639/15
**literally [1]** 688/8
**little [6]** 643/15 657/4 678/22 696/4 701/14 722/12
**lived [1]** 718/25
**loaded [1]** 676/3
**loading [1]** 677/24
**locate [1]** 708/15
**location [13]** 690/16 703/15 704/5 705/3 705/3 705/22 705/25 706/3 706/3 706/6 708/18 718/24 719/8
**locations [2]** 704/4 708/17
**long [4]** 635/11 635/23 659/2 714/13
**look [23]** 639/17 646/10 646/22 657/8 672/10 674/18 675/6 675/24 676/5 679/20 683/24 685/22 687/1 689/3 690/15 693/18 700/12 702/20 704/4 704/18 705/3 708/16 708/17
**looked [13]** 640/3 647/3 648/3 649/13 649/17 649/18 650/24 667/7 672/11 682/13 695/1 697/23 706/2
**looking [30]** 640/7 640/10 640/13 644/4 644/7 658/1 667/24 668/15 679/11 681/5 686/17 688/16 690/12 691/3 698/16 698/22 699/4 699/4 699/16 700/19 703/8 703/15 703/16 705/5 705/20 705/22 705/22 706/17 707/21 712/25
**looks [2]** 675/3 704/4
**lost [1]** 660/21
**lot [5]** 660/6 677/1 706/15 707/10 722/12
**lots [1]** 707/21
**loud [3]** 635/5 710/20 714/8
**lunch [3]** 722/6 722/13 722/14

**M**

**M-I-L-L-S [1]** 635/8
**M140461 [3]** 638/13 713/4 713/17
**M140461-18.2SFM [1]** 713/4
**M140461-1BEFM [1]** 713/17
**Ma'am [1]** 645/1
**machine [9]** 631/24 677/25 699/24 700/7 700/10 700/25 709/19 727/4 727/9
**mad [2]** 701/14 701/15
**made [39]** 634/9 634/11 646/4 649/20 655/12 656/4 656/6 659/9 663/11 663/12 669/3 669/8 669/12 670/8 670/10 672/2 672/21 672/24 673/6 673/12 674/17 683/16 685/8 686/4 686/16 687/17 688/10 692/15 696/12 697/3 697/4 710/7 717/13 721/1 722/3 722/4 722/7 722/23 724/21
**major [16]** 658/18 658/19 658/21 691/1 691/2 696/6 700/14 706/16 706/21 706/23 706/25 707/3 707/16 707/24 708/1 709/2 709/8
**majority [1]** 646/19
**make [29]** 634/7 643/15 643/15 656/22 657/1 665/20 669/14 672/18 673/2 673/3 675/5 676/1 676/20 683/6 684/6 684/22 684/22 685/3 685/7 693/25 697/9 697/11 698/16 702/5 709/17 710/5 722/23 724/19 725/11
**makes [1]** 702/7
**making [7]** 653/25 655/15 675/17 699/8 709/19 720/2 720/25
**male [49]** 640/1 640/13 645/18 646/1 646/6 646/7 646/9 646/13 646/17 646/21 646/24 646/25 647/4 657/13 658/16 658/18 658/19 658/19 658/21 658/21 658/22 658/25 666/12 666/14 667/3 668/1 669/5 669/23 678/9 679/2 679/6 679/15 680/12 682/6 686/10 690/20 691/3 694/8 695/2 704/6 705/21 705/23 705/23 705/25 706/4 706/8 708/21 708/22 709/8
**males [1]** 706/5
**man [1]** 681/5
**managers [1]** 635/19
**mandatory [1]** 681/6
**many [8]** 633/9 636/13 636/16 686/19 690/17 700/15 703/18 708/15
**march [5]** 657/18 657/22 660/18 709/4 709/5
**marked [3]** 637/20 641/15 711/21
**marker [4]** 689/3 690/17 700/3 700/3
**markers [1]** 688/22
**marking [1]** 639/7
**marshal [2]** 723/25 724/5
**mask [1]** 655/23
**Masters [1]** 636/3
**match [9]** 644/8 648/7 649/15 649/17 663/16 666/17 669/9 670/24 683/7
**matched [1]** 648/9
**matches [1]** 648/3
**material [1]** 709/11
**materials [9]** 647/2 650/23 657/24 667/4 669/3 669/8 685/19 694/7 695/4
**maternal [1]** 660/19
**maternity [1]** 709/13
**math [1]** 705/17
**matter [4]** 633/2 685/3 700/20 701/13
**may [20]** 634/15 637/23 638/23 663/14 663/14 663/15 667/9 670/6 670/10 672/5 681/10 692/18 695/16 701/5

701/1 701/15 703/7 708/4 722/17 726/16
**maybe [8]** 636/17 680/14 681/21 683/10 683/20 683/25
**me [44]** 639/25 642/2 647/9 648/18 651/14 651/21 652/24 653/15 654/4 655/14 655/17 655/19 663/4 663/10 664/22 665/14 666/6 673/3 673/4 673/24 680/16 682/2 682/16 687/19 690/19 692/9 692/14 692/16 692/25 693/3 693/6 695/22 696/19 699/21 700/22 701/15 702/25 705/16 707/10 707/24 715/24 719/16 720/20 726/14
**mean [19]** 651/20 653/9 662/13 662/19 663/2 670/14 670/15 673/3 680/12 681/15 683/10 683/18 684/25 691/25 699/20 704/13 714/21 720/18 723/8
**meaning [1]** 684/9
**means [6]** 681/2 684/20 688/22 700/17 720/5 720/12
**meant [4]** 681/22 684/2 720/15 721/20
**measures [1]** 655/22
**media [1]** 726/11
**meets [1]** 720/11
**members [2]** 634/5 677/3
**mentioned [1]** 668/14
**message [1]** 695/16
**messed [1]** 670/2
**methods [1]** 636/25
**Metropolitan [1]** 696/6
**Michael [1]** 673/17
**mid [1]** 722/11
**mid-trial [1]** 722/11
**middle [2]** 660/19 660/24
**might [5]** 657/21 666/6 667/13 673/19 690/18
**Mike [1]** 673/22
**Mills [17]** 632/5 634/17 634/19 635/7 635/7 635/9 638/4 638/19 644/18 653/6 666/9 666/13 666/18 667/1 669/6 711/15 711/25
**minor [6]** 636/3 706/17 706/23 706/25 707/15 708/1
**minute [2]** 652/1 725/7
**minutes [2]** 719/25 723/8
**Miss [3]** 651/25 653/4 710/9
**misstate [1]** 688/7
**mistake [1]** 724/22
**mister [1]** 698/10
**misunderstood [1]** 683/10
**mix [2]** 667/24 676/2
**mixture [43]** 659/17 659/21 659/23 660/9 661/14 661/17 662/1 662/11 662/15 663/6 666/10 666/20 668/1 671/9 671/25 674/14 678/14 682/20 684/2 686/4 690/20 691/4 695/1 700/15 702/20 702/23 702/24 703/1 703/3 703/7 703/18 703/19 703/21 703/23 704/2 704/18 704/21 705/4 705/6 705/16 706/25 707/5 709/17
**mixtures [13]** 660/2 660/5 662/25 667/22 680/6 682/17 722/20 703/25 703/25 705/13 705/14 706/14 707/21
**MJOA [1]** 722/2
**mock [2]** 636/10 636/12
**molecular [1]** 636/4
**Monday [14]** 692/18 722/18 722/24

## M

**Monday... [11]** 722/25 723/1 723/5
723/10 723/11 723/18 725/5 725/10
725/19 725/19 726/22
**months [1]** 636/7
**more [21]** 635/20 653/19 657/4 660/3
660/7 661/1 662/10 662/12 673/11
673/20 691/5 703/4 703/21 703/21
705/14 706/15 707/4 707/5 707/24
707/25 713/18
**morning [14]** 633/15 635/3 635/4
638/9 642/19 673/22 710/18 710/19
714/6 714/7 722/24 723/10 723/11
725/20
**most [3]** 638/6 674/11 720/8
**motion [3]** 717/24 718/19 721/23
**motions [1]** 722/3
**move [5]** 643/24 644/9 716/19 716/22
717/3
**moving [2]** 687/23 708/8
**Mr [14]** 632/6 653/24 654/10 655/5
655/14 679/23 682/15 691/21 717/21
721/8 721/25 723/14 724/7 725/11
**Mr. [2]** 723/22 724/3
**Mr. Kelsey [2]** 723/22 724/3
**Ms [12]** 632/6 632/8 632/11 666/18
704/25 706/19 706/19 706/20 706/20
706/21 706/22 706/22
**Ms. [14]** 635/9 638/4 638/19 644/18
653/6 666/9 666/13 667/1 669/6 674/8
679/19 686/5 686/9 686/25
**Ms. Mills [9]** 635/9 638/4 638/19
644/18 653/6 666/9 666/13 667/1
669/6
**Ms. Parker [5]** 674/8 679/19 686/5
686/9 686/25
**much [3]** 668/13 675/17 701/7
**multiple [1]** 704/25
**my [37]** 636/10 638/6 638/7 641/7
642/21 646/9 657/22 658/14 659/6
659/6 666/3 667/14 672/6 672/15
672/22 683/4 683/24 688/20 690/21
692/5 693/15 701/7 705/15 707/1
709/9 710/22 711/3 712/18 712/22
713/3 713/10 714/10 715/25 723/1
725/22 727/9 727/10
**myriad [1]** 678/5

