**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 1:16-CR-00055-RBW** |
| | : | |
| **ROBERT KELSEY,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' OPPOSITION TO**
**DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO**
**VACATE, SET ASIDE OR CORRECT SENTENCE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant's *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Dkt. 106). As discussed in the United States' prior response in this matter (Dkt. 102), defendant's motion is untimely, and equitable tolling of the statute of limitations under 28 U.S.C. § 2255(f) is not warranted. The government now files this opposition to defendant's motion in response to the Court's order (Dkt. 105). Defendant's claims are procedurally barred because he could have raised them on direct appeal, and they conclusively lack merit. For the reasons herein, defendant's claims should be dismissed as untimely or summarily denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant picked up 11-year-old S.H. from her summer camp at the Kingsford Elementary School in Maryland, drove her to the house he shared with his father in Washington D.C., had sex with her in that house, and then returned her to camp later that same day. A jury convicted defendant of transporting a minor with intent to engage in criminal sexual activity, aggravated sexual abuse of a child, and first-degree child sexual abuse with aggravating circumstances.

### The Trial Evidence

1

The evidence at trial showed that S.H. had first come into contact with defendant earlier that summer through the photo-sharing internet application, known as Instagram, that she had on her cellphone (8/24/16:434,436,439-40).[1] Defendant requested to "follow" S.H. on Instagram, so that he could see her Instagram photos (8/24/16:440-42). S.H. accepted defendant's request, he accepted hers, and they shared access to each other's Instagram photos (8/24/16:440-42). Defendant then asked for S.H.'s username on Kik, another Internet application, and they began exchanging text messages over Kik (8/24/16:443-46).

Defendant and S.H. exchanged messages every day for a few days (8/24/16:448). Defendant lied to S.H. about himself, telling her that his name was "Kevin" and that he was 19 years old when he was in fact 26 years old. (8/24/16:447); Government's Trial Exhibit ("GX") 17, GX17(a)). S.H. told defendant her actual name and age (8/24/16:447-48). She also told him that she went to summer camp at the Kingsford Elementary School, which is located in Mitchellville, Maryland (8/23/16:330; 8/24/16:448).

Defendant and S.H. exchanged messages about sex (8/24/16:448). S.H. told defendant that she was a virgin, but that she wanted to have sex, and wanted to get pregnant (8/24/16:448-49). Defendant told S.H. that he could get her pregnant (8/24/16:450).

Defendant and S.H. also spoke with each other one time using a video-calling Internet application known as ooVoo (8/24/16:451,454). During their video call, defendant could see S.H. but she could not see him (8/24/16:454-55). Defendant asked S.H. to show her vagina to him, which she did (8/24/16:455).

Defendant and S.H. eventually exchanged messages over Kik about his coming to her camp and picking her up (8/24/16:458). The following morning, on July 25, 2014, defendant and S.H.

---

[1] References are to the trial transcripts "[date]:[page]."

exchanged messages about how he would be able to get past the camp staff and pick her up that day (8/24/16:458-59). S.H. told defendant to act like he was her cousin (8/24/16:461).

Later that morning, defendant called S.H. while she was at camp (8/24/16:464). S.H. went to the bathroom and called him back from inside a bathroom stall (8/24/16:465). Defendant told S.H. that he was there at her camp (8/24/16:465).

Defendant told a camp counselor, Sean Rowland, that he was S.H.'s cousin, and asked Rowland if he could pick her up (8/24/16:553,559). Rowland "called [S.H.] over . . . [and] asked [her] if she recognized [defendant]" (8/24/16:559). S.H. said "yes" (8/24/16:560). S.H. then got her things and left the camp in defendant's black Jeep (8/24/16:468-69,473,560). Defendant drove, and S.H. sat in the front passenger's seat (8/24/16:473-74).

Defendant told S.H. that they were going to his father's house in the District of Columbia (8/24/16:474-75). At stoplights along the way, defendant and S.H. kissed, and defendant "put his hand over [S.H.'s] vagina" (8/24/16:476). Defendant was first "[r]ubbing [S.H.'s] vagina" over her leggings (8/24/16:481). Defendant then placed his hand underneath her leggings and underwear and continued "rubbing" directly on S.H.'s vagina (8/24/16:481-82). Defendant also "pushed up" with his hand (8/24/16:482).[2]

After about 15-20 minutes of driving, defendant and S.H. arrived at the house (8/24/16:483). Defendant took S.H. into the house, up the stairs, and inside a bedroom on the second floor (8/24/16:487-90). Defendant then briefly left S.H. alone in the bedroom (8/24/16:491,493). Meanwhile, S.H. took her shoes off, put her purse on the floor, and lay down on an air mattress in the room (8/24/16:492).

---

[2] The Court granted defendant's motion for judgment of acquittal as to Count 4, which alleged digital penetration of S.H.'s vulva, after concluding that this testimony provided insufficient evidence of penetration (8/26/16:718-21).

Defendant returned to the bedroom, closed the door, removed his shorts and boxer shorts, and removed S.H.'s leggings and underwear (8/24/16:493). Defendant then kneeled on the air mattress in front of S.H., who was on her back, and put his penis slowly into her vagina (8/24/16:495-96). S.H. was in pain (8/24/16:495). Defendant told S.H. "it was going to be okay" and kept going (8/24/16:495-96). After "a while," defendant had S.H. switch positions and get on top of him (8/24/16:496). After having sex in that second position, defendant had S.H. switch positions again so that he was behind her and then he "put his penis in . . . [S.H.'s] vagina or [her] butt" (8/24/16:497-98). S.H. was not sure where defendant penetrated her from behind 8/24/16:498). S.H. said that it felt "different" than the frontal penetration, and she "couldn't take…that [third] position" (8/24/16:498-99).

Defendant and S.H. took a break and rubbed each other's genitalia (8/24/16:499). Defendant then had S.H. return to the first position and put his penis back inside of her vagina (8/24/16:500). They ultimately stopped having sex because of "[t]he time" (8/24/16:500). S.H. was not sure whether defendant ejaculated (8/24/16:500).

Defendant and S.H. got dressed and went downstairs (8/24/16:501). Defendant went to the back of the house and spoke with an older-sounding man, who S.H. thought was defendant's father (8/24/16:502). Defendant then drove S.H. back to her camp (8/24/16:503). Neither of them spoke during the drive back (8/24/16:504). Once S.H. got out of defendant's car, he drove off (8/24/16:513).