## N

**N.W [1]** 631/20
**name [6]** 635/5 635/7 710/20 710/22
714/8 727/11
**nature [1]** 718/10
**necessarily [4]** 659/20 662/13 705/13
706/23
**neck [1]** 639/8
**need [7]** 640/16 644/17 651/23 655/11
660/5 664/3 724/13
**needed [6]** 640/6 655/11 672/3 672/13
673/1 711/4
**needs [1]** 680/14
**negative [2]** 637/5 684/21
**never [5]** 652/4 660/21 686/5 687/7
687/9
**new [2]** 699/21 707/17
**newer [1]** 635/22
**next [7]** 633/5 633/15 646/11 646/12
710/9 713/22 715/9
**nice [1]** 726/1
**no [56]** 631/4 632/15 637/6 637/25
638/22 640/22 641/7 645/6 648/11
649/16 650/6 655/10 655/19 661/1
661/12 664/7 664/24 664/25 665/6
665/12 665/12 665/12 666/11 671/2
671/17 679/1 681/2 681/3 681/15
684/22 687/3 691/18 692/10 692/20
692/22 694/1 694/12 694/14 694/18
695/6 698/14 701/3 708/21 708/22
709/15 713/18 713/20 715/4 715/5
715/7 716/25 717/7 717/9 721/12
721/13 723/6
**none [2]** 655/5 680/6
**noon [3]** 723/19 725/18 725/24
**north [2]** 674/23 687/15
**not [130]**
**notation [1]** 702/7
**notes [1]** 727/9
**nothing [7]** 677/4 683/22 685/1 685/5
692/13 722/1 723/1
**noticed [1]** 690/15
**notify [1]** 687/19
**notions [1]** 702/5
**November [1]** 658/1
**now [38]** 633/23 636/22 637/13 640/18
641/14 643/24 644/4 644/9 645/1
647/1 648/6 649/2 649/10 650/6 654/6
657/5 659/12 660/11 663/4 674/22
680/7 680/8 681/22 682/11 687/9
690/15 692/6 692/14 697/5 699/14
700/10 700/23 702/20 707/7 708/2
708/9 722/6 726/20
**number [8]** 632/14 635/17 638/13
646/23 665/15 682/13 703/24 707/9
**numbers [3]** 643/17 682/8 712/8
**nurse [4]** 653/4 720/4 720/8 721/10
**nurse's [1]** 721/4
**NW [2]** 631/13 631/16

## O

**objected [1]** 650/10
**objection [11]** 638/22 638/23 647/5
653/22 653/23 694/22 695/7 695/11
716/25 717/6 717/7
**objections [1]** 722/4
**obligated [1]** 698/13
**obligation [2]** 726/12 726/13
**obligations [2]** 677/12 679/17
**observe [1]** 699/11
**obtain [1]** 666/14
**obtained [5]** 640/2 646/10 667/3 669/6
669/20
**obtaining [1]** 666/14
**obtestd [1]** 669/9
**obvious [1]** 706/18
**obviously [13]** 650/20 654/8 664/16
677/11 678/13 678/14 679/8 679/21
691/2 691/25 706/22 717/11 722/12
**occasions [1]** 721/19
**occur [1]** 719/2
**occurred [5]** 718/16 718/22 718/24
719/8 726/15
**occurs [1]** 703/3
**October [1]** 714/14
**off [10]** 642/7 654/12 670/3 677/1
710/9 713/22 715/9
677/10 689/4 703/13 711/12 712/14
719/7
**offer [2]** 653/17 690/4
**offered [1]** 640/22
**offering [2]** 652/21 652/23
**offers [1]** 652/19
**office [16]** 631/13 658/12 659/4
666/22 669/7 669/18 670/8 672/7
672/8 672/10 673/17 673/24 674/17
676/17 680/4 692/2
**officer [1]** 692/2
**official [4]** 631/19 727/2 727/8 727/16
**offline [2]** 696/11 696/12
**often [2]** 676/21 699/7
**oftentimes [1]** 686/21
**Oh [1]** 643/10
**okay [34]** 633/5 636/13 637/16 641/14
642/1 643/12 644/9 644/12 644/21
651/25 655/14 657/6 681/4 682/14
682/15 687/8 688/12 689/24 691/21
697/20 700/21 706/13 708/10 709/6
710/5 710/9 712/1 712/19 714/24
716/17 717/18 717/25 725/4 725/13
**once [12]** 636/5 641/10 642/16 671/19
678/10 683/5 683/14 685/9 687/15
703/16 703/23 724/19
**one [48]** 635/18 654/10 654/22 658/21
658/25 659/1 659/14 660/3 660/7
662/15 664/12 664/13 664/20 665/15
671/11 671/11 672/3 674/11 674/21
675/4 675/5 675/8 676/8 676/15
676/25 677/21 680/20 680/22 685/7
688/20 690/21 690/25 697/24 698/12
699/19 703/4 704/4 705/1 705/2
707/23 707/23 708/18 709/16 718/1
722/11 724/22 726/15 726/16
**only [28]** 637/21 638/2 640/22 647/10
648/16 650/14 658/25 659/1 665/24
676/24 677/6 678/7 679/8 679/14
686/16 690/16 690/20 695/19 696/1
696/19 697/5 697/5 697/18 698/8
716/5 717/12 717/14 721/9
**open [16]** 651/22 663/13 663/14
663/14 663/15 668/6 668/8 678/3
678/4 686/15 693/4 693/9 696/22
708/13 710/4 725/14
**opened [2]** 697/10 697/17
**opens [7]** 664/10 665/7 666/1 692/16
693/6 695/22 696/17
**operating [5]** 636/8 662/10 662/11
707/8 707/11
**operation [1]** 634/6
**operations [1]** 660/21
**opinion [11]** 652/19 652/22 652/23
662/8 680/13 680/20 689/3 689/4
690/9 690/21 700/25
**opinions [1]** 678/2
**opportunity [3]** 641/17 641/21 676/9
**opposed [1]** 639/14
**opted [1]** 658/4
**options [1]** 722/5
**oral [1]** 636/12
**order [12]** 636/1 651/18 653/12 663/8
673/18 680/23 690/3 699/7 699/15
699/22 700/23 701/19
**original [1]** 669/15
**other [23]** 634/14 635/17 648/4 649/14

# O

**other... [19]** 649/20 658/19 662/5 665/1 671/14 671/22 672/19 681/15 682/19 683/15 686/22 689/14 690/22 696/6 696/18 697/9 711/19 720/16 724/22

**others [1]** 673/7

**otherwise [2]** 699/3 725/12

**our [37]** 635/19 635/21 637/8 637/9 638/13 641/10 643/17 653/4 653/19 659/21 670/3 672/7 672/8 673/17 675/8 675/9 676/17 677/1 677/8 677/12 677/18 678/1 678/3 678/21 678/23 678/24 679/16 679/17 685/9 685/17 687/13 688/10 690/6 694/7 695/10 696/5 707/7

**ourselves [1]** 693/1

**out [75]** 637/9 637/10 641/11 642/18 643/14 647/1 647/2 650/2 650/12 651/21 654/3 654/17 656/2 656/4 656/7 656/12 656/18 656/23 657/14 657/16 657/18 657/22 658/5 658/8 659/3 659/7 659/8 660/18 660/18 661/20 664/3 665/4 665/5 665/7 665/8 665/15 665/16 665/19 666/1 666/9 667/2 667/15 667/20 670/7 671/18 672/14 674/7 674/22 675/16 675/20 677/25 681/18 682/23 685/22 686/11 690/25 691/1 692/22 696/23 699/24 700/16 700/18 702/8 702/21 705/7 705/8 705/14 705/16 705/24 707/2 708/9 709/12 722/7 723/7 726/5