S.H.'s custodial father, Aaron Mason[3], was waiting for her at the camp (8/24/16:513). Mason directed the camp staff to call the police (8/24/16:514). When patrol officers from the

---

[3] S.H.'s biological mother had given Mason and his wife physical custody of S.H. when she was born (8/24/16:412-13).

Prince George's County Police Department ("PGPD") arrived at the camp, S.H. told them what had happened (8/23/16:353-54; 8/24/16:515).

S.H. was then taken to the police station, where she was interviewed by PGPD Investigator Nicholas Collins (8/23/16:354;8/24/16:516). S.H. gave Collins her cellphone and a description of defendant (8/23/16:356-57,361;8/24/16:516-17,521). S.H. described defendant as a black male, with light skin and tattoos all over his body (8/23/16:357).[4] She also described him as "possibly 19 to 20 years old and going by the name of Kevin" (8/23/16:357). Collins then drove with S.H. in a failed effort to locate the house where the sexual assault had occurred (8/23/16:357-59).[5]

Later that same day, S.H. was taken to the Prince George's County Hospital, where a sexual assault nurse, Arnita Shelton, examined S.H. and completed a sexual assault kit (8/23/16:215-20;8/24/16:521-22). Among other things, Shelton performed a vaginal swab exam and an anal swab exam on S.H. (8/23/16:220;8/24/16:523). During the examination, S.H. told Shelton that she had had "vaginal sex and . . . sex doggy style" with a person named "Kevin" (8/23/16:219-20).

On July 30, 2014, S.H. identified defendant as her assailant from a photo array that was administered using a double-blind procedure (8/23/16:379-80;8/24/16:526-27,592-602; GX20, GX22).[6] S.H. also made an in-court identification of defendant at trial (8/24/16:506). S.H. was "100 percent" certain of her identification of defendant (8/24/16:551-52).

S.H.'s identification of defendant as her assailant was corroborated by numerous items of

---

[4] In her second interview on July 30, 2014, S.H. told Collins that defendant had a tattoo on his ear (8/23/16:375-77).

[5] S.H. later identified the house, located at 512 21st Street, Northeast, Washington, D.C., from a photograph (8/23/16:339;8/24/16:510-11).

[6] A double-blind procedure is one in which the photo array is administered by a law enforcement officer with no knowledge of the case (8/23/16:379-80).

independent evidence: (1) defendant's cellular telephone records; (2) defendant's false exculpatory statements to law enforcement and civilian witnesses; and (3) the forensic evidence.

First, defendant's telephone records demonstrated contact between his cellphone and S.H.'s cellphone on the day of the offense. The parties stipulated to the authenticity of those records and the accuracy of a summary chart reflecting that contact (GX13a, GX14). Defendant's telephone records also listed his address as 512 21st Street, Northeast, Washington, D.C. (8/23/16:330-31).[7]

Second, soon after the offense, defendant made false exculpatory statements to law enforcement and a family friend. In those statements, defendant provided a false explanation for his contact with S.H., while falsely implicating another person – "Kevin" – in the sexual assault. "Kevin" was the same fake name defendant used with S.H.

On July 25, 2014, Investigator Collins called defendant's number using S.H.'s cellphone, which still had defendant's number in it (8/23/16:361-63). When defendant answered, he identified himself as "Robert" and said that Collins needed to speak with his cousin "Kevin" (8/23/16:366-67).[8] In calls later that day and the next day, defendant repeatedly told Collins that defendant would have "Kevin" get in contact with him (8/23/16:367-70).[9]

On July 30, 2014, Collins called defendant again, and they agreed to meet, because defendant said he had "some information" (8/23/16:370). Defendant told Collins over the phone that "he had picked up a girl from an address over in Bowie[, Maryland,] for his cousin Kevin and driven her to an area in Washington, D.C." (8/23/16:370). Collins saw defendant arrive at their

---

[7] In addition, defendant told the police that he lived there with his father (8/23/16:330-31; GX16b).

[8] In a later statement to the police, defendant identified "Kevin" as "Kevin Anderson" and called him "an acquaintance" (8/23/16:367; GX16b).

[9] Collins was never contacted by anyone named "Kevin" (8/23/16:370).

agreed-upon meeting location in a black Jeep Cherokee with a D.C. license plate (8/23/16:371). Defendant identified himself as "Robert Kelsey" and provided his driver's license (8/23/16:372). Collins and defendant then drove around looking for the area where defendant said he "dropped this girl off for his cousin" (8/23/16:373). They eventually ended up in the 1200 block of Orren Street, Northeast, Washington, D.C. (8/23/16:374). Defendant told Collins that he "dropped the girl off, and . . . came back and picked her up several hours later" from that location (DA427; 8/23/16:374).[10]

On August 1, 2014, defendant called Brendell Smith (8/24/16:582). Smith was a friend of defendant's family (8/24/16:570-73).[11] Smith was also friendly with S.H. and stayed in contact with her over Instagram (8/24/16:568-70).[12] Defendant told Smith that he needed to talk with her in person (8/24/16:582). Defendant went to Smith's house that same day and told her that he wanted to talk with her about "a girl" that she was friends with on Instagram (8/24/16:584). Smith understood defendant to be referring to S.H. (8/24/16:585).

Defendant told Smith that "his friend Kevin gave him $40 to go pick this girl up from what he thought was her summer job, but was her camp, and . . . he signed [the] girl out" (8/24/16:585). Defendant said that he was with "Kevin" and an unnamed female friend (8/24/16:585). Defendant told Smith that "he dropped [off] Kevin and the girl he signed out somewhere, and that he and his female friend went to a Chik-fil-A and then he picked Kevin and the girl up" (8/24/16:586). Defendant said that when he picked them up, the "girl didn't seem any different" (8/24/16:586). Defendant told Smith that he dropped the girl off at the camp and then went home (8/24/16:586).

---

[10] That location was approximately five blocks from the house at 512 21st Street, Northeast, Washington, D.C., where defendant lived with his father (8/23/16:330-31,333,338-39; 8/24/16:572,577).

[11] Defendant and Smith's son were cousins (8/24/16:571).

[12] Smith and S.H.'s biological mother were best friends (8/24/16:568).

While giving his account to Smith, defendant appeared "a little nervous, like he was . . . putting a story together . . . . Like he was trying to cover for himself." (8/24/16:586.)