**outer [1]** 720/9

**outside [5]** 651/25 656/21 667/10 667/11 677/15

**over [13]** 636/17 648/2 648/3 650/3 673/16 674/8 682/13 685/10 690/2 692/1 707/16 723/16 725/16

**oversee [1]** 673/23

**own [4]** 636/10 669/13 686/6 724/9

# P

**p.m [3]** 717/20 725/6 726/23

**package [2]** 638/9 649/23

**packaged [1]** 709/6

**packages [1]** 701/23

**packet [1]** 638/12

**page [15]** 642/22 643/6 643/10 643/25 644/7 644/10 644/18 689/12 712/24 712/25 713/1 713/3 713/12 713/12 713/16

**pages [4]** 643/11 644/11 713/3 727/7

**panel [3]** 675/9 677/3 688/3

**Parker [5]** 674/8 679/19 686/5 686/9 686/25

**parking [1]** 719/25

**part [10]** 641/24 663/7 665/10 685/4 687/11 688/9 690/3 690/3 705/14 720/9

**particular [11]** 638/12 643/12 645/1 654/19 661/13 680/22 681/8 681/11 700/1 712/12 721/23

**parties [3]** 633/4 634/2 699/20

**parts [5]** 653/5 717/12 717/13 717/14 717/15

**party [1]** 711/13

**pass [2]** 679/12 699/18

**passed [6]** 688/19 688/24 688/24 699/3 699/13 719/7

**past [1]** 709/23

**peaks [1]** 691/5

**peer [1]** 637/8

**penetrated [1]** 720/6

**penetration [9]** 719/10 719/18 719/20 720/10 720/13 720/15 721/12 721/14 721/17

**people [15]** 646/5 649/14 659/15 672/7 672/24 679/18 686/22 700/15 703/7 703/19 703/20 703/20 703/20 703/21 705/5

**per [1]** 690/17

**perceived [1]** 716/9

**percent [3]** 686/6 707/25 707/25

**perfect [1]** 681/16

**perform [3]** 636/9 667/5 711/2

**performed [3]** 667/6 711/11 713/2

**Perhaps [1]** 656/19

**perianal [7]** 639/6 639/12 644/22 658/23 660/1 704/8 712/5

**period [7]** 647/3 654/9 672/16 674/4 677/13 677/14 695/5

**permit [7]** 653/17 663/11 668/6 669/11 692/14 692/17 693/3

**perplexing [1]** 683/18

**person [10]** 660/3 660/7 684/13 684/14 703/4 705/9 706/15 712/11 712/20 726/18

**persons [2]** 672/8 690/20

**pertaining [1]** 638/12

**pertains [2]** 633/20 633/25

**pertinent [1]** 671/14

**phone [4]** 634/6 634/7 634/9 634/10

**phrased [1]** 659/21

**physical [1]** 675/12

**physically [1]** 675/22

**picked [1]** 718/12

**piece [1]** 675/13

**pieces [1]** 666/8

**pipetting [1]** 675/23

**place [1]** 718/9

**Plaintiff [1]** 631/3

**played [3]** 715/23 716/21 717/1

**please [2]** 673/24 725/25

**plus [2]** 708/17 719/2

**point [14]** 641/4 646/9 654/9 654/15 659/14 666/11 667/3 669/7 675/5 685/2 685/7 695/24 697/2 717/21

**points [2]** 684/6 708/15

**Police [1]** 696/6

**policy [2]** 682/16 684/4

**portions [4]** 641/18 641/19 641/20 641/25

**position [6]** 635/13 636/5 676/17 679/24 718/4 720/23

**positioning [2]** 721/5 721/6

**positive [2]** 637/4 684/21

**possibilities [1]** 685/11

**possibility [5]** 685/11 685/13 685/15

**possible [1]** 640/10

**possibly [1]** 696/20

**posture [1]** 665/14

**potential [3]** 663/1 681/6 687/3

**potentially [1]** 662/24 704/9 709/13

**power [2]** 695/19 698/2

**PowerPoint [12]** 646/4 650/24 651/1 651/3 680/10 697/24 697/25 698/3 698/4 698/18 698/20 698/23

**preamble [1]** 680/1

**Precisely [1]** 665/4

**preclude [1]** 670/16

**precluded [2]** 647/18 647/22

**predated [2]** 671/1 671/16

**predicate [2]** 648/14 721/22

**predicated [1]** 652/9

**prefer [1]** 723/12

**prejudice [1]** 685/21

**prejudicial [3]** 664/15 665/7 666/2

**preliminary [1]** 686/2

**prepare [2]** 641/24 642/4

**presence [4]** 634/12 640/11 640/11 656/21

**present [5]** 633/4 646/24 689/18 706/6 715/11

**presentation [2]** 704/25 717/19

**presented [3]** 650/19 673/25 716/12

**pressing [4]** 720/3 720/5 720/24 721/1

**pressure [1]** 722/17

**pretrial [1]** 722/3

**pretty [3]** 662/14 668/13 683/10 725/17

**prevent [3]** 702/12 702/14 702/15

**prevention [1]** 671/18

**previously [1]** 726/1

**primarily [1]** 680/1

**Prince [1]** 639/19

**print [1]** 698/17

**printout [1]** 643/14

**prior [4]** 653/19 657/10 665/8 668/8

**private [27]** 641/11 647/2 648/10 654/3 654/18 655/9 656/2 656/18 657/17 658/5 658/9 659/3 659/5 672/14 674/7 681/19 681/22 681/24 691/8 692/13 692/16 692/22 693/11 693/17 694/15 699/1 709/11

**probably [3]** 642/8 662/15 722/14

**probative [1]** 664/16

**problem [20]** 648/20 663/18 666/24 668/20 671/17 671/20 672/1 672/13 672/19 672/25 674/8 678/19 681/1 682/17 692/4 694/12 694/13 695/20 696/16 723/15

**problematic [1]** 673/5

**problems [25]** 654/3 656/8 659/14 661/10 666/10 666/24 667/21 669/13 670/3 671/9 671/13 672/4 674/12 680/18 680/25 681/11 681/11 681/13 683/13 688/3 688/4 691/16 692/20 694/3 694/18

**procedure [4]** 637/3 637/7 707/8 707/17

**procedures [5]** 636/8 659/19 662/10 662/11 662/17

**proceed [2]** 701/15 725/16

**proceedings [4]** 631/24 710/8 727/5 727/8

**process [20]** 660/6 660/22 661/13 661/25 670/22 671/6 671/23 671/24 672/6 672/23 673/5 673/18 680/23 685/5 687/2 696/13 699/22 700/22 712/10 712/17

**processed [6]** 712/3 712/4 712/16

**P**

processed... [3] 714/16 714/20 714/22
processes [2] 660/23 677/21
processing [3] 636/10 712/6 715/2
produced [8] 631/24 652/15 652/17
679/8 686/18 691/13 700/20 704/16
proffer [1] 677/19
proficiency [1] 638/7
profile [63] 640/12 640/13 645/18
646/1 646/6 646/10 646/21 646/24
646/25 647/4 651/10 651/12 651/13
655/6 657/14 658/17 658/18 658/19
658/21 658/23 658/25 660/4 666/12
666/14 667/3 668/1 669/5 669/23
669/23 678/9 678/15 679/2 679/6
679/8 679/9 679/11 679/15 680/24
682/7 683/6 683/9 683/14 683/15
686/11 694/9 695/2 703/3 703/17
703/23 704/10 704/11 704/14 704/17
704/17 704/22 705/1 705/9 705/18
705/18 705/24 706/4 708/15 708/19
profiles [11] 646/12 658/20 664/2
702/21 703/22 703/25 704/6 705/1
706/1 708/17 708/21
program [1] 703/14
project [1] 688/10
promptly [1] 723/1
pronouncing [1] 642/15
proper [7] 637/10 686/3 688/23 698/21
698/21 699/6 699/8
properly [4] 637/6 676/2 676/3 684/23
proportions [1] 706/25
pros [1] 724/3
prosecution [1] 698/13
prosecutions [1] 687/13
protective [1] 637/10
protocols [1] 707/12
provide [3] 640/20 653/12 690/5
provided [5] 647/25 653/13 655/16
678/11 716/5
providing [1] 652/3
publish [4] 715/12 715/18 716/19
716/23
pull [5] 642/8 680/4 691/1 705/7
705/16
pulled [5] 705/7 685/9 686/10 696/5
696/8
purely [3] 652/8 677/20 700/20
purportedly [3] 678/16 716/2 718/9
purpose [1] 645/17
purposely [1] 689/14
purposes [1] 637/21
pursue [3] 664/9 668/5 679/25
push [1] 680/9
pushed [3] 720/14 720/18 721/19
pushing [2] 720/12 721/6
put [12] 633/18 634/1 666/7 674/17
682/12 688/5 700/24 703/14 704/25
712/20 712/22 722/9
putting [4] 643/12 665/14 679/17
700/18

**Q**

QA [1] 685/4
qualified [14] 636/18 650/3 650/5
650/12 652/2 652/7 653/6 653/12
653/19 680/14 692/6 692/7 698/5