On August 6, 2014, defendant gave a statement to Metropolitan Police Department ("MPD") Detective Nicholas Oliver at the MPD Fifth District police station (GX16a-c). Defendant told Oliver that on July 25, 2014, he "picked somebody up and dropped somebody off. That's all." (GX16b.) Defendant repeated his story that "Kevin" had him pick up a "girl" somewhere in Bowie, Maryland, drop her off to meet with "Kevin,"[13] and then return the "girl" to Maryland later that same day (GX16b). Defendant said that he drove his mother's "Cherokee" and that "Kevin" gave him "gas money" (GX16b). Defendant said that there was an unnamed female friend with him, while he waited for "the girl" (GX16b). Defendant said that "Kevin" gave him "the number" for "the girl" so that defendant could text her while he was waiting to pick her up in Maryland (GX16b).

Defendant told Detective Oliver that he had learned from Smith's son that Smith's "best friend['s] daughter just got raped" (GX16c). Defendant said that he had called Smith and asked to speak with her (GX16c). Defendant said that he "went over there" and told Smith that he had "been going through something that's been brewing . . . told her [about it] . . . and she was like oh my god that's . . . my best friend['s] daughter" (GX16c). Defendant said that he told "the detective [in Maryland] everything [he] told [Smith]" (GX16c).

Third, the forensic evidence further corroborated S.H.'s identification of defendant. Serology testing confirmed the presence of semen on numerous swabs from S.H.'s completed sexual assault kit, including the vaginal/cervical swabs and the anal/perianal swabs (8/23/16:249-

---

[13] Defendant told Oliver that he "showed the detective from Maryland" (i.e., Collins) where he brought "the girl" to meet with "Kevin" (GX16b).

65; GX4(b)). DNA testing was later performed on evidence samples taken from the vaginal/cervical swabs and the anal/perianal swabs and on known samples from S.H. and defendant[14] (8/23/16:300-08; 8/26/16:639-45; GX6(b)). The DNA testing and interpretation established the presence of DNA from S.H. and defendant in two evidence samples (one from the vaginal/cervical swabs and the other from the anal/perianal swabs).[15] A statistical analysis showed that the probability of randomly selecting an unrelated individual with the male component of the DNA profile tested (that is, someone other than defendant) was infinitesimally small. Using the African-American population group, the probability of a random match was 1 in 250 quadrillion for the first sample and 1 in 1.5 quadrillion for the second sample (8/23/16:306, 308; GX6(b)).

## **Procedural History**

On March 31, 2016, a grand jury returned an indictment charging defendant with transportation of a minor with intent to engage in criminal sexual activity (18 U.S.C. § 2423(a)) (Count 1), aggravated sexual abuse of a child (18 U.S.C. § 2241(c)) (Count 2), and first-degree child sexual abuse with aggravating circumstances (D.C. Code §§ 22-308, 3020(a)(a) (Counts 3 and 4). Following an evidentiary hearing, the Court denied defendant's suppression motions on August 2, 2016 (8/2/16:41-43,74-77). A jury trial commenced on August 22, 2016. The Court granted defendant's motion for judgment of acquittal as to Count 4 on August 26, 2016 (8/26/16:721). The jury rendered guilty verdicts on Counts 1-3 on August 29, 2016 (8/29/16:85-86).

---

[14] S.H.'s known sample was taken from an oral swab (also known as a buccal swab) used at the time of her sexual assault examination (8/23/16:223; 8/26/16:639). Defendant's known sample was taken from an oral swab, which FBI Special Agent Alicia McShane collected in the presence of defendant's counsel (8/23/16:344).

[15] These evidence samples were identified as Item 1A.2SF and Item 1BEF, respectively (8/23/16:304-08; GX6(b)).

On December 19, 2016, the Court sentenced defendant on Count 1 to 600 months' imprisonment with credit for time served, followed by lifetime supervised release, and a $100 special assessment; on Count 2 to 30 years' imprisonment with credit for time served, followed by lifetime supervised release, and a $100 special assessment; and on Count 3 to 260 months' imprisonment with credit for time served, followed by five years' supervised release, and a $100 special assessment; with all prison and supervised release terms to run concurrently (12/19/16:26-29). On December 19, 2016, defendant filed a timely notice of appeal (Dkt.49).

On appeal, defendant challenged the Court's denial of his motion to strike testimony about foundational facts related to DNA testing; (2) the Court's denial of his motion to suppress S.H.'s identification of him from a photo array; and (3) the Court denial of his motion to suppress statements he made to the police.  On March 8, 2019, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") affirmed. *United States v. Kelsey*, 917 F.3d 740 (D.C. Cir. 2019). On April 8, 2019, defendant filed a petition for rehearing and a petition for rehearing *en banc*. On May 14, 2019, the D.C. Circuit denied defendant's petitions. Defendant did not file a petition for writ of certiorari in the United States Supreme Court.

On or about July 12, 2020, defendant filed a *pro se* Motion for Extension of Deadline to file for Habeas Corpus Relief; it was docketed for filing on August 25, 2020 (Dkt. 94). In his motion, defendant stated that his former trial and appellate counsel failed to advise him of the timing for filing a motion pursuant to 28 U.S.C. § 2255 (Dkt. 94). Defendant also claimed that it took him over two years to get access to his trial file from counsel and that the federal institution where he is incarcerated had been on modified lockdown since March 31, 2020, and he had not been able to access the law library. At a hearing conducted on July 26, 2020, defendant withdrew his last two assertions.

On February 12, 2021, the Court ordered the government to address whether equitable tolling of the statute of limitations under 28 U.S.C. § 2255(f) was warranted (Dkt. 95). On September 24, 2021, the government filed its response to the Court's order, arguing that defendant had not presented facts sufficient to establish that the doctrine of equitable tolling applies to excuse the late filing of his § 2255 motion (Dkt. 102). On November 2, 2021, and February 7, 2022, defendant filed his reply (Dkt. 103, 104).[16]

On February 23, 2022, the Court issued an Order in which it stated that "[i]n order to fully assess the timeliness of any § 2255 motion filed by the defendant, the Court must review the grounds on which the defendant seeks relief." (Dkt. 105).  The Court then directed the defendant to file a copy of "his proposed motion pursuant to § 2255 motion" on or before April 25, 2022, and the Court also stated that it would "reserve its ruling on the timeliness of the defendant's [then] forthcoming motion." (Dkt. 105).[17]

On or about April 29, 2022, defendant filed the instant *pro se* motion under 28 U.S.C. § 2255 to vacate, set aside, or correct a sentence by a person in federal custody (Dkt. 106). The government now responds to defendant's motion.

## ARGUMENT

### I. Legal Standards

#### A. Section 2255

A defendant may move to vacate, set aside, or correct a sentence if the defendant believes the sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the

---

[16]  The pleadings appear to be the same, but one is typed (Dkt. 103) and one is handwritten (Dkt. 104).