701/2
qualify [5] 650/21 653/7 663/2 698/9
701/2
quality [11] 655/25 656/14 657/15
659/19 659/20 665/17 684/9 684/15
692/10 694/1 694/18
Quantico [1] 674/22
quantification [2] 707/4 707/6
quantitation [2] 675/16 677/23
quantities [1] 676/22
quantity [1] 706/8
query [1] 668/5
question [39] 639/2 646/3 650/13
652/2 661/9 664/13 676/11 676/13
676/23 677/6 681/23 682/10 684/6
686/8 687/14 687/17 688/2 689/5
689/11 693/5 695/7 695/11 695/17
695/18 695/20 695/21 695/22 696/14
696/16 696/17 696/19 696/20 697/13
697/20 707/10 709/16 710/6 710/7
720/17
questioned [1] 687/10
questions [25] 645/6 647/9 657/8
657/9 661/1 667/14 667/14 667/16
669/12 673/20 674/1 675/9 676/8
676/16 677/20 682/1 690/15 702/12
713/18 713/20 713/21 715/5 715/7
715/8 719/15
quickly [1] 722/19
quite [3] 674/4 700/1 708/1
quote [1] 688/8

**R**

raise [3] 681/25 717/22 718/2
raised [8] 653/23 659/15 659/16
659/17 661/3 661/9 671/19 693/5
raising [2] 681/25 696/20
ranking [1] 686/24
rather [3] 667/3 707/1 723/6
ratio [1] 707/25
raw [19] 642/5 642/6 642/12 642/14
648/3 649/13 650/8 650/23 668/14
682/21 686/17 689/8 689/10 690/5
694/7 694/8 694/10 694/12 709/7
RBW [1] 631/4
reached [5] 633/23 672/12 686/3
696/2 696/3
reaching [1] 720/24
read [7] 633/16 633/23 634/15 642/18
643/16 671/20 717/4
reading [3] 633/8 636/7 636/9
reads [1] 634/2
real [1] 675/23
realize [1] 647/24
really [4] 648/19 653/7 689/1 700/13
reason [8] 647/13 647/16 647/17
659/2 666/22 674/9 676/11 696/19
reasonable [1] 721/22
reasons [2] 664/14 664/20
rebuttal [1] 697/11
recall [5] 660/13 711/19 719/17
receive [5] 636/1 639/3 639/16 640/25
646/7
received [6] 639/4 639/10 645/21
646/1 657/24 691/13
recess [5] 651/23 673/11 673/14
717/19 726/2

recognize [2] 711/22 711/24
record [12] 635/3 635/6 657/20 669/1
670/18 681/14 683/25 693/25 697/19
710/21 713/9 714/9
recorded [1] 631/24
recording [1] 716/1
recordings [1] 715/14
red [3] 706/19 706/20 706/22
redirect [2] 632/4 709/15
redone [1] 687/5
refer [4] 643/25 644/9 644/18 681/19
reference [21] 638/20 644/5 648/1
648/21 655/25 665/17 671/22 678/19
680/25 690/10 691/16 691/22 692/3
692/4 692/11 692/21 714/20 717/11
718/6 718/18 718/23
referencing [2] 641/14 675/11
referring [4] 654/10 680/10 681/20
684/3
reflect [1] 713/12
reflected [6] 641/23 644/1 644/12
644/15 644/21 689/12
reflection [2] 700/10 713/16
reflects [3] 643/13 652/24 713/1
regarding [10] 648/25 662/22 665/8
668/8 678/6 678/25 679/21 688/11
722/8 722/10
regardless [2] 685/17 724/10
REGGIE [1] 631/9
regions [1] 637/6
reinterpret [1] 642/13
reinterpreted [1] 676/18
reinterpreting [1] 685/20
related [4] 661/10 689/7 689/8 726/6
relates [5] 663/18 664/17 665/18
668/12 696/21
relative [2] 636/9 721/6
release [1] 725/4
relevance [3] 655/20 695/13 695/14
relevant [4] 647/10 647/15 648/19
655/15 656/5 657/2 693/20 710/7
717/14 717/16
reliability [1] 656/14
reliable [1] 702/18
rely [2] 676/15 726/7
relying [1] 656/3
remained [1] 640/4
remaining [1] 639/22
remember [5] 637/14 659/12 707/7
708/1 726/11
render [1] 726/9
renew [1] 722/2
renown [2] 674/11 674/18
repeat [1] 715/25
report [28] 638/17 639/19 641/10
641/14 643/6 643/20 643/25 644/3
644/10 644/19 644/24 657/22 658/6
658/14 658/16 666/16 685/12 685/13
685/16 686/1 688/4 709/9 711/25
712/13 712/14 713/12 721/11 721/13
reported [7] 657/18 657/22 659/7
660/18 666/9 711/25 724/4
reporter [6] 631/19 631/19 719/16
720/20 727/2 727/16
reporting [1] 711/14
reports [3] 637/17 701/24 711/3
represent [1] 724/2

**R**

**representations [1]** 681/3
**request [4]** 658/12 659/7 659/9 670/8
**requested [2]** 658/14 702/20
**require [8]** 651/18 653/10 653/15
663/4 699/9 699/16 700/23 701/1
**research [1]** 726/5
**resolve [5]** 674/15 701/13 701/14
722/17 722/19
**resolver [1]** 691/4
**respect [3]** 718/1 718/20 719/9
**respond [1]** 724/5
**response [3]** 656/13 719/14 719/23
**responsibilities [1]** 635/21
**rest [4]** 694/9 725/9 726/20 726/21
**result [7]** 642/3 651/3 651/5 656/9
695/25 696/25 696/25
**results [36]** 639/20 639/25 640/2
640/7 641/1 641/9 641/22 641/22
642/4 654/21 656/2 658/7 659/6 659/6
663/16 663/22 666/9 666/13 666/18
666/22 668/9 669/19 669/21 669/21
670/24 671/1 673/1 676/14 677/2
677/17 684/1 698/21 698/22 699/25
709/9 711/12
**resuming [2]** 660/13 673/14
**retry [2]** 664/22 665/3
**revealed [1]** 697/20
**reversal [3]** 663/10 665/16 665/23
**reverse [1]** 699/7
**review [18]** 637/8 637/9 637/16 641/17
641/25 645/17 671/12 672/6 674/25
677/4 678/6 680/15 684/14 685/9
687/18 687/21 687/25 712/2
**reviewed [10]** 638/9 671/10 671/17
672/16 672/17 684/4 687/15 688/3
688/9 701/19
**reviewing [1]** 719/19
**reviews [2]** 637/8 687/23
**right [25]** 637/20 639/8 644/6 652/18
653/5 654/24 659/12 664/19 676/1
679/5 689/16 690/2 698/16 699/5
699/25 700/5 701/4 706/20 707/7
708/2 708/9 713/5 724/8 724/14
724/18
**right-hand [1]** 644/6
**ROBERT [10]** 631/5 633/3 633/24
634/3 634/10 638/14 638/16 648/12
711/7 714/17
**robot [1]** 680/13
**robots [2]** 675/24 677/24
**role [1]** 711/10
**Room [1]** 631/20
**round [1]** 639/24
**RPR [2]** 631/19 727/16
**rubbing [1]** 720/1
**rule [1]** 697/21
**ruled [1]** 668/23
**ruling [1]** 673/4
**running [1]** 675/18
**runs [1]** 674/22

**S**

**S-H-A-N-A [1]** 635/7
**said [57]** 636/22 647/15 648/3 649/15
649/16 649/17 649/19 649/21 650/6
650/7 650/14 652/6 652/10 654/20