[17]  The Court has not yet ruled on the timeliness of defendant's § 2255 motion.

maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. The relief contemplated by § 2255 "does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979). "Because of the premium placed on the finality of judgments, there are limited circumstances under which a court should grant a Section 2255 motion." *Bedewi v. United States*, 583 F. Supp. 2d 72, 76 (D.D.C. 2008) (internal quotation marks omitted).

A defendant bears the burden of demonstrating that he is entitled to relief under § 2255. *See, e.g.*, *United States v. Bell*, 65 F. Supp. 3d 229, 231 (D.D.C. 2014). It is "well-settled" that "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982); *see also United States v. Pollard*, 959 F.2d 1101, 1020 (D.C. Cir. 1992). A judgment challenged on collateral attack carries with it a "presumption of regularity," "even when the question is waiver of constitutional rights." *Daniels v. United States*, 532 U.S. 374, 381 (2001) (internal quotation marks omitted). A defendant may not raise a claim as part of a collateral attack if that claim could have been raised on direct appeal, unless he can demonstrate either: (1) "cause" for his failure to do so and "prejudice" as a result of the alleged violation, or (2) "actual innocence" of the crime of which he was convicted. *Bousley v. United States*, 523 U.S. 614, 622 (1997).

## B. To Prevail on an Ineffective-Assistance-of-Counsel Claim, Defendant Must Show Both Deficient Performance and Prejudice.

To prevail on an ineffective-assistance-of-counsel claim, a defendant must demonstrate that: (1) counsel's performance was deficient, and (2) counsel's deficient performance "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "'Surmounting [this] high bar is never an easy task.'" *United States v. Brinson-Scott*, 714 F.3d 616, 623 (D.C. Cir. 2014) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

To establish deficient performance, a defendant must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A defendant "must identify the acts or omissions of counsel" that were not the result of "reasonable professional judgment," and the Court "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

To show prejudice, a defendant must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* It is not enough for the defendant to show that the error had some conceivable effect on the outcome of the proceeding. *Id.* Rather, he must show that the result would have been different. *Id.* "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695. Ultimately, it is "very difficult for a convicted defendant to prevail on a claim of ineffective assistance of counsel." *United States v. Moore*, 703 F.3d 562, 574 (D.C. Cir. 2012).

Failure to make the required showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim. *See Strickland*, 466 U.S. at 700. Consequently, the reviewing court need not even "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697. "If it is easier to dispose of an effective assistance claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*; *see also Brinson-Scott*, 714 F.3d at 623.

## II. Defendant's Motion Should Be Dismissed as Untimely; In the Alternative, the Claims He Raises Should Be Summarily Denied.

Defendant's § 2255 motion is untimely and should be dismissed on this basis. Further, defendant's claims are procedurally barred because he could have raised them on direct appeal but failed to do so. In any event, each of the claims defendant raises in his motion conclusively lack merit and should be summarily denied. Defendant cannot demonstrate that his trial counsel was ineffective, and many of his claims are too vague or conclusory to warrant review, let alone relief.

### A. Defendant's Motion is Untimely.

Defendant's § 2255 motion is untimely, as it was filed well beyond the one-year limitation period of 28 U.S.C. § 2255(f). Defendant's petition for rehearing was denied on May 21, 2019. Defendant had 90 days from that date, or until on or about August 21, 2019, to file a petition for writ of certiorari in the Supreme Court of the United States. *See Clay v. United States*, 537 U.S. 522, 527 (2003) ("Finality attaches when [the Supreme] Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires."). Accordingly, defendant should have filed his § 2255 motion by on or about August 21, 2020. Instead, he filed a *pro se* Motion for Extension of Deadline to file for Habeas Corpus on or about July 12, 2020, and did not state any claims in the motion (Dkt. 94).[18] Defendant filed the instant § 2255 motion on April 29, 2022, nearly two years late. For the reasons discussed in the United States' prior response, defendant has not met his burden of showing that the doctrine of equitable tolling applies (Dkt. 102). Accordingly, defendant's motion should be summarily denied as untimely.

### B. Defendant's Claims are Procedurally Defaulted.

Defendant's allegations of trial counsel's ineffectiveness are procedurally defaulted because he failed to raise them on direct appeal even though he did or should have known about

---

[18]  As noted above, this motion remains pending.

them at that time. *See United States v. Weaver*, 281 F.3d 228 (D.C. Cir. 2002) (when trial counsel ineffectiveness claims are raised for the first time on appeal, "our general practice is to remand to the district court for an evidentiary hearing unless it is clear from the record that counsel was or was not ineffective, or that the supposed defect in representation amounted to a strategic choice by defense counsel") (citations omitted).  Because defendant did not raise his claims of trial counsel's ineffectiveness on direct appeal, the procedural default rule bars review of these claims unless he can demonstrate both cause and prejudice sufficient to overcome the default of his claims. *See Bousley*, 523 U.S. at 622 ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'") (citations omitted). Here, defendant alleges merely in passing that his direct appeal counsel did not consult with him about which issues to raise on appeal (Mot. at 9). This bare allegation is insufficient to show cause and prejudice to overcome the procedural default. *See United States v. Bowman*, 2018 WL 6308778, at *7 (D.D.C. Dec. 3, 2018) (claim that appellate counsel failed to raise claims was too conclusory and vague to demonstrate cause and prejudice), citing *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (to show "cause," a defendant must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim"); *Frady*, 456 U.S. at 170 (actual prejudice requires a defendant to show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."). Thus, defendant's claims should be dismissed as procedurally barred and unreviewable.[19]

---

[19]  The government notes that defendant's direct appeal counsel, Mary Davis, Esq., is married to his trial counsel, Christopher Davis, Esq. *See United States v. Scurry*, 992 F.3d 1060 (D.C. Cir. 2021) (per curiam) (appointment of Mary Davis in Section 2255 proceedings was not in the interest of justice under the Criminal Justice Act given conflict of interest based on her representation of defendant at trial). However,

**C. Defendant's Claim that Trial Counsel was Ineffective for Failing to Impeach the Government's Witnesses with Purported Inconsistencies in Evidence Conclusively Lacks Merit.**