655/16 655/17 655/19 656/9 660/15
660/17 663/3 663/4 663/7 663/9
664/11 665/25 669/2 670/21 671/5
671/8 679/2 679/14 680/15 680/16
680/17 680/18 680/25 682/14 684/8
691/6 691/23 692/6 692/9 693/7
696/15 703/17 705/4 707/23 708/1
716/2 716/16 718/13 720/14 721/18
722/15 726/7 727/8
**sake [1]** 653/7
**same [16]** 638/3 658/22 669/20 671/14
684/24 689/13 689/15 689/25 690/2
691/13 696/2 697/4 698/22 699/4
707/19 723/13
**sample [43]** 639/13 644/6 645/18
646/1 646/8 646/11 646/13 646/17
647/4 651/1 655/5 655/5 658/8 658/20
660/4 662/20 666/17 669/5 669/16
674/7 678/10 678/12 682/7 697/1
697/3 702/13 703/5 704/8 704/8 704/9
704/10 704/16 704/19 705/3 705/5
705/11 705/12 705/15 713/4 713/17
714/20 714/22 714/24
**samples [33]** 639/9 639/21 639/24
640/2 640/18 640/19 641/6 647/1
649/20 655/2 660/22 666/22 669/17
669/23 676/2 684/24 684/24 692/15
694/9 695/2 701/20 702/1 704/7
705/19 711/16 711/18 712/2 712/12
712/16 712/21 714/25 715/3 715/4
**sampling [1]** 676/9
**SANE [3]** 720/4 720/8 721/3
**sanitize [2]** 685/19 685/23
**satisfy [2]** 677/12 679/17
**saw [6]** 686/5 686/12 687/18 697/24
717/12 719/6
**say [49]** 640/6 646/9 651/5 652/10
659/23 667/25 667/25 668/3 668/9
668/18 669/25 670/2 675/10 678/12
681/4 683/20 685/23 688/9 689/10
690/18 691/22 691/24 695/6 695/23
696/1 696/2 696/16 696/22 696/25
698/3 698/11 699/12 699/15 703/1
703/11 703/24 704/13 704/22 705/11
705/19 705/23 707/19 709/16 713/7
719/5 720/18 721/19 724/21 725/22
**saying [22]** 652/24 654/13 657/1 669/1
671/22 678/17 678/23 679/3 679/5
683/17 683/25 685/24 688/16 688/18
688/20 691/14 694/12 697/1 697/6
697/7 698/24 716/14
**says [11]** 640/9 644/11 653/10 663/6
680/24 681/12 692/3 697/4 700/4
705/21 719/4
**scenario [2]** 639/17 640/9
**schedule [1]** 690/6
**science [4]** 636/2 636/4 652/5 681/16
**Sciences [20]** 635/10 636/23 637/1
666/16 666/25 669/10 669/12 669/22
670/2 674/5 674/13 674/22 675/8
686/2 686/10 686/13 694/19 696/7
710/25 714/12
**scientific [1]** 684/12
**scientist [6]** 635/14 635/17 635/18
635/19 687/1 711/2
**scientists [5]** 674/18 674/21 682/13
686/24 688/6

**scrap [1]** 676/14
**scratch [1]** 676/19
**screen [3]** 633/18 634/1 643/19
**scrutinized [1]** 682/4
**scrutiny [2]** 661/25 688/14
**search [1]** 703/22
**seat [1]** 720/23
**seated [1]** 701/11
**second [5]** 685/7 705/8 705/9 705/17
705/18
**see [25]** 647/14 656/4 660/8 664/8
664/16 665/6 665/25 673/8 679/11
683/6 683/15 693/1 693/14 697/24
700/13 700/25 705/4 705/24 712/2
716/2 716/9 719/19 723/7 726/8
726/22
**seeing [1]** 676/10
**seek [2]** 648/17 663/2
**seeking [6]** 640/20 648/24 650/18
655/8 681/18 682/2
**seems [23]** 647/9 648/18 651/14
653/15 654/4 655/17 655/19 663/4
673/3 673/4 682/2 692/9 692/14
692/16 692/25 693/3 693/6 695/22
696/19 696/22 697/4 700/2 700/22
**seen [3]** 634/1 675/3 704/24
**segment [1]** 697/25
**semen [3]** 639/20 640/11 644/14
**send [19]** 641/9 651/21 654/21 656/4
656/7 656/18 657/16 658/4 665/3
669/3 669/8 669/18 670/3 671/4
672/14 692/12 693/17 696/7 709/10
**sending [7]** 647/1 647/2 647/2 654/3
654/17 656/12 671/18
**senior [2]** 631/9 635/20
**sent [30]** 641/11 647/14 656/1 657/13
657/14 658/8 659/3 659/8 662/21
663/8 663/22 665/20 666/23 667/1
667/4 667/20 669/15 670/20 674/6
681/24 682/20 685/9 690/2 692/15
692/22 694/9 694/14 694/19 695/2
695/16
**sentence [1]** 681/6
**separate [5]** 655/4 655/13 680/11
707/2 714/24
**separating [1]** 705/24
**series [1]** 687/12
**serology [3]** 639/19 660/22 660/23
**set [5]** 634/5 684/3 684/18 697/19
706/21
**setting [1]** 688/4
**settings [1]** 707/17
**seven [2]** 638/1 638/2
**sex [2]** 655/2 718/18
**sexual [16]** 639/4 639/18 640/1 640/4
640/9 676/21 678/13 679/9 686/11
691/2 704/15 705/19 718/3 718/3
718/10 718/14
**SH [6]** 634/6 634/8 634/13 639/5 644/6
704/16
**SH's [1]** 634/9
**Shana [6]** 632/5 634/17 634/19 635/7
711/15 711/25
**she [192]**
**she'll [2]** 668/3 695/6
**she's [38]** 640/22 647/22 647/25 648/7
648/22 649/2 649/10 650/6

**S**

she's... **[29]**  650/25 651/15 652/3 652/13 652/23 652/23 653/13 653/13 655/9 655/16 655/25 656/10 663/5 663/6 664/17 667/25 668/13 668/14 668/15 668/16 670/15 670/22 671/6 678/12 683/2 705/4 705/6 705/7 718/23
short **[4]**  651/23 659/2 673/13 717/19
shorter **[1]**  701/8
shorthand **[3]**  631/24 727/5 727/9
Shortly **[1]**  660/19
shot **[1]**  676/25
should **[26]**  648/6 650/10 654/11 656/19 679/24 681/14 681/15 681/22 683/25 689/2 689/4 692/6 692/24 693/13 693/21 698/5 704/20 717/15 722/19 723/19 724/11 724/11 724/19 725/17 725/23 726/1
shouldn't **[2]**  679/6 689/2
show **[6]**  637/20 689/9 689/14 693/10 702/15 718/16
showed **[1]**  700/24
showing **[1]**  698/20
shown **[3]**  716/1 717/13 717/16
shows **[1]**  692/9
shut **[2]**  658/4 694/5
side **[5]**  638/7 639/8 657/25 658/10 690/16
sign **[3]**  718/12 719/6 719/7
significance **[1]**  722/20
significant **[1]**  664/16
signify **[1]**  712/20
since **[11]**  635/24 642/4 646/16 657/5 657/20 667/13 674/25 693/15 697/22 714/14 722/18
single **[8]**  674/19 679/9 688/1 688/2 703/17 703/22 704/16 704/17
sir **[4]**  710/23 713/22 715/9 724/16
sit **[3]**  668/24 678/21 695/6
sitting **[2]**  681/5 720/25
situation **[4]**  683/18 685/17 697/20 707/2
six **[1]**  636/7
skilled **[1]**  675/25
skills **[1]**  676/6
slammed **[2]**  668/19 668/22
slash **[2]**  639/7 712/5
slide **[5]**  643/24 644/1 644/9 644/17 644/18
slight **[2]**  720/10 720/13
slot **[1]**  643/3
smears **[3]**  643/4 643/22 644/13
so **[153]**
software **[3]**  642/9 642/9 703/14
some **[50]**  635/17 636/11 637/3 639/5 643/15 649/20 652/6 653/10 653/14 653/24 654/1 656/14 657/9 657/15 659/17 659/18 662/4 662/8 662/9 662/17 666/19 667/21 671/5 671/7 671/9 671/25 672/12 672/12 673/11 673/20 674/12 676/23 677/15 681/8 681/14 681/20 682/18 684/7 685/12 695/24 696/9 697/2 697/23 700/13 701/25 707/17 719/15 720/15 721/20 722/6
somebody **[5]**  672/10 673/19 703/6
705/15 719/5
somehow **[1]**  668/12
someone **[6]**  652/12 653/19 699/10 702/7 712/12 718/25
something **[14]**  648/13 648/25 649/10 655/18 658/11 666/7 678/18 682/1 682/2 683/12 689/6 689/7 693/24 705/12
sometime **[1]**  650/17
sometimes **[5]**  636/7 677/15 687/23 703/19 706/14
somewhat **[2]**  635/20 637/15
soon **[1]**  672/5
SOP **[1]**  707/7
SOPs **[1]**  636/7
sorry **[6]**  633/16 643/10 649/8 659/6 661/18 708/4
sort **[7]**  637/4 655/1 661/23 662/16 671/18 673/18 690/3
sorts **[1]**  700/12
sounds **[1]**  680/3
source **[4]**  697/1 703/17 704/17 704/17
sources **[2]**  689/21 709/18
speak **[1]**  688/6
specialized **[1]**  635/25
specific **[12]**  636/6 661/12 661/22 662/9 662/16 680/20 688/6 689/11 704/5 705/22 706/3 707/9
specifically **[4]**  659/11 659/12 696/18 721/12
specimens **[1]**  709/25
speculate **[3]**  717/15 720/14 721/18
speculation **[2]**  720/16 721/21
spell **[3]**  635/5 710/21 714/8
sperm **[2]**  660/1 686/11
spit **[3]**  675/20 677/25 700/18
spits **[1]**  699/24
spoken **[5]**  716/4 716/7 716/11 716/13 716/14
sponsor **[1]**  691/20
sponsoring **[1]**  679/19
spring **[3]**  709/2 711/6 714/16
stage **[4]**  654/24 666/21 679/14 702/7
stand **[2]**  698/16 724/9
standard **[6]**  636/8 662/10 662/11 707/8 707/11 707/11
standards **[7]**  684/9 684/11 684/13 684/15 684/18 685/4 708/22
start **[9]**  633/8 660/13 676/18 700/15 723/1 723/19 725/18 725/23 726/19
started **[5]**  650/2 658/1 660/22 660/24 681/19
starting **[1]**  725/23
statement **[1]**  719/3
STATES **[29]**  631/1 631/3 631/10 631/13 633/3 633/24 634/3 638/14 659/4 661/21 666/21 669/7 669/17 670/7 670/12 674/10 674/16 682/23 684/17 694/11 711/7 714/16 715/11 715/12 715/17 716/19 716/22 717/3 727/3
stating **[1]**  673/25
status **[1]**  692/25
step **[7]**  642/6 646/11 646/13 651/25 663/20 667/10 667/11
steps **[4]**  660/6 675/21 677/25 712/16
stick **[1]**  688/8
still **[5]**  646/22 660/21 679/24 697/15 723/4
stipulate **[1]**  634/4
stipulation **[10]**  633/8 633/11 633/16 633/20 633/22 633/23 634/1 634/15 715/15 717/4
stood **[2]**  674/21 675/1
stop **[5]**  656/25 660/15 695/24 718/12 726/20
stopped **[3]**  655/2 683/5 718/12
stopping **[1]**  646/9
straight **[1]**  697/19
straightened **[1]**  682/23
straightforward **[1]**  696/14
Street **[1]**  631/13
stricken **[1]**  650/25
strike **[1]**  650/18 650/22
stronger **[1]**  690/22
subject **[2]**  671/13 715/15
subliminal **[1]**  695/16
submit **[2]**  718/21 719/12
submitted **[1]**  710/6
subscribed **[1]**  727/10
subsequent **[1]**  681/1
subsequently **[1]**  718/15
substance **[1]**  663/3
substances **[1]**  667/25
substantive **[1]**  722/8
subtract **[1]**  690/25
such **[7]**  639/5 653/8 656/22 671/17 672/25 686/5 686/21
Sufficiency **[1]**  718/5
sufficient **[4]**  718/16 719/1 721/17 721/21
suggest **[2]**  667/13 681/20
suggesting **[1]**  650/7
suggestion **[3]**  663/17 668/10 693/12
suitable **[1]**  639/25
Suite **[1]**  631/16
summation **[1]**  694/16
summer **[2]**  637/14 637/14
Superior **[1]**  677/8
supposed **[1]**  637/5
sure **[17]**  646/3 665/20 669/14 676/2 684/22 684/22 685/8 686/4 686/16 693/25 695/12 697/11 698/16 699/8 700/1 709/12 724/22
surprised **[1]**  657/8
suspect **[4]**  638/15 638/15 646/7 646/17
suspend **[1]**  660/20
sustain **[1]**  694/21
swab **[4]**  671/2 703/6 705/11 711/19
swabs **[19]**  639/6 639/6 639/7 639/8 639/12 639/13 643/4 643/21 644/13 644/22 658/22 658/23 660/1 660/2 711/19 712/4 712/5 712/6 712/7
sworn **[3]**  634/21 710/13 714/1