Defendant's allegations of trial counsel's ineffectiveness are meritless. He first argues that trial counsel was ineffective because counsel failed to capitalize upon various alleged inconsistencies and inaccuracies in the testimony of the government's witnesses (Mot. at 13-17; "Ground One"). Specifically, defendant raises over 80 alleged inconsistencies in the evidence, cherry-picking from the record and citing trial testimony out of context. In essence, defendant argues that if trial counsel had elicited these inconsistencies through cross-examination, the government's theory of the case in specific areas would have been undermined, including: (1) whether the sexual assault took place within the District of Columbia (Mot. at 13, numbered examples 1-11); (2) whether the victim told her parents that she was sexually assaulted (Mot. at 13-14, numbered examples 12-20); (3) whether the sexual assault took place at defendant's father's house (Mot. at 14, numbered examples 21-35); (4) the nature of the victim's initial communications with defendant (Mot. at 14-16, numbered examples 36-59); and (5) whether the victim was ever sexually assaulted (Mot. at 16, numbered examples 60-83). Defendant's claim conclusively lacks merit. The trial record does not support defendant's purported inconsistencies, and, in any event, any additional impeachment of the government's witnesses would have been merely cumulative and would not have changed the outcome of defendant's trial. That is, defendant can neither show that his counsel's performance was deficient nor that he was prejudiced by trial counsel's method of cross-examination.

---

defendant does not raise any alleged conflict of interest as "cause" for overcoming the procedural bar, and even if this could constitute "cause" sufficient to overcome any bar, defendant cannot show sufficient prejudice.

As a threshold matter, defendant essentially argues that the jury improperly credited the witnesses' testimony despite the alleged inconsistencies he has identified. This claim—sounding in insufficiency of the evidence—is unreviewable. "Weighing trial evidence and making '[d]eterminations of credibility are for the jury.'" *United States v. Moore*, 651 F.3d 30, 59 (D.C. Cir. 2011), quoting *United States v. Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995) (citation and quotation marks omitted). Defendant cannot prevail on collateral review simply because he disagrees with the jury's credibility determinations.

Even when framed as an allegation of ineffective assistance of trial counsel for failing to impeach or cross-examine the witnesses, the record refutes defendant's claim. Trial counsel ably cross-examined the prosecution's witnesses, including the victim and law enforcement officers who investigated the case. For example, contrary to defendant's assertions, trial counsel extensively questioned the victim about whether she had told police that defendant had taken her to the District of Columbia and whether she knew she was there when the sexual assault took place (8/24/16:537-46). Trial counsel also questioned Investigator Collins about the victim's recollection of the location of the house where she was raped (8/23/16:386-88). Indeed, in his closing argument, counsel further underscored that the victim had not mentioned that the crime took place in the District of Columbia when the police first interviewed her (8/29/16:41-2). Trial counsel also attempted to elicit testimony that the victim was mistaken that the assault took place at his father's house because she did not hear any dogs barking when she was there (8/24/16:546-47), and he highlighted this point in his summation (8/29/16:45). Thus, trial counsel did in fact cross-examine the witnesses in several areas that defendant now alleges he was ineffective for failing to pursue.

17

Trial counsel cannot be deemed ineffective for declining to impeach the witnesses with each of the myriad minor alleged inconsistencies that defendant notes in his motion. Many of the purported inconsistencies that defendant identifies are merely portions of trial testimony taken out of context and therefore not inconsistencies at all. For instance, he notes that the victim testified on direct examination that she did not remember if defendant talked to her about sex (Mot. at 16, numbered examples 54-55). However, he tellingly omits that the victim later testified that defendant told her, "I can get you pregnant." (8/24/16:450). Further, counsel's decision to not cross-examine the witnesses on the basis of minor, collateral issues—*e.g.*, what the victim initially told her parents about the assault, whether she remembered defendant's username on the Kik application, or her recollection of how many times they spoke before the assault and whether they discussed his job during their conversation—was entirely reasonable.

Further, defendant's arguments fail, as they attack trial counsel's strategic decisions, such as whether and how to question a witness. "[S]trategic decisions . . . are [often] entitled to a 'strong presumption of reasonableness" because "[d]efense lawyers have both 'limited' time and resources and so must choose from among 'countless' strategic options." *Dunn v. Reeves*, 141 S.Ct. 2405, 2410 (2021) (quoting *Harrington v. Richter*, 562 U.S. 86, 104, 106-07 (2011) (internal quotation marks omitted); *see also United States v. Glover*, 153 F.3d 749, 758 (D.C. Cir. 1998) (declining to "second-guess trial counsel's strategy" in cross-examining the government's witness). The mere possibility that trial counsel could have made some additional, cumulative points when questioning the government's witnesses hardly demonstrates that trial counsel's tactics were "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *see also Henderson v. Norris*, 118 F.3d 1238, 1287 (8th Cir. 1997) ("There are a few, if any, cross-examinations that

could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past muster.").

Defendant further fails to establish any prejudice. As the D.C. Circuit observed, there was "overwhelming evidence identifying [defendant] as the perpetrator." *United States v. Kelsey*, 917 F.3d 740, 751 (D.C. Cir. 2019). The victim identified defendant from a photo array and credibly testified at trial that she was "100 percent" certain that defendant was her assailant (8/24/16:551-52). She "had plenty of opportunity to view [him], both on the drive to and from [defendant's] father's house itself, where the sexual assault occurred." *Kelsey*, 917 F.3d at 750. Ample evidence corroborated the victim's identification of defendant as the perpetrator. Telephone records demonstrated that defendant and the victim communicated via their cellphones on the day of the offense (GX13a, GX14). Defendant's telephone records also listed his address as 512 21st Street, Northeast, Washington, D.C., where the assault occurred (8/23/16:330-31). The victim also identified a photograph of defendant's house as the location where he assaulted her (8/23/16:339; 8/24/16:510-11; GX11B).

Defendant made false exculpatory statements to the police and Ms. Brendell Smith, further demonstrating his guilt. He claimed that he picked up a girl from her summer camp in Bowie, Maryland for his cousin Kevin and drove her to the 1200 block of Orren Street, Northeast, Washington, D.C., approximately five blocks from the house at 512 21st Street, Northeast, Washington, D.C., where he lived with his father (8/23/16:370-74; 8/24/16:585-86). Defendant also stated that he picked up the girl and drove her back to camp several hours later (8/23/16:374; 8/24/16:586). Thus, even by his own admissions, defendant transported the victim from her camp to an area close to his home in Washington, D.C.