**T**

table **[13]**  632/1 642/4 642/11 643/12 643/16 643/18 651/3 651/5 651/7 654/12 677/10 689/15 705/1
tables **[2]**  642/19 704/24
take **[17]**  651/23 673/10 673/13 677/9 677/10 685/8 687/4 692/18 694/25

**T**

take... [8] 697/14 704/18 717/19 722/7 722/12 722/12 723/8 724/8
taken [3] 655/22 673/14 718/9
taking [1] 700/18
talk [3] 680/5 685/1 726/2
talked [3] 677/21 684/8 701/18
talking [14] 650/2 653/23 654/25 654/25 659/24 661/7 661/8 661/24 661/25 663/24 665/1 698/1 703/1 721/2
tampering [1] 702/15
tape [2] 716/1 717/16
tapes [2] 717/11 717/12
target [1] 687/23
task [2] 634/5 634/12
Tavon [1] 674/10
tech [1] 681/9
technical [4] 637/8 638/6 676/4 683/11
technician [4] 635/18 675/25 676/1 680/13
technicians [1] 686/23
technology [4] 641/13 658/13 658/15 707/16
tell [15] 636/25 637/22 643/12 646/24 660/3 668/20 703/1 704/5 706/20 706/23 711/16 717/12 725/5 726/3 726/16
telling [1] 700/7
ten [1] 709/23
tend [2] 663/17 668/10
terms [7] 646/17 655/3 666/7 666/10 666/14 666/19 688/6
test [7] 638/7 639/11 639/23 640/25 656/2 677/1 684/24
tested [2] 639/12 640/15
testified [33] 634/22 636/13 645/17 645/24 646/20 648/22 649/4 652/8 654/4 655/9 655/21 656/1 656/10 661/3 661/16 662/22 663/6 665/18 670/15 670/22 678/8 678/12 678/17 680/19 680/23 681/23 683/2 683/22 692/12 693/12 710/14 714/2 719/23
testify [27] 638/10 650/1 650/15 652/5 655/16 663/16 664/5 665/24 677/16 678/14 680/15 682/1 682/6 692/19 695/1 697/18 699/10 711/3 724/5 724/9 724/11 724/12 724/14 724/18 724/18 724/24 724/25
testifying [8] 641/21 648/7 649/24 651/15 654/1 680/2 697/23 724/3
testimony [30] 638/21 640/21 647/25 648/5 649/13 650/7 650/19 650/20 650/22 650/25 652/3 653/12 678/11 678/21 678/24 681/8 688/12 692/23 693/20 698/6 699/6 701/1 715/11 719/13 719/17 720/3 720/8 721/4 721/11 727/5
testing [17] 639/3 639/20 639/21 639/24 640/5 641/4 647/14 648/2 665/10 666/23 669/4 669/4 676/24 679/12 684/21 686/20 702/3
Texas [2] 674/23 697/16
than [11] 653/19 660/3 660/7 667/3 681/15 689/14 690/22 703/4 706/15 716/9 720/16

thank [10] 697/20 701/6 709/14 710/9 713/24 715/8 716/18 717/2 725/3 725/3
that [718]
that's [88] 637/2 638/17 642/1 645/14 645/21 647/14 648/12 648/16 648/18 648/22 649/9 649/15 649/25 651/10 652/1 652/6 653/21 654/8 654/25 655/17 656/1 656/5 656/12 657/6 662/13 662/14 663/3 663/7 663/24 665/4 665/5 665/14 665/22 666/2 667/23 668/7 669/14 670/4 670/19 670/24 673/25 675/19 677/7 678/3 679/5 679/16 680/13 680/13 681/12 681/17 682/19 683/4 683/16 684/25 685/2 685/3 686/15 687/14 688/17 688/19 688/23 689/1 689/1 689/4 689/18 692/8 698/8 699/5 699/22 700/20 700/25 702/10 702/12 703/9 705/12 706/22 707/23 708/9 710/1 712/9 716/11 716/14 716/16 717/16 720/19 720/19 723/14 724/20
their [20] 639/20 642/9 660/4 660/8 666/10 668/15 669/13 676/6 677/4 681/19 685/5 686/6 686/18 687/18 691/9 691/17 703/4 704/10 704/11 704/14
them [38] 639/23 642/8 642/8 642/12 645/9 654/3 654/17 660/5 661/23 667/4 668/6 668/20 675/2 676/15 676/16 680/5 683/20 685/19 686/3 686/23 686/25 687/14 687/16 687/17 690/6 690/21 692/18 694/6 696/11 696/12 699/24 701/15 712/20 723/4 723/6 723/12 725/5 725/5
themselves [1] 677/16
then [76] 635/19 636/11 636/12 637/5 639/18 639/25 640/14 643/14 645/12 646/6 646/11 647/18 647/22 648/5 649/19 650/20 653/22 654/7 655/19 656/3 657/24 658/14 659/7 660/22 663/12 663/15 663/17 664/3 664/9 667/15 667/22 668/6 668/8 668/9 668/10 675/14 675/18 676/6 679/12 680/12 682/1 682/23 683/14 683/19 686/23 690/8 691/18 692/16 692/17 692/19 693/1 693/6 694/10 694/19 695/22 696/1 696/17 696/22 696/23 696/24 697/4 698/9 700/17 700/20 703/5 703/16 703/23 705/8 705/21 705/25 708/23 709/6 709/10 711/12 716/14 723/4
there [121]
there's [34] 637/6 639/16 640/10 642/6 646/24 658/11 660/3 660/6 679/2 679/6 679/8 684/9 684/22 688/17 690/16 690/20 690/21 693/4 694/1 694/12 694/14 695/16 705/21 706/10 706/14 706/21 719/12 720/9 721/16
thereabouts [1] 636/7
thereafter [1] 660/19
therefore [6] 653/11 654/3 672/13 692/21 694/14 718/15
Thereupon [12] 633/14 634/18 651/24 667/12 673/14 701/10 710/10 719/23