Moreover, "[t]he DNA evidence . . . strongly supported that [defendant] was the perpetrator." *Kelsey*, 917 F.3d at 751. Testing and analysis confirmed that the male DNA taken from the victim's sexual assault kit matched defendant's DNA (8/23/16:306,308). Statistically, there was a 1 in 250 quadrillion chance for the first sample from the kit, and a 1.5 quadrillion chance for the second sample, that the DNA from belonged to an African American male other than defendant (8/23/16:306,308). Given this evidence, the record conclusively establishes that defendant cannot show that the verdict would have been different had counsel supplemented his thorough cross-examination of the witnesses by further impeaching them with any alleged immaterial or non-existent inconsistencies defendant identified in his motion. *See Strickland*, 466 U.S. at 694 (to show prejudice, defendant must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). *Id.* at 694. Thus, defendant cannot satisfy his burden of demonstrating *Strickland* prejudice.

Relatedly, defendant argues that trial counsel was ineffective for not effectively cross-examining Brendell Smith, a friend of his family, to demonstrate her bias against him (Mot. at 20-21; "Ground Four"). Specifically, defendant claims that Smith told a defense investigator that defendant had sent "sexual advances" to her daughter via Instagram and that he had sexual relations with other underage girls (Mot. at 20).

Trial counsel was not ineffective for declining to question Smith about any bias she may have had against defendant. Smith testified that defendant told her that he picked up a girl she knew via Instagram from summer camp for his friend Kevin (8/24/16:584-85). Defendant further told Smith that he dropped off Kevin and the girl, later picked them up, and then dropped the girl off at her camp (8/24/16:585-86). Trial counsel's decision to not question Smith about her alleged bias, based upon her knowledge of defendant's other sexual relations with young girls, was

20

eminently reasonable since any such cross-examination would have opened the door to a wide-ranging inquiry by the parties into defendant's other bad acts and would have been highly prejudicial to defendant in the eyes of the jury. Nor can defendant demonstrate that he was prejudiced by counsel's reasonable trial strategy. Smith's testimony about the story defendant told her was consistent with defendant's own statement to the police, *i.e.*, that he picked up a girl from her camp in Maryland drove her to Washington, D.C. for his friend Kevin (8/23/16:367-70,374).[20] In any event, as discussed above, the evidence of defendant's guilt was overwhelming, and defendant's proposed cross-examination of Smith would have only harmed his defense. For these reasons, defendant's claims that counsel was ineffective in cross-examining and impeaching witnesses is meritless. *See Strickland*, 466 U.S. at 700 (failure to make showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim).

### D. Defendant's Claim that Trial Counsel was Ineffective for Failing to Challenge the Chain of Custody of the DNA Evidence Conclusively Lacks Merit.

Defendant appears to challenge the chain of custody of the DNA samples and alleges that counsel was ineffective for failing to challenge the test results based on an allegedly deficient chain of custody (Mot. at 18, 21; "Ground Two"). Defendant's claim fails because there was no break in the chain of custody. Furthermore, trial counsel did in fact call into question the chain of custody through cross-examination and in his closing argument. Additionally, defendant cannot demonstrate that counsel's performance prejudiced him given that the evidence established the

---

[20] In his § 2255 motion, defendant appears to stand by his implausible statements that "Kevin" sexually assaulted the victim. *See* Mot. at 16 ("There is no evidence presented by [the] government that can label me as Kevin.").

chain of custody and, in any event, the government's case against defendant would have been compelling even without the DNA evidence.[21]

As an initial matter, the evidence readily established the chain of custody of the DNA evidence. Arnita Shelton, a sexual assault nurse at Prince George's Hospital, examined the victim after the assault and used a sexual assault kit to collect swabs from the victim's vagina and rectum (8/23/16:207, 220). She then put each swab in a sexual assault envelope and signed and sealed it (8/23/16:225-32). Elizabeth Copeland, a laboratory assistant at the Prince George's County Police Department, processed this evidence and conducted serological testing of the swabs for the presence of semen (8/23/16:242-46, 254-58). Daniel Curtis, a forensic scientist at the District of Columbia Department of Forensic Sciences ("DFS"), performed the laboratory work on the items of evidence and sent them to Shana Mills, a forensic scientist at DFS (8/25/16:635, 710-11). Ms. Mills processed the DNA samples and, based on the semen testing from the Prince George's County Police Department's laboratory, tested the kit for DNA and issued a report (8/25/16:635-641). Ms. Mills testified that the data was sent to Bode Technology, a private laboratory (8/25/16:641). Special Agent Alicia McShane, a special agent assigned to the FBI's Child Exploitation Task Force, used a DNA kit to collect a saliva sample from defendant and delivered it to Bode Technology (8/23/16:316-17, 343-44, 346). Kristiana Kuehnert, a forensic DNA case work analyst at Bode Technology, checked out the saliva card from Bode's evidence management section and separated the DNA from the rest of the sample (8/23/16:311-14). She then passed on the data to Hope Parker (8/23/16:315-16). Ms. Parker, a forensic scientist at Bode, analyzed the

---

[21] To the extent defendant raises a standalone challenge to the admissibility of the DNA evidence based on an alleged defect in the chain of custody, § 2255 is not the proper vehicle to raise this claim. An error which can be raised on appeal is not cognizable under § 2255 unless it is a constitutional violation or an error of law or fact of such "'fundamental character' that it renders the entire proceeding irregular and invalid." *United States v. Addonizio*, 442 U.S. 178, 178 (1979) (internal quotations omitted).

evidence and data provided to her from Ms. Kuehnert and DFS and determined that the DNA from the victim's sexual assault kit belonged to defendant (8/23/16:302-06).

Trial counsel reasonably did not object to the admission of the DNA evidence because the prosecution established an adequate chain of custody. Defects in the chain of custody go to the weight the jury might afford the evidence rather than its admissibility. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009) ("gaps in the chain of custody of evidence normally go to the weight of the evidence rather than its admissibility" and "[i]t is up to the prosecution not decide what steps in the chain of custody are so crucial as to require evidence."). Defendant does not allege—nor is there any suggestion in the record—that the DNA evidence was mishandled, mislabeled, or contaminated in any way. Moreover, in its position as the gatekeeper of scientific evidence, the Court did not have reason to *sua sponte* exclude the evidence based on any gap in the chain of custody. Thus, there was no basis to object the admission of the DNA evidence.