717/9 717/20 725/6 726/23
these [25] 653/14 666/8 666/19 666/22 677/13 678/18 680/4 680/17 680/24 683/17 683/20 686/15 687/22 688/22 688/23 689/18 692/15 692/19 693/18 698/24 699/12 700/13 701/12 707/10 710/8
they [111]
They'd [1] 700/12
they're [9] 656/2 675/24 679/10 682/9 684/8 684/10 698/25 699/15 699/25
they've [2] 702/2 702/2
thicket [1] 666/24
thing [10] 648/5 677/6 678/7 681/3 686/16 688/20 689/25 698/8 721/9 723/10
things [14] 651/16 656/17 656/18 657/16 662/16 675/6 675/22 676/3 684/7 685/8 687/24 690/24 698/12 700/12
think [59] 641/16 647/17 647/23 648/16 648/22 652/11 653/10 653/11 653/18 654/8 654/15 656/1 659/21 663/3 663/10 663/12 665/14 665/16 665/19 665/22 665/23 665/23 668/4 668/13 668/16 668/18 669/2 669/10 670/5 670/13 680/21 682/16 682/25 683/19 691/23 696/1 696/15 697/18 698/1 698/5 698/10 698/12 705/4 705/6 707/24 710/1 710/3 715/12 717/5 718/13 718/15 719/1 720/3 720/7 720/22 721/3 721/16 721/18 721/21
third [2] 685/14 711/12
this [212]
thoroughly [1] 679/22
those [51] 634/13 639/10 639/14 639/22 639/24 640/3 640/7 640/15 640/18 640/18 640/19 640/25 641/1 641/9 649/21 651/16 654/15 660/2 660/13 666/22 667/15 671/10 671/11 671/11 671/14 671/16 672/3 675/21 676/14 677/21 677/25 678/2 684/11 684/1 684/18 688/4 689/11 690/24 701/23 703/16 705/13 711/12 712/6 712/7 712/12 712/17 712/17 712/19 712/21 717/15 718/18
though [3] 647/21 649/9 653/13
thought [5] 649/12 650/4 650/11 668/15 720/17
thousand [1] 709/4
three [12] 633/10 634/9 635/12 635/14 635/17 635/19 635/20 684/6 685/10 700/4 703/20 718/20
through [18] 643/11 646/4 646/22 648/8 649/13 650/8 652/17 675/2 675/19 675/21 676/9 677/13 694/25 695/16 703/14 712/10 712/16 715/13
throughout [2] 684/15 702/16
throw [1] 675/14
tie [1] 648/12
tied [1] 683/9
time [37] 647/3 654/9 654/11 657/14 658/3 661/11 666/15 666/19 668/11 669/2 670/23 671/1 672/16 674/4 675/7 676/4 677/13 677/14 682/11 684/25 695/5 695/15 697/14 701/14

**T**

time... [13] 706/16 707/8 707/8 707/16
711/20 715/12 715/17 717/3 722/12
722/13 722/22 725/20 725/23
times [3] 636/16 636/17 650/3
timetable [1] 666/7
timing [1] 662/24
today [13] 637/16 637/18 640/23
641/21 661/4 661/11 661/16 717/5
722/21 722/23 723/4 723/9 725/17
together [7] 666/8 674/18 676/2
682/12 684/4 684/24 722/10
told [6] 641/5 661/4 671/6 677/3
700/23 724/8
took [7] 636/6 649/19 675/13 688/4
696/11 696/12 701/14
top [1] 668/21
totally [2] 655/18 726/7
touch [2] 676/24 703/5
touched [2] 674/19 674/25
touches [1] 703/6
touching [1] 720/1
towards [2] 660/18 707/25
track [1] 699/25
tracks [1] 700/1
train [1] 635/21
trained [2] 636/8 675/25
training [5] 635/25 636/6 636/10
707/20 707/21
transcribed [1] 727/9
transcript [7] 631/8 631/24 716/2
719/16 719/19 720/21 727/8
transcription [1] 631/24
transfer [2] 658/12 658/13
transference [1] 643/17
transferred [1] 658/15
travel [2] 690/6 718/2
traveling [1] 719/24
treating [1] 686/25
trial [7] 631/8 636/12 722/3 722/4
722/11 725/15 725/20
tricky [1] 695/18
tried [1] 643/16
true [3] 640/15 681/12 700/13
try [9] 643/15 665/13 674/1 684/7
703/18 703/23 706/18 722/17 726/5
trying [7] 656/25 657/1 665/16 689/25
691/10 700/16 722/19
tube [1] 675/14
tubes [1] 676/2
Tuesday [1] 692/18
turn [1] 726/13
two [26] 635/18 644/20 651/16 660/20
689/20 690/20 693/18 697/15 702/21
703/7 703/19 703/25 704/1 704/3
706/1 706/10 707/2 707/5 709/4
709/18 711/2 712/9 718/1 718/18
721/19 722/5
type [10] 635/23 653/14 654/16 659/16
662/5 686/14 690/14 701/12 707/25
726/4
types [1] 705/13

**U**

U.S [5] 631/20 658/12 673/23 680/3
692/2
uh [2] 665/13 665/13

uh-uh [1] 665/13
ultimate [1] 724/11
ultimately [9] 670/24 671/8 678/9
678/15 692/10 693/7 693/11 702/17
724/4
uncovered [1] 671/13
under [5] 643/21 644/22 661/25 693/2
693/14
undergo [1] 636/6
undergraduate [1] 636/2
undermine [5] 663/17 668/10 677/5
687/18 693/11
undermined [1] 687/13
understand [13] 646/3 651/17 656/25
664/8 670/13 670/18 673/24 674/3
683/5 691/6 700/21 716/6 724/19
understanding [9] 672/15 672/23
673/21 683/4 683/12 683/13 683/16
692/5 724/17
understood [4] 649/15 683/8 688/14
693/25
underwear [1] 639/9
undisputed [1] 634/16
unfair [1] 669/10
unit [2] 635/15 685/18
UNITED [29] 631/1 631/3 631/10
631/13 633/2 633/23 634/2 638/14
659/4 661/21 666/21 669/7 669/17
670/7 670/12 674/10 674/16 682/23
684/17 694/11 711/7 714/16 715/11
715/12 715/17 716/18 716/22 717/3
727/3
University [1] 674/23
unless [1] 701/2
unrelated [1] 655/19
unsuccessfully [1] 674/16
until [7] 675/24 682/22 687/24 692/18
696/10 696/12 725/10
up [39] 633/18 634/1 634/5 651/9
653/17 654/20 660/23 660/24 663/16
663/22 666/19 668/2 670/2 674/21
675/1 677/8 678/3 678/4 678/5 678/15
682/24 684/3 690/4 694/24 695/25
698/14 699/2 700/19 704/25 709/6
718/12 720/12 720/14 720/18 721/1
721/6 721/6 721/19 723/25
uploaded [1] 666/15
upon [14] 649/18 656/3 656/17 656/17
663/5 672/12 679/23 680/15 680/17
693/16 696/15 719/18 724/20 726/8
upward [3] 720/3 720/5 720/24
us [12] 636/25 637/22 641/5 643/12
653/17 658/13 669/14 704/14 710/20
711/16 714/8 723/4
use [4] 638/20 680/23 705/17 722/9
used [8] 634/7 636/25 642/18 657/10
678/9 678/16 691/9 699/1
using [6] 682/18 683/14 684/21 712/1
712/13 712/14
usually [1] 642/5
utilize [4] 660/6 704/11 704/13 705/15
utilizes [1] 637/3

**V**

vagina [5] 720/1 720/2 720/9 721/1
721/7
vaginal [11] 639/6 639/12 643/3

643/21 644/13 658/22 660/1 704/7
704/19 711/8 712/25
valid [1] 707/17
value [1] 664/17
variability [2] 662/13 662/17
versus [8] 633/3 635/17 638/14
674/10 706/8 711/7 712/12 714/16
vertical [1] 686/20
very [34] 633/10 634/14 638/23 642/5
653/9 656/20 662/16 674/24 674/25
675/25 676/4 678/3 678/20 679/10
686/8 686/9 687/14 687/17 688/6
688/23 690/19 693/25 694/21 701/9
706/18 715/16 715/19 715/22 716/20
716/24 717/8 720/8 722/5 725/3
via [1] 669/20
victim [15] 640/12 644/5 646/15 648/9
680/11 705/20 706/24 708/15 718/9
718/11 718/11 719/5 719/23 721/11
721/15
victim's [3] 705/2 708/19 719/10
video [1] 715/14
Videotape [3] 715/23 716/21 717/1
visualize [1] 706/19
voice [1] 715/10 720 714/8
vulva [5] 719/10 719/21 720/6 720/8
721/21