Here, trial counsel pursued the reasonable strategy of challenging the weight of the evidence based on the chain of custody through cross-examination and in his summation. For example, trial counsel questioned Ms. Copeland on whether she knew where the swabs from the sexual assault kit came from (8/23/16:270) and Ms. Mills on whether she personally sent the raw data she processed to Bode Technology (8/26/16:709). Trial counsel also attempted to cast doubt on the chain of custody and the reliability of the DNA evidence in his closing argument by noting that Ms. Mills was on maternity leave when the data was turned over to Bode (8/29/16:33-36). Accordingly, the manner in which trial counsel strategically chose to challenge the DNA evidence was reasonable. *See United States v. Catlett*, 97 F.3d 565, 570 (D.C. Cir. 1996) ("strategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable") (quoting *Strickland*, 466 U.S. at 690).

Defendant also cannot demonstrate *Strickland* prejudice. As discussed above, the chain of custody was intact. Even if trial counsel had objected to the admission of the DNA evidence, there was no basis for the Court to exclude it. Defendant alleges that the prosecution failed to prove who precisely sent the DNA samples to Bode (Def. Mot. at 18). However, the government's witnesses testified that the data and swabs of evidence were secure, properly sealed in collection containers, and labeled and identified with information from this case. *See, e.g.*, 8/23/16:224-27, 232, 265, 343; 8/26/16:636-67. Given the controls in place, defendant's suggestion that the integrity of the DNA evidence was somehow undermined is refuted by the record.

And even assuming *arguendo* that the DNA evidence had been excluded, there was still substantial evidence implicating defendant. The victim credibly testified that she communicated with defendant over various social media applications, showed him her vagina via video chat, and communicated with him on her cellphone on the day of the assault. She also testified that defendant picked her up from her summer camp, drove her to his father's house in Washington, D.C., and sexually assaulted her there. The victim also definitively identified defendant as the perpetrator. Cellphone records corroborated that the victim and defendant communicated with each other on the day of the offense. Defendant's false exculpatory statements further implicated him, as he acknowledged that he picked up the victim from her camp and drove her to the District of Columbia within blocks of where the assault occurred. Accordingly, defendant cannot demonstrate that it was reasonably probable that the result of his trial would have been different even if the DNA evidence had been excluded. *See Strickland*, 466 U.S. at 694 (prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different); *Harrington v. Richter*, 562 U.S. 86, 112 (2011) ("The likelihood of a different result must be substantial, not just conceivable.").

**E.  Defendant's Claim that Trial Counsel was Ineffective for Advising Him to Waive His Right to a Speedy Trial Conclusively Lacks Merit.**

Defendant next argues that trial counsel was ineffective for permitting him to waive his constitutional right to a speedy trial (Mot. at 19, 21; "Ground Three"). This claim is meritless. Trial counsel reasonably requested a continuance so that trial counsel would have sufficient time to prepare for trial, and, in any event, there was no undue delay in bringing this case to trial sufficient to violate the Sixth Amendment. Indeed, defendant also cannot demonstrate that he was prejudiced by trial counsel's actions, as any delay in bringing the case to trial only benefited his defense, and there is no indication that the ultimate outcome of the proceeding would have been any different.[22]

At a status hearing on April 18, 2016, trial counsel informed the Court that he was appointed as replacement counsel for defendant (4/18/16:2).[23] He further explained that since defendant's arrest, defendant had rejected a plea offer from the government and had been indicted (4/18/16:2). Trial counsel also informed the Court that he anticipated defendant's speedy trial date to run on June 9, 2016, and he expected to file a motion to suppress prior to that date (4/18/16:2, 6-7). Before scheduling a trial date, the Court colloquied defendant on the requested continuance and his right to a speedy trial:

> The Court: Mr. Kelsey, you do have a right to a speedy trial both under the
> Constitution and by statute, and pursuant to the statute from what I'm being told

---

[22]  To the extent defendant raises an independent claim that his constitutional right to a speedy trial was violated, that claim is procedurally defaulted. *Murray v. Carrier*, 477 U.S. 478, 485 (1986).  Defendant can only raise this claim pursuant to § 2255 if he can show cause and prejudice for the procedural default. *See Bousley*, 523 U.S. at 622 (1998); *United States v. Perkins*, 161 F.3d 66, 71 (D.C. Cir. 1998) ("where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate cause and actual prejudice") (quoting *Bousley*, 523 U.S. at 622). Because defendant has failed to demonstrate cause and prejudice, any underlying speedy trial claim is unreviewable here.

[23]  Trial counsel, Christopher Davis, Esq., entered his appearance in this case on November 19, 2015, after defendant made an oral motion before the court to appoint new counsel (Dkt. 5).

you have a right to have your case go to trial by June 9th. If the case did not go to trial by that date then your lawyer could request that these charges be dismissed on the grounds that you were not given your right to a speedy trial. Do you understand that?

The Defendant: Yes.

The Court: Your lawyer says he's discussed this issue with you and that you are willing to waive or give up your right to a speedy trial until July 29th, when we would actually start the trial.

The Defendant: Yes.

The Court: Are you sure?

The Defendant: Yes.

The Court: Is it because of counsel's need to have that additional time to adequately prepare for trial?

The Defendant: Yes.

The Court: Is that your position counsel?

Mr. Davis: That is, your Honor.

The Court: And you agree with that?

The Defendant: Yes.

(4/18/16:10-11). The Court then "conclude[d] that it is in the interest of both the government and the defendant to permit the defendant to waive his right to a speedy trial so that his counsel, his new counsel having taken over from the Federal Defender, will have adequate time to adequately prepare his case for trial" (4/18/16:11-12).

Defendant cannot demonstrate that counsel's performance was deficient. Counsel reasonably sought a continuance to prepare for trial as newly appointed counsel. Indeed, when defendant to the continuance, trial counsel clearly indicated that he was diligently preparing for trial and intended to litigate a motion to suppress the evidence (4/18/16:7-8). It was entirely

reasonable for trial counsel to advise defendant to waive his speedy trial rights to enable counsel sufficient time to better prepare a defense of this case, particularly since he had entered his appearance just five months before this status hearing. Trial counsel's performance hardly fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *see also Thomas v. United States*, 737 F.3d 1202, 1206, 1209 (8th Cir. 2013) (decision whether to move to dismiss for speedy trial violation is tactical decision of trial strategy). Defendant cannot claim that counsel was ineffective where defendant's waiver of his speedy trial rights only favored his defense, and defendant willingly consented to it on the record. *See United States v. Lattany*, 982 F.2d 866, 881 (3d Cir. 1992) ("Defendants cannot be wholly free to abuse the system by requesting . . . continuances and then argue that their convictions should be vacated because the continuance they acquiesced in were granted.").