**W**

wait [1] 725/10
waiver [1] 677/11
WALTON [1] 631/9
want [40] 633/16 639/2 641/14 648/13
654/20 655/24 663/2 665/5 665/8
665/13 666/23 668/25 669/1 670/11
670/17 670/18 674/1 675/5 678/20
681/20 683/20 684/6 685/2 685/7
688/7 690/10 690/24 690/25 691/22
692/7 694/25 694/25 701/14 717/22
723/16 723/25 724/1 724/23 725/9
725/10
wanted [6] 659/5 665/20 676/16 686/7
686/8 693/24
wants [4] 664/9 665/6 673/10 701/2
was [296]
Washington [5] 631/5 631/14 631/17
631/21 710/24
wasn't [9] 664/12 664/12 666/10
667/20 670/9 671/15 672/3 682/22
687/5
watching [1] 636/8
way [14] 649/23 659/21 662/24 670/4
674/12 685/21 687/3 687/4 705/23
706/7 707/19 721/5 724/22 724/23
we [172]
we'd [4] 638/19 653/17 679/7 691/18
we'll [8] 633/5 656/20 665/3 667/15
717/19 723/18 725/4 726/22
we're [24] 633/8 637/18 654/25 654/25
657/20 664/4 674/17 676/24 676/24
676/25 679/11 683/10 690/8 691/2
701/18 703/15 703/16 705/20 705/20
705/21 708/6 710/2 722/6 725/16
we've [3] 653/18 670/2 722/13
wear [1] 637/10
week [1] 660/20
weekend [2] 726/19 726/22

**W**

**weigh [1]** 666/24

**well [50]** 634/14 636/12 637/9 638/7 638/23 639/8 647/16 648/2 650/8 650/11 651/10 651/20 652/11 653/3 654/19 655/21 656/6 656/20 657/21 664/11 670/6 675/16 682/5 683/8 686/9 687/22 690/15 690/18 691/25 692/15 694/21 695/23 698/10 699/3 699/18 701/9 712/4 713/3 713/13 715/16 715/19 715/22 716/20 716/24 717/8 720/7 722/1 722/5 724/21 725/3

**went [11]** 646/4 648/2 648/8 649/13 650/14 660/18 667/7 684/1 686/16 690/7 709/12

**were [98]**

**weren't [3]** 649/5 654/2 683/1

**what [215]**

**what's [10]** 635/16 637/20 663/24 680/16 684/20 696/15 699/21 700/10 716/14 719/14

**whatever [2]** 647/11 681/9

**when [65]** 639/16 640/6 641/8 642/2 645/21 645/25 646/10 646/20 650/5 651/5 653/18 657/24 659/23 660/4 660/13 666/9 666/21 667/6 668/2 669/22 675/10 675/19 676/5 680/2 680/7 681/4 682/9 684/10 684/11 685/1 685/8 685/9 685/23 687/16 687/22 697/23 699/16 700/15 702/8 702/8 702/23 703/1 703/3 703/11 704/8 704/13 704/22 705/15 705/19 706/2 706/17 708/19 708/23 709/12 709/16 712/19 715/1 718/12 718/13 719/25 720/14 720/18 721/18 722/17

**where [18]** 635/9 641/8 654/21 664/12 671/12 674/5 690/13 691/4 697/1 702/1 702/14 702/15 708/7 710/23 714/11 718/24 719/8 721/13

**whereof [1]** 727/10

**whether [20]** 645/18 646/9 648/20 650/9 652/2 670/14 672/25 672/25 676/17 676/18 692/6 692/7 692/23 693/20 709/18 719/18 724/5 724/11 724/12 724/13

**which [28]** 633/19 633/20 633/25 634/8 639/10 640/11 643/18 658/16 658/21 663/21 671/1 671/24 674/3 674/13 677/22 689/8 697/10 704/5 712/16 712/16 713/4 715/13 715/25 717/4 718/14 721/19 724/22 725/20

**while [2]** 675/21 726/2

**who [18]** 645/4 646/25 649/21 651/12 673/17 673/19 674/20 678/18 680/17 682/13 692/1 692/19 693/18 694/10 705/8 705/17 711/14 718/25

**who's [8]** 653/19 674/11 678/8 681/5 692/1 700/14 705/14 706/23

**whoever [1]** 685/19

**whole [3]** 687/12 690/19 700/22

**why [31]** 639/14 647/1 648/6 649/25 652/1 652/6 654/17 655/14 656/1 656/12 656/12 658/8 659/9 662/4 664/14 665/4 665/5 667/14 667/19 670/20 671/21 673/6 676/11 677/8 686/16 687/14 690/3 690/3 692/15 720/19 720/19

**why1 [1]** 649/25

**will [19]** 639/17 643/15 662/17 666/7 686/22 694/21 695/9 696/2 701/7 703/23 704/18 715/18 715/25 721/23 722/12 723/8 723/22 725/20 726/10

**willing [1]** 674/24

**wish [1]** 715/12

**within [8]** 639/5 657/15 658/20 662/18 671/23 677/14 688/21 719/25

**without [7]** 638/23 653/1 673/4 673/7 681/7 682/14 697/1

**witness [37]** 633/5 633/15 634/20 634/23 640/23 645/7 650/6 650/15 653/25 667/12 678/7 683/22 684/8 688/13 688/16 688/18 688/20 689/2 690/14 690/18 692/5 692/24 694/23 697/11 698/24 700/17 710/9 710/12 710/15 713/22 713/25 714/3 715/6 715/9 715/11 724/9 727/10

**witnesses [7]** 632/2 633/9 677/19 677/20 678/2 686/21 690/5

**won't [1]** 722/12

**wonder [1]** 699/3

**words [4]** 716/3 716/10 716/13 716/15

**work [65]** 635/9 635/10 635/21 635/23 637/2 647/9 655/25 661/3 662/21 663/19 665/17 665/20 668/11 674/6 675/7 675/10 675/12 675/23 676/11 676/12 676/14 677/2 677/4 677/6 679/3 679/7 679/18 681/21 681/21 681/24 684/10 684/15 685/15 685/18 686/23 687/2 687/5 687/11 687/19 688/11 688/18 691/7 691/9 691/15 691/17 691/20 692/4 692/12 692/12 692/21 693/5 693/10 694/18 696/8 696/9 696/21 697/13 699/16 701/20 708/24 710/23 710/24 711/11 714/11 714/12

**worked [7]** 635/11 656/11 672/23 700/22 712/20 714/13 715/1

**worker [2]** 681/9 694/8

**working [3]** 637/6 645/11 684/12

**worksheets [2]** 712/15 712/19

**world [4]** 674/12 684/16 684/17 691/19

**worthiness [1]** 696/20

**would [113]**

**wouldn't [11]** 652/5 656/22 669/25 676/15 676/20 680/9 682/5 701/1 707/19 712/14 722/20

**write [1]** 711/3

**Writeups [1]** 661/20

**written [6]** 636/11 662/23 677/1 716/4 716/5 716/17

**wrong [4]** 662/13 672/10 682/25 683/22

**wrote [4]** 658/6 684/11 684/13 684/14

**X**

**XX [1]** 706/5

**XY [1]** 706/6

**Y**

**Yeah [1]** 700/9

**year [3]** 660/25 681/5 682/22

**years [3]** 635/12 635/24 709/23

**yes [66]** 633/13 633/17 636/15 636/20 636/24 637/19 637/24 638/2 638/11 638/15 638/18 640/17 641/3 641/20 641/24 642/21 642/25 643/5 643/8 643/23 644/8 644/16 644/25 645/3 645/13 645/16 645/23 657/12 658/7 659/1 660/12 661/18 661/19 662/1 666/5 667/11 667/25 668/1 672/20 685/25 691/10 693/23 696/24 701/6 701/25 702/6 702/14 702/22 706/5 706/12 707/12 709/3 709/9 711/9 713/3 713/6 713/8 713/14 714/18 715/1 717/23 720/22 723/24 724/16 725/2

**yesterday [1]** 722/15

**yesterday's [1]** 715/15

**yet [2]** 666/13 685/14

**you [325]**

**you'll [1]** 726/20

**you're [30]** 636/22 646/18 647/10 648/24 650/18 653/25 655/15 657/2 664/22 665/1 665/14 665/15 667/17 673/6 676/22 678/17 679/3 682/2 685/24 687/24 689/24 691/14 700/17 700/17 704/22 707/22 715/25 716/15 724/25 726/2

**you've [16]** 633/25 641/5 641/16 661/3 661/8 661/11 661/16 662/21 667/17 678/13 678/13 697/5 700/4 702/9 709/16 709/17

**your [115]**

**yourself [1]** 726/2

**yourselves [1]** 726/3