Defendant also cannot show that he was prejudiced by relying on counsel's recommendation and waiving his speedy trial rights. Even if trial counsel had preserved and pursued a speedy trial claim, defendant could not demonstrate that the government denied him a speedy trial. The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial and public trial." U.S. Cost. Amend. VI. The Supreme Court has recognized that the constitutional right to a speedy trial permits some delays depending on the circumstances of each case, and cannot "be quantified into a specified number of days or months." *Barker v. Wingo*, 407 U.S. 514, 521-23 (1972). Defendant was arrested on May 4, 2015, and trial commenced 15 months later on August 22, 2016. Although a delay approaching one year is "presumptively prejudicial," *Doggett v. United States*, 505 U.S. 647, 651-52 & n.1 (1992), even "longer delays have been deemed constitutionally acceptable." *United States v. Taplet*, 776 F.3d 875, 881 (D.C. Cir. 2015), citing *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 202-03

(D.C. Cir. 2013) (finding no violation in case where delay was "three-and-a-half years"). *See Barker*, 400 U.S. at 533-34 ("extraordinary" five-year delay suggests prejudice); *Doggett*, 505 U.S. at 652 (eight-year delay).

Furthermore, regardless of defense counsel's conduct, defendant cannot show that he would have prevailed under the multi-factor balancing test for reviewing constitutional speedy trial claims, which includes weighing the length of delay, reasons for the delay, the extent to which the defendant pressed his right in the trial court, and prejudice resulting from the delay. *See Barker*, 407 U.S. at 530 (employing multi-factor test to review speedy trial claims). Here, the delay was not severe and was due in part to defendant's own pretrial motions, joint continuances, the guilty plea negotiations. *See, e.g.*, 8/6/15 Minute Entry ("The parties are in ongoing plea negotiations."); 11/18/2015 Minute Entry ("Oral Motion by Defendant to Appoint New Counsel"); 1/8/16 Minute Entry ("Joint Oral Motion by USA and Defendant Robert Kelsey to Continue the status Hearing"); Dkts. 14-15 (Motions to Suppress Identification and Statements). Nor did the delay impair defendant's defense; rather, he benefited from the delay so that his counsel could adequately prepare for trial. Thus, there was no undue delay, and the length of the delay was far less than the 11-year delay that did not violate the constitution in *United States v. Tchibassa*, 452 F.3d 918, 921 (D.C. Cir. 2006), for example. Thus, defendant cannot show *Strickland* prejudice: that the ultimate outcome of the proceeding would have been any different.[24]

---

[24]  It appears as though defendant alleges that trial counsel was ineffective for advising him to waive his constitutional right to a speedy trial. *See* Mot. at 19 (captioning the claim as "Constitutional Right to Speedy Trial"). However, even if defendant intended to argue that trial counsel was ineffective for advising him to waive his rights under the Speedy Trial Act, 18 U.S.C. § 3161, this claim would also fail because no violation of the statute occurred. The statute generally requires that a trial begin within 70 days of the defendant's initial appearance, on penalty of dismissal of the indictment. 18 U.S.C. §§ 3161(c)(1), 3162(a)(2). However, delay is excludable if it results "from a continuance granted by any judge . . . if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. 18 U.S.C. §§ 3161(h)(7). Indeed, the granting of a continuance to ensure effective assistance of counsel is a specifically enumerated

### F.  Defendant's Remaining Claims are Vague and Conclusory.

Defendant raises additional, single-sentence claims in his motion. *See* Mot. at 21 (*e.g.*, alleging that trial counsel failed to conduct a reasonable investigation, call "critical witnesses" on his behalf, present "favorable evidence" on his behalf, review *Brady*[25] material with him). The Court should summarily deny these claims because they are vague and conclusory to the point of being unintelligible. *See United States v. Taylor*, 139 F.3d 924, 933 (D.C. Cir. 1988) (stating that "some claims of ineffective assistance of counsel can be resolved on the basis of the trial transcripts and pleadings alone" and noting that "the motion may fail to allege facts or circumstances upon which the elements of constitutionally deficient performance might properly be found") (internal quotation marks and citation omitted); *United States v. Smith*, 172 F.3d 922, 1998 WL 939501, *2 (D.C. Cir. Dec. 14, 1998) (upholding summary denial of § 2255 claims because the claims were conclusory and lacked "any factual predicate"); *see also United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (noting that although defendant's *pro se a*llegations must be liberally construed, court is "not required to fashion Defendant's arguments for him where his allegations are merely conclusory in nature and without supporting factual averments.").

### G.  No Hearing is Required to Deny These Claims.

Defendant's claims should be summarily denied without a hearing. "A judge need not conduct an evidentiary hearing before denying a petition for relief under § 2255 when 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"

---

factor in the Speedy Trial Act that a judge may consider. *See* 18 U.S.C. § 3161(h)(8)(B)(iv) (allowing a continuance if the 70-day limitation "would deny counsel for the defendant . . . the reasonable time necessary for effective preparation, taking into account the exercise of due diligence"). "With no Speedy Trial act violation, [defendant] can make no case for ineffective assistance of counsel." *United States v. Harris*, 491 F.3d 440, 445 (D.C. Cir. 2007).

[25] *Brady v. Maryland*, 373 U.S. 83 (1963).

*United States v. Morrison*, 98 F.3d 619, 625 (D.C. Cir. 1996) (quoting 28 U.S.C. § 2255). Moreover, "even if the files and records of the case do not clearly rebut the allegations of the prisoner, no hearing is required where his claims are 'vague, conclusory, or palpably incredible.'" *United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992) (quoting *Machibroada v. United States*, 368 U.S. 487, 495 (1962)). Here, as is evident from the discussion supra, each of defendant's claims is either vague or conclusory or conclusively lacks merit and therefore should be summarily denied.

## CONCLUSION

For the reasons discussed above, as well as those discussed in the government's response on the timeliness of defendant's motion (Dkt. 102), the Court should dismiss defendant's *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence as untimely or, in the alternative, summarily deny the claims therein.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

PETER S. SMITH
Assistant United States Attorney
Chief, Special Proceedings Division
D.C. Bar No. 465131

_____/s/_____

SIMRAN DHILLON
Assistant United States Attorney
Special Proceedings Division
PA Bar No. 312390
601 D Street NW
Washington, D.C.
Simran.Dhillon@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 3, 2023, I caused a copy of the foregoing to be mailed to:

Robert Kelsey
Fed. Reg. # 40374-007
USP TUCSON
U.S. PENITENTIARY
P.O. BOX 24550
TUCSON, AZ  85734

_____/s/_____

Simran Dhillon
Assistant United States Attorney